UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| JOHN J. JERUE,<br>On Behalf of Himself and all Others Similarly Situated,<br><br>        Plaintiffs,<br><br>v.<br><br>DRUMMOND COMPANY, INC.,<br><br>        Defendant. | Civil Action No.<br><br>8:17cv 587 T 17 AEP |

## PLAINTIFFS' ORIGINAL CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiffs, by and through their undersigned attorneys, Lilly O'Toole & Brown L.L.P., The Lanier Law Firm, Girardi | Keese PC, Nidel & Nace, PLLC, and German Rubenstein LLP, bring this civil action on his/their own behalf and on behalf of the classes they represent to obtain damages, both compensatory and punitive, injunctive relief, and costs of suit from the named Defendant, and complain and allege, as follows:

## INTRODUCTION

1.  This is a civil action to secure redress from DRUMMOND COMPANY, INC. ("Drummond" or "Defendant") for damages suffered by members of the putative classes defined below (the "Class Members") as a result of the contamination of their property by the phosphate mining and reclamation activities of Drummond and its real estate division, which subsequently developed the reclaimed land into residential properties and sold it to Class Members without warning the Class Members of, or disclosing, the hazardous radiation and substances it knew emanated from the contaminated property.

1

2. Plaintiff and Class Members have been exposed to hazardous substances, including radon and gamma radiation, released as a result of Drummond's conduct in phosphate mining operations and its reclamation and development of the former mining lands, including for the use as residential real estate, using phosphate mining and processing fill materials generated as a result of such mining operations.

3. Drummond, along with other members of the phosphate industry, has repeatedly assured the public that the presence of mining wastes did not present a health risk and nothing to the contrary was provided by Drummond, or by anyone else, to the Class Members.

4. These assurances to the public have been, and continue to be, echoed by local health and environmental regulators.

5. Despite these assurances, the abundance of radiation and hazardous substances on these properties presents a significant health risk to those living in, on, and around these properties.

7. As a result of the assurances from Drummond and health and environmental regulators, plaintiff and members of the public had no reason to believe that the land they live on presents a significant health risk

8. In unreleased internal agency documents, government scientists have noted with significant concern that the use of phosphate mining slag as fill material had created elevated concentrations of a decay products of uranium, including radium-226, in the Class Area's soil.

9. Radium and other radionuclides found in the Class Area's soil produce gamma radiation that can penetrate the body and increase the risk for a variety of cancers. The half-life of radium-226 is approximately 1600 years.

2

10. These forms of ionizing radiation are recognized as being human carcinogens by every major human health and regulatory body including the EPA and IARC, the International Agency for Research on Cancer.

11. Inhaling or ingesting uranium byproducts can increase the risk of numerous cancers, including but not limited to, leukemia, lymphoma and bone and thyroid cancer.

12. In addition, the decay of radium creates radon, an odorless, radioactive gas that can increase the risk of lung cancer by seeping into Class Area's homes and polluting both indoor and outdoor air.

13. While health threats from radon are typically associated with buildup in homes on top of uranium-rich lands, due to the extensive radionuclide contamination in and around the Class Area's properties, radon gas is likely a health threat in the outdoor environment as well, where no reinforced slab or ventilation systems can effectively mitigate.

14. According to the EPA, there is no "safe" level of radon exposure. Congress passed legislation in 1988 setting a goal of reducing indoor radon levels to between 0.2 and 0.7 picocuries per liter.

15. According to the EPA, one in 43 people would be expected to die of cancer from a lifetime of radon exposure at the 4 picocurie per liter level. The average level of radon in US homes is about 1.25 picocuries per liter.

16. Gamma radiation creates a constant threat, and while structures such as concrete foundations may degrade or decrease exposure levels within a structure, the outdoor levels are unmitigated resulting in unacceptable exposures to residents and children recreating in and around property in the Class Area.

17.     Drummond, a company experienced in mining activities, was, or should have been familiar with the risks posed by mining wastes and disturbed phosphate lands.

18.     Despite its knowledge of the radioactive threat posed by mining wastes, Drummond disposed of radioactive mining wastes and "reclaimed" the mined lands that ultimately formed various residential developments, including Oakbridge and Grasslands.

19.     Poseidon Mines, which was purchased (and subsequently operated) by Drummond in 1978, engaged in strip mining activities on these lands evident from aerial photos of the lands which now form Oakbridge and Grasslands as shown below:



20.     Despite knowledge of the risks posed by their activities, Drummond sought to utilize its mining wastelands in one of its highest value uses, residential real estate development—also known to be the most threatening use of toxic wastelands with respect to human health.

21.     Although Drummond took minimal efforts to characterize the radioactive nature of these lands, and despite not having fully characterized the extent of contamination at the property, Drummond knew, as early as October of 1978, that the radiation levels on the

4

properties that would form portions of these developments were on average 2 to 3 times background radiation levels and as high as 5 times background levels.

22.     Despite its knowledge of the likelihood of radiation and the health and property risks posed by the radiation on this land, and its actual knowledge of elevated radiation levels on this land from the use of phosphate mining slag as fill material in the Class Area, Drummond did not inform any of the purchasers of homes built on top of the formerly mined land, including the Class Members, of the radiation and the health and property risks posed by the radiation.

23.     Drummond never informed Plaintiff or Class Members about the presence of, or specialized health risks posed by, the radiation levels on and around their properties due to its unique history and the nature of historical activities on the property, including, but not limited to its use of phosphate mining slag as fill material in the Class Area.

24.     To this day, Drummond continues to develop and sell real estate for residential uses and continues to fail to disclose the elevated levels of radiation known to be inherent in its property or the health risks associated therewith.

25.     Drummond's mining, disposal, and "reclamation" of these lands has created an ongoing presence of mining waste and related contamination that has impacted Plaintiff, the Class Members and the Class Area properties and deprives Plaintiff and the Class Members of their free use and enjoyment of their property. The impact of Drummond's disposal of, and/or failure to properly remediate such mining waste, impacts the Class Members and the property in Class Area (as defined below).

26.     The presence of elevated levels of radiation products has posed, poses, and will continue to pose a significant health threat to the resident Class Members and to those within the Class Area.

5

## PARTIES

### Plaintiff(s)

27.     Plaintiffs own, reside or have resided on, property located in the Class Area.

28.     Plaintiff John J. Jerue is a resident of the Oakbridge community, Polk County, Florida.  Plaintiff John J. Jerue owns the property located within the Class Area at 805 Summerfield Drive, Lakeland, Florida.  Plaintiff John J. Jerue is a putative class representative for the Drummond Property Damage Class and for the Medical Monitoring Class.

29.     As a result of Drummond's actions, mining waste and radioactive substances have entered onto Plaintiff John J. Jerue's property and the Class Members' properties and have contaminated their property, air, land, groundwater, dwelling and surrounding environment, thereby causing John J. Jerue and the Class Members to suffer damage to property and personal finance, loss of the use and enjoyment of property and destruction of their community.

30.     As a result of the actions of Drummond, mining waste and radioactive and hazardous substances at and from Drummond's mining, reclamation, rehabilitation and development operations has entered onto John J. Jerue and the Class Members' person, property, air, land, and dwelling, thereby causing them an increased and significant risk to their health necessitating medical monitoring.

### Defendant

31.     DRUMMOND COMPANY, INC. ("Drummond") is an Alabama Corporation with its principal place of business in Vestavia Hills, Alabama.

32.     In or around 1978, Drummond purchased the Poseidon Mining Company along with more than 1400-acres of mining lands in Polk County, Florida.

6

33.     Drummond initially operated Poseidon as a wholly owned subsidiary, Poseidon Mines, Inc., but in or around March 31, 1984, Drummond merged with Poseidon.

34.     At all relevant times hereto, Drummond was authorized to do business, routinely did substantial business, and owned property in the State of Florida.

35.     Drummond, its predecessors, or wholly owned subsidiaries, mined, disposed of wastes, and "reclaimed" the land that became known as the Oakbridge and Grasslands developments in Polk County, Florida.

36.     At all times relevant hereto, Drummond was involved in the mining and processing of phosphate, phosphate products, reclamation of phosphate mines, and real estate development in the State of Florida.

## JURISDICTION AND VENUE

37.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiffs and Drummond are citizens of different states and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

38.     This Court has personal jurisdiction over Drummond because this suit arises out of Drummond's contacts with this judicial district and because Drummond has had continuous and systematic contacts with this judicial district. Drummond is deemed to reside in this judicial district because its contacts are sufficient to subject it to personal jurisdiction here. Drummond may be served with process by delivering a copy of the Summons and Complaint to its registered agent, CT Corporation System, at its registered office, 1200 S. Pine Island Road, Plantation, Florida 33324.

39.     Venue is appropriate in the Middle District of Florida because the acts which give rise to this Complaint occurred and continue within the District and a substantial part of property that is the subject of this action is situated in this District.

## FACTUAL ALLEGATIONS

40.     Plaintiff and the Class Members have incurred damages as a result of the contamination of their property by the phosphate mining and reclamation activities of the prior owner of land, Drummond and its real estate division, which subsequently developed the reclaimed land into residential properties and sold it to homebuyers, despite knowing that the reclaimed land under the homes is contaminated with hazardous substances and radioactive materials that expose Plaintiffs and other residents to cancer-causing radiation well in excess of acceptable limits set by the EPA.

41.     These hazardous waste materials released radioactive matter that scattered so that persons and properties in the Class Area were and are exposed to hazardous substances. Plaintiffs, the Class Members and the Class Area properties have been contaminated with hazardous substances, including alpha, gamma and other forms of radiation.

42.     The waste materials have been and continue to be a source of hazardous substance emissions onto and within the surrounding properties and persons in the class areas.  The waste contains, and has continuously released into the class areas, a variety of radioactive substances.

**Background of Drummond's Phosphate Mining in Florida**

43.     Seventy-five percent of the nation's phosphate supply and about 25-percent of the world supply comes from the state of Florida. Mining companies, including Drummond, mined land in Polk County to recover phosphate ore, which is rich in radioactive elements, including,

but not limited to uranium and its daughter products, including, but not limited to, radium 226, which has a half-life of 1600 years.

44.     Phosphate is removed from the ground and, after removal of the phosphate ore, the remaining slag is enriched in the radioactive elements, thereby enhancing or concentrating the radioactivity of the waste material.

45.     Mining companies, including Drummond, then used the slag waste material to "rehabilitate" the mined lands, filling in the mines with the highly radioactive material.

46.     After such "rehabilitation," real-estate developers, including Drummond (through its real-estate division) built communities on top of such contaminated/reclaimed land. In many of these developments, including Oakbridge and Grasslands, radioactive materials, radiation, and radioactive gases, including, but not limited to, radon and gamma radiation, permeate the ground surface increasing exposures to those people living or recreating on the land.

47.     Drummond first came to Polk County in 1978 and purchased the Poseidon Mining Company along with more than 1,400-acres of previously mined land in the southwest part of Lakeland.

48.     In 1982, the Drummond Company Board of Directors decided to cease their mining operations and pursue a plan to reclaim and develop the 1,400-acres into what is known today as Oakbridge and Grasslands residential developments.

49.     Specifically, Drummond's real estate division developed Oakbridge and Grasslands and sold homes in those neighborhoods to homebuyers.

**Drummond Knew That the Land They Owned and They Built and Sold Homes On Was Contaminated, Yet Failed to Disclose to Homebuyers and Plaintiffs**

50.     Drummond built and sold homes in the Class Area, despite knowing that the "rehabilitated" land under those homes was contaminated with radioactive materials, and thus

9

that radiation, and radioactive gases, including, but not limited to, radium-226, radon, and gamma rays, permeate the soil, water, air, and buildings in the Class Area, increasing exposures to those people living or recreating on that land.

51.     In fact, unreleased testing at Oakbridge prior to development showed average radiation levels significantly higher than the EPA's acceptable risk limit.

52.     Radium-226 produces gamma rays that can penetrate the body and increase the risk for a variety of cancers. Inhaling or ingesting radium-226 can increase the risk of leukemia, lymphoma, and bone cancer, specifically.

53.     In addition, the decay of radium-226 creates radon, an odorless, radioactive gas that can increase the risk of lung cancer by seeping into homes and polluting air inside and outside the home.

54.     Drummond knew of these risks prior to developing Oakbridge and Grasslands and selling the homes to homebuyers, Plaintiffs and Class Members, yet still did not disclose those risks to homebuyers, Plaintiffs and Class Members.

55.     Upon information and belief, at least as early as 1975, Drummond and other mining companies learned of the risks of radioactive contamination of reclaimed former mining lands, and the dangerous levels of exposure that people living and recreating on those contaminated lands would be subjected to, via non-public reports and testing done by the EPA that were shared with the phosphate mining industry, including Drummond.

56.     In September of 1975, the EPA Administrator informed the Governor of Florida that the EPA had found elevated levels of radiation in buildings constructed on land reclaimed

10

from phosphate mining areas and recommended that construction of new buildings on phosphate mining lands be "discouraged".[1]

57.     In 1980, the Department of Natural Resources published an evaluation of disturbed phosphate lands recommending, "[r]adiation levels should be determined if the site might be used for residential housing after reclamation."[2]

58.     By at least 2003, the EPA had established its "Florida Phosphate Initiative" or "Florida Phosphate Mining Initiative" (the "Phosphate Initiative").

59.     As part of the Phosphate Initiative, the EPA evaluated the risks posed by these contaminated reclaimed mining lands as well as various cleanup alternatives, and, by September of 2003, the EPA had compiled a binder of materials related to the Phosphate Initiative.

60.     The EPA's Phosphate Initiative materials were not shared with or accessible to Plaintiffs or the public, and in fact were marked as exempt from Federal freedom of information laws ("FOIA-exempt"). Upon information and belief, such materials, however, were shared with Drummond and other mining companies.

61.     Among the materials that the EPA shared with the mining industry, including, upon information and belief, Drummond, but did not share with Plaintiffs or the public, was the following statement summarizing the agency's main concern (emphasis added):

> The main concern is that **people may be exposed to unsafe levels of radiation in cases where residential dwellings have been constructed over former phosphate mines.** Phosphate mining results in the redistribution of Radium226 (Ra226), a radioactive contaminant of the phosphate ore, from buried deposits to the land surface. The radioactive contaminant emits gamma radiation which has been determined to be a

---

[1] INDOOR RADIATION EXPOSURE DUE TO RADIUM-226 IN FLORIDA PHOSPHATE LANDS, Office of Radiation Programs, U.S. Environmental Protection Agency (July 1979).

[2] EVALUATION OF PRE-JULY 1, 1975 DISTURBED PHOSPHATE LANDS, Department of Natural Resources Division of Resource Management Bureau of Geology, (August 1980).

11

**cancer causing agent**. The Ra226 eventually degrades into Radon gas which is another known carcinogen. Preliminary estimates indicate that approximately 40,000 residential dwellings have been built over former phosphate mines in Polk County, Florida. Many of these homes are believed to have **elevated levels of Ra226 or gamma radiation that exceeds EPA's safe standards**. [3]

62.     The EPA's investigation paid special attention to Drummond's Oakbridge development, noting that:

> Steps are urgently needed to assess the degree of contamination and exposure, and as appropriate, implement mitigative measures to reduce the potential risks to individual living in this subdivision.[4]

63.     At the same time, the phosphate mining industry in Central Florida, including, upon information and belief, Drummond, was touting Oakbridge as a model of a "good" example of successful reclamation of former mining land.[5]

64.     In fact, the Florida phosphate mining industry, including, upon information and belief, Drummond, pressured the EPA (both directly and through state and/or federal legislators) to cease its investigation into the risks of reclaimed phosphate mining lands.

65.     As a result of that pressure from Drummond and elected officials, in 2014 the EPA officially abandoned its plans for further assessment and potential remediation of the contaminated mining areas under the Federal Superfund program, including those comprising the Oakbridge and Grasslands developments.

66.     Argonne National Laboratories and the Department of Energy ("DOE") were also involved in the assessment of the radiation risks on reclaimed phosphate lands in Central Florida.

---

[3] EPA Florida Phosphate Initiative, "Talking Points", July 1, 2003.
[4] *Id.*
[5] *See e.g.*, "Polk County has Good, Bad Examples of Reclaimed Land," Kevin Bouffard, The Ledger (Feb. 17, 2003).

67.     The federal government has triggers for remedial action that include levels for gamma radiation detected on property (20 uR/hr), radon gas in air (4 piC/l) and radium concentration in soil (5 piC/g).

68.     According to the DOE, background levels of gamma radiation generally are approximately 6 uR/hr, and in phosphate mining areas are often in the range of 20-40 uR/hr, however, surveys conducted on reclaimed phosphate mining lands in Central Florida found that gamma radiation levels can be as high as ~100 uR/hr.[6]

69.     Based on the DOE's review of the available survey data, they concluded that "The surveys provide evidence that a significant number of residential properties located over former mine areas have the potential to contain radioactivity (Ra-226) at levels exceeding current remedial action guidelines".[7]

70.     As part of their review, the DOE prioritized the surveyed areas based on the "Probable need for additional action" of High (H), Medium (M), and Low (L) - the Oakbridge development, as well as other Drummond parcels, was noted as "H" or highly likely of needing additional action with gamma radiation levels generally 15-25 uR/hr, or 2.5-8 times the background gamma levels with a high level of 50 uR/hr.[8]

71.     Based on these EPA and DOE reports and testing results, Drummond knew, or should have known, by at least 1975 that the land comprising the Class Area communities in Polk County, Florida were unfit for residential development due to the presence of radioactive materials on, in, and around these properties.

---

[6] "Summary and Impact of Florida Department of Health (FDOH) Historical Radiological Survey Data", Argonne National Laboratory (undated presentation).
[7] Id.
[8] Table 1 "Summary of Historical Florida Department of Health Radiological Survey Results for Selected Subdivisions and Property Developments" (undated spreadsheet table).

72.     Drummond knew that this wasteland was comprised of radioactive and other hazardous substances that pose a threat to the health and wellbeing of those people living and recreating on the property as well to the use and enjoyment of those same people, including Plaintiff and the Class Members.

73.     In fact, as the potential of ionizing radiation to cause cancer has become better understood in the last 10 years, Drummond became even more aware of the risks Plaintiffs had been, and continued to be, subjected to from its contaminated lands.

74.     In 2006, the National Academies of Sciences published its "Health Risks from Exposure to Low Levels of Radiation" which concluded based on its review of available science and epidemiology that there is no threshold for ionizing radiation's cancer-causing abilities. Thus, every incremental dose carries with it an increased risk of disease. [9]

75.     Based on the National Academies' determination, experts in the medical, dental, and occupational fields have evaluated the safety of exposure to ionizing radiation for things like medical and dental x-rays with health organizations recommending against dosing patients with radiation unless medically necessary.

76.     But as Drummond knew and failed to disclose, Plaintiff and resident Class Members living in the Oakbridge and Grasslands developments are exposed to radiation levels that are significantly above background levels.

77.     Exposure to levels of radiation similar to that identified in the Oakbridge development translates to residents receiving over one chest x-ray per week—with obviously no diagnostic or health purpose whatsoever.

---

[9] *See generally*, Committee to Assess Health Risks from Exposure to Low Levels of Ionizing Radiation, National Research Council. Health risks from exposure to low levels of radiation. BEIR VII phase 2. Washington, DC: The National Academies Press; 2006.

78.     Drummond, intentionally and/or negligently concealed and failed to disclose, and continues to conceal and fail to disclose, to Plaintiff and the Class Members material facts concerning the nature, extent, magnitude, and effects of the exposure of Plaintiff, the Class Members and/or their property to these toxic and hazardous substances.

79.     Drummond knew and/or reasonably should have known that Plaintiffs, the Class Members, and/or their property would be exposed to hazardous materials and contaminants. Drummond knew and understood, and/or reasonably should have known and understood, that its concealment of such information would subject and continue to subject Plaintiff, the Class Members, and/or their property to continued exposure to hazardous materials and contaminants.

80.     Despite this knowledge, Drummond did not take sufficient measures to prevent the mining waste from being used in a manner that resulted in harm, or threatened harm, to the property, health, safety, and welfare of Plaintiff, and did not disclose to Plaintiff, Class Members or the public that the land upon which it built and sold the Oakbridge and Grasslands homes was contaminated and radioactive.

**Plaintiff and Residents Left Completely in the Dark**

81.     No one, including Drummond, or its agents, notified Plaintiff or Class Members of the significantly elevated cancer risks posed by the presence of radon gas in and around their properties.

82.     No one, including Drummond, or its agents, notified Plaintiff or Class Members of the significantly elevated presence of radon gas in and around their properties.

83.     No one, including Drummond, or its agents, notified Plaintiff or Class Members of the significantly elevated presence of gamma radiation in and around their properties.

15

84.     No one, including Drummond, or its agents, notified Plaintiff or Class Members of the significantly elevated cancer risks posed by the presence of gamma radiation in and around their properties.

85.     No one, including Drummond, or its agents, notified Plaintiff or Class Members of the internal concerns raised by various Federal environmental and health agencies about the use of their properties.

86.     No one, including Drummond, or its agents, notified Plaintiff or Class Members of the fact that EPA had considered emergency actions to remove the threats posed to people living on comparable lands or that their properties had been determined to be highly likely to require further action to be safe for residential uses.

87.     No one, including Drummond, or its agents, notified Plaintiff or Class Members that the EPA had recommended against further development of phosphate lands, such as those used for the Oakbridge and Grasslands developments, for residential purposes.

88.     Rather, Drummond, its agents, and the phosphate mining industry have continued to assure Plaintiff, Class Members and the public in general that there is no threat posed by developing former phosphate lands for residential use.

89.     Plaintiff and the Class Members reasonably believed that the groundwater, air, soil, and natural resources in the Oakbridge and Grasslands developments did not pose any potential health hazard.

90.     Plaintiff, the Class Members, and their properties have each been exposed to radioactive and other hazardous materials due to Drummond's negligence in remediating and producing, handling, storing, disposing of, and/or failing to properly remediate hazardous substances contaminating the Class Area.

16

91.     Plaintiff, the Class Members, and their properties have each been exposed to radioactive and other hazardous materials due to Drummond's negligence in reclaiming their former phosphate mining lands and developing their former phosphate mining lands for residential use without the adequate and appropriate testing, sampling, remediation, disclosures, warnings, and other precautions.

92.     Plaintiff and the Class Members seek redress and damages for economic losses, such as loss of property value and the interference with the use and enjoyment of their property; the prompt cleanup, excavation, treatment, and removal of radioactive wastes and related contaminants from their properties; medical monitoring; and punitive damages and other damages as the result of the carelessness, recklessness, negligence and willful and wanton violation of law by the Drummond.

93.     Separate and apart from acting negligently, at all relevant times Drummond caused injury and damages to Plaintiff, the Class Members, and/or their property through acts and omissions actuated by actual malice and/or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by such acts or omissions.

94.     Drummond, despite its knowledge of the serious health and environmental effects associated with radioactive waste, released, discharged, stored, mishandled, exposed, processed, enhanced, disposed of and dumped mining waste throughout the Class Area and the surrounding environment, while failing to warn the public in general and the Class Members in particular of the dangers that the historical use of the property posed.

95.     Drummond, despite its knowledge of the serious health and environmental effects associated with radiation exposure, and despite continued warnings from health and

17

environmental regulators, masked the true extent of contamination and its associated risks, thereby enabling it to avoid taking all appropriate steps to properly remediate these properties.

96. Drummond, despite its knowledge of the serious health and environmental effects associated with mining waste exposure, and despite orders and warnings from health and environmental regulators, failed to properly remediate such radiation in the class areas.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

97. Plaintiff and Class Members incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

98. The running of any statute of limitations has been tolled by reason of Drummond's fraudulent concealment. Drummond, through its affirmative misrepresentations and omissions, actively concealed from Plaintiff and Class Members the pollution present on their properties.

99. As a result of Drummond's actions, Plaintiff and Class Members could not reasonably know or have learned through reasonable diligence that Plaintiffs' and the Class Member's properties were contaminated with significantly elevated levels of radiation and that those risks were the direct and proximate result of Drummond's acts and omissions.

100. Furthermore, Drummond is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of the properties developed as parts of the Class Area. Drummond was aware of the non-public nature of the true character, quality, and nature of the properties developed as parts of the Oakbridge and Grasslands neighborhoods because this was non-public information over which Drummond had and continues to have control, and because Drummond knew that this information was not

18

available to residential purchasers and ultimate owners of the properties, including the Plaintiff and the Class Members and continued to intentionally concealed such facts.

101.    Plaintiffs and the Class Members had no knowledge that Drummond was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Drummond, neither Plaintiff nor the Class Members could have reasonably discovered the wrongdoing at any time prior.

## CLASS ALLEGATIONS

102.    This Class Action is being filed by the Plaintiff(s), pursuant to Federal Rule of Civil Procedure 23, on behalf of herself/themselves and others similarly situated.

103.    Plaintiff seek to certify the following class, defined as:

> **Drummond Property Damage Class ("Property Class"):** Any and all persons that own any real property in the Oakbridge & Grasslands Communities (collectively, the "Class Area") in Polk County, Florida.

> **Medical Monitoring Class:** All persons who ever resided on property located within the Class Area for a minimum of four years.

104.    To the extent revealed by discovery and investigation, there may be additional appropriate classes and/or subclasses from the above class definitions which are broader and/or narrower in time or scope of exposure.

105.    Excluded from the classes are Drummonds' officers, directors, agents, employees and members of their immediate families; and the judicial officers to whom this case is assigned, their staff, and the members of their immediate families.

106.    Excluded from the classes are any local, state, or federal government entities.

107.    This Court may maintain these claims as a Class Action pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3) and/or 23(c)(4).

108. Numerosity – Fed. R. Civ. P. 23(a)(1): The members of each class are so numerous that joinder of all members is impractical.

109. The number of properties located within the Class Area exceeds 100 and, therefore, the number of members of each class likely also exceeds 100 people, in satisfaction of Fed. R. Civ. P. 23 (a)(1).

110. Commonality – Fed. R. Civ. P. 23(a)(2): There are common questions of law and fact that affect the rights of every member of each respective class, and the types of relief sought are common to every member of each respective class. The same conduct by Drummond has injured or will injure every member of the Class.

111. A class action is superior to other available methods for the fair and efficient adjudication of the controversy, in satisfaction of Fed. R. Civ. P. 23(a)(2). Common questions of law and/or fact common to each respective class include, but are not limited to:

a. Whether Drummond discharged (or caused any other condition of pollution) a hazardous substance into the land or water on or under the respective Class Area;

b. Whether Drummond is strictly liable for discharging (or caused any other condition of pollution) a hazardous substance into the land or water on or under the Class Area.

c. Whether Drummond, through its acts or omissions, is strictly liable for the contamination on, in, and around the Class Area under Fl. Stat. § 376.313;

d. Whether Drummond was negligent in its handling, storing, remediating, using, disposing, developing and failing to disclose the presence of radioactive materials and related contamination in the Class Area;

e. Whether Drummond, through its acts or omissions, proximately caused property damage, diminution of property values, cleanup costs and health risks due to radioactive materials and related contaminants mined, deposited, released, enhanced, or abandoned in the Class Area;

    f.  Whether Class Members, through Drummond's acts, omissions and/or discharges (or other condition of pollution), have suffered damages, including but not limited to economic damages; and

    g.  Whether, as a proximate result of Drummond's conduct, Medical Monitoring Class Members are at a significantly increased risk of disease due to exposures to Drummond's radioactive materials, such that they will benefit from ongoing medical monitoring.

  112. These questions of law and/or fact are common to the class and predominate over any questions affecting only individual Class Members.

  113. Typicality – Fed. R. Civ .P. 23 (a)(3): The claims of John J. Jerue are typical of the claims of the Drummond Property Class and the Medical Monitoring Class, as required by Fed. R. Civ. P. 23(a)(3), in that all claims are based upon the same factual and legal theories. The principal issues in this matter involve Drummond's conduct in wrongfully handling, releasing, discharging (or other condition of pollution), enhancing, storing, transporting, processing, disposing of, and/or failing to remediate, its toxic and hazardous mining wastes and substances and by-products as well as its reckless and negligent decision to develop these reclaimed phosphate lands into residences where people live, work, and play, which impact all Class Members.

  114. Adequacy – Fed. R. Civ. P. 23(a)(4): Plaintiff John J. Jerue will fairly and adequately represent and protect the interests of the Class Members, as required by Fed. R. Civ. P. 23(a)(4). Plaintiff has retained counsel with substantial experience in the prosecution of environmental class actions and lawsuits involving phosphate waste in Florida. Plaintiff and their counsel are committed to vigorously prosecuting this action on behalf of the class, and they have the financial resources to do so. Neither Plaintiff nor counsel has any interest adverse to those of the class.

115.    Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by individual members of the classes would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Drummond and/or because adjudications respecting individual members of the class would, as a practical matter, be dispositive of the interests of the other members or would risk substantially impairing or impending their ability to prosecute their interests.

116.    Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because Drummond has acted or refused to act on grounds generally applicable to all members of the classes, thereby making relief in the form of an injunction requiring the prompt excavation and removal of all radioactive waste and related contaminants from the class properties and because Drummond has acted or refused to act on grounds generally applicable to all members of classes, thereby making relief in the form of an injunction requiring the prompt excavation and removal of all mining waste, slag and related contaminants from the properties of Plaintiff and the Class Members appropriate.

117.    In addition, Plaintiffs and the members of the Medical Monitoring Class ("Medical Monitoring Class Members") allege that:

> a.    Plaintiff and the Medical Monitoring Class Members have each been exposed to toxic and hazardous substances, including radioactive materials, due to Defendants' reclaiming the land and in handling, storing, use, disposal and/or failure to properly remediate such toxic and hazardous substances.

> b.    The toxic and hazardous substances, including radioactive materials, at issue in this case are proven hazardous substances.

> c.    As a proximate result of the exposure to toxic and hazardous substances, including radioactive materials, Plaintiffs and the Medical Monitoring Class Members have a significantly increased risk of contracting serious latent diseases, including, without limitation, cancer.

22

d.   A monitoring procedure exists that makes early detection of these potential diseases possible.

e.   The prescribed monitoring regiment is different from that normally recommended in the absence of exposure to toxic and hazardous substances.

f.   The prescribed monitoring regiment is reasonable and appropriate according to contemporary medical and scientific principles.

118.   Plaintiff and the Class Members have suffered, and will continue to suffer, harm and damages as a result of Drummond's unlawful and wrongful conduct, including but not limited to its discharge (or other condition of pollution) of hazardous substances into the land and water of and under the Class Area.

119.   A class action is superior to other available methods for the fair and efficient adjudication of the controversy under Fed. R. Civ. P. 23 (b)(3). Absent a class action, most members of the classes likely would find the cost of litigating their claims to be prohibitive, and will have no effective remedy at law. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

120.   Class certification is also appropriate because this Court can designate particular claims or issues for class-wide treatment and may designate one or more subclasses pursuant to Fed. R. Civ. P. 23(c)(4).

121.   Maintenance of this action as a class action is a fair and efficient method for adjudication of this controversy.  It would be impracticable and undesirable for each member of the class who has suffered harm to bring a separate action.  In addition, the maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result

23

in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all members of such class.

122.    No unusual difficulties are likely to be encountered in the management of this action as a class action.

123.    Class certification is also appropriate because Drummond has acted on grounds generally applicable to the members of the classes, making relief appropriate with respect to the classes.   Specifically, Plaintiff and the Class Members seek compensation for loss of use and enjoyment of their property, diminution in property value, removal of contamination from their property, medical monitoring (with respect to the Medical Monitoring Class) and other relief deemed just and proper.

## CAUSES OF ACTION

## COUNT I.  STRICT LIABILITY PURSUANT TO § 376.313 FLA. ST.

124.    The Drummond's wrongful acts and omissions in releasing and discharging (or other conditions of pollution) toxic pollutants and contaminants onto the lands and water of the state of Florida in general, and the Class Area in particular, as is alleged in more detail above, was in violation of various environmental statutes in the State of Florida, including but not limited to the following:

        a.    Discharging (or other condition of pollution) of any pollutants or hazardous substances into or upon land (or water) in violation of § 376.302(1)(a) Fla. St.; and

        b.    Failure to immediately remediate, contain, remove and abate the discharges in violation of § 376.305(1) Fla. St.

125.     Plaintiff is a "person[s]" who may bring a cause of action for damages under § 376.313.

126.     Plaintiff has alleged damages resulting from Drummond's discharge of hazardous substances onto their land, as those terms are defined in Fla. Stat. §§ 376.30 – 376.319.

127.     Drummond is strictly liable for damages to Plaintiff and the Class Members resulting from such discharges (or other conditions of pollution) covered by §§ 376.30 – 376.319 Fla. St., and Plaintiff and the Class Members are not required to plead or prove negligence in any form or manner, pursuant to § 376.313 Fla. St., because it is sufficient to plead and prove, as set forth in various paragraphs above, that the prohibited discharges or other polluting conditions occurred.

128.     Drummond's acts and omissions violate numerous Department of Environmental Protection ("DEP") standards as well as federal standards adopted by the DEP including, *inter alia*, Chapters 62-730, 62-777, 62-780, 62C-16, and/or 64E-5 of the Florida Administrative Code, Part II of Chapter 378, Florida Statutes, 40 C.F.R. §6262.11, 42 U.S.C. § 6925(a), 40 C.F.R. Part 264, Subparts A-G, K, and CC, and/or 40 C.F.R. Part 268.

## COUNT II - NEGLIGENCE

129.     Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs of this complaint as if set forth in full herein.

130.     At all relevant times hereto, Drummond owed to Plaintiff and Class Members who foreseeably could be injured by its negligence, a duty to exercise reasonable care in not releasing, enhancing, reclaiming, discharging (or other conditions of pollution), concentrating, freeing, or stockpiling toxic contaminants, including radioactive materials, that it knew, or

25

should have known, could result in damage and injury to Plaintiff, Class Members and their property.

131. Drummond also owed a duty of care to Plaintiff and Class Members to exercise reasonable care in the development of its phosphate lands for residential uses, to include living, working, and playing.

132. Drummond further owed a duty to exercise reasonable care to disclose the presence of these hazardous substances, including radioactive materials, the risks that they posed, and what Drummond knew about the presence and risks of these contaminants as found on its phosphate lands.

133. These duties to exercise reasonable care arose out of the common law of Florida, as well as relevant Federal and state environmental regulations.

134. Drummond breached its duty, over a period of years, in at least the following respects:

   a. Drummond acted with knowledge of the widespread presence of hazardous substances, including radioactive materials, on the former phosphate lands that became lands forming the Class Area along with the knowledge of the health and environmental risks that this radiation posed for those engaged in residential activities on these lands, and despite that it continued developing and ultimately profiting by putting these lands into use as residential properties.

   b. Failing to safely and properly remove and dispose the hazardous substances, including radioactive materials.

c.  Developing its phosphate lands for residential uses, including living, working, and playing, despite internal agency, public health, and other non-public recommendations to the contrary.

d.  Developing its phosphate lands for residential uses, including living, working, and playing, without the appropriate and adequate sampling, testing, or assessment to determine the suitability of these lands for such uses.

e.  Developing its phosphate lands for residential uses, including living, working, and playing, without the appropriate and adequate remediation, containment, or other handling, including, but not limited to, bringing in clean fill dirt, that may have made these properties suitable for such uses.

f.  Putting residential properties into the stream of commerce that were, are, and will continue to be unfit for residential uses due to the high levels of radioactive materials on, in, or around these properties.

g.  In failing to warn Plaintiff and Class Members of the contamination on, in, and around their properties, and the risks that it posed to them and to their families, and the likelihood that they were being exposed to carcinogenic radiation.

135.  As a result of Drummond's acts and omissions, as further detailed above, extensive contamination has existed, exists and will continue to exist and has been documented in the Class Area.

136.  As a result of Drummond's misconduct as set forth herein, Plaintiff and Class Members have suffered and continue to suffer damages, including, but not limited to, the loss of

value to their property and the loss of the use and enjoyment of their property and an increased risk of serious latent injury/illness.

137.    At all relevant times, Drummond caused injury and damages to Plaintiff and the Class Members and/or their property through acts and omissions actuated by actual malice and/or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by such acts or omissions.

138.    Drummond, despite its knowledge of the serious health and environmental effects associated with exposure to such hazardous substances, including radioactive materials, reclaimed and developed phosphate lands for residential use that were unfit for this purpose due to the presence of elevated levels of radiation in, on, and around the land comprising the Class Area and subsequently failed to warn Plaintiff, the Class Members, and the public of the dangers such activities posed.

139.    Drummond, despite its knowledge of the serious health and environmental effects associated with radiation exposure masked the true extent of contamination, thereby enabling the Drummond to avoid taking all appropriate steps to properly remediate the hazardous substances and levels of radiation in, on, and around the Class Area or to remediate and mitigate dangers created by its development of radioactive phosphate lands for residential use.

140.    As a direct and proximate result of the Drummond's wrongful acts and omissions, Plaintiff and Class Members properties have been and will continue to be contaminated and unfit for residential uses.

141.    As a direct and proximate result of the Drummond's wrongful acts and omissions, Plaintiff and the Class Members currently suffer an increased risk of serious latent disease, including a number of types of cancer that are associated with exposure to ionizing radiation.

28

142.    As a direct and proximate result of the Drummond's wrongful acts and omissions, Plaintiff and Drummond Property Damage Class Members currently suffer property damage, diminution in the value of their property, cleanup costs, loss of use and enjoyment of their property and destruction of their community.

143.    Plaintiff and Class Members seek to recover against the Drummond for property damage, including diminution of property values, the cost of remediation of properties, as well as the cost of periodic medical examinations necessary to detect the onset of physical harm that may be caused by radioactive contaminants on and around Plaintiff's property.

## COUNT III – PRIVATE NUISANCE

144.    Plaintiff(s) repeats and realleges each and every allegation contained in the preceding paragraphs of this complaint as if set forth in full herein.

145.    Defendant's past, present and/or continuing acts and/or omissions constitute a nuisance in that Defendant has used its property in a manner that has resulted in an unreasonable burden and interference on the Plaintiff and the Class Members in the form of personal harm, inconvenience, annoyance and discomfort incidental to exposure and cleanup of radiation and associated radioactive contaminants.

146.    Defendant's past, present and/or continuing activities, acts and/or omissions on the property that they developed that now forms the Oakbridge and Grasslands neighborhoods constitute a private nuisance resulting in unreasonable interference with Plaintiff's and the Class Members' right to the exclusive use and enjoyment of their properties through the presence of hazardous and toxic substances contaminating their properties and the surrounding environment, thereby exposing Plaintiff and the Class Members to hazardous and toxic substances and

substantially interfering with Plaintiff's and the Class Members  free use and enjoyment of their properties.

147.    Defendant's past, present and/or continuing acts and/or omissions, resulting in high levels of radioactive contamination in and on and/or failure to remove or properly investigate and remediate this radioactive contamination, and allowing such contamination to remain on Plaintiffs' properties and surrounding environment, constitutes a nuisance in that Defendant has used and developed its property in a manner that has unreasonably interfered with Plaintiff's and the Class Members' property interests, health and safety.

148.    Defendant's past, present and/or continuing acts and/or omissions, resulting in high levels of radioactive contamination in and on and/or failure to remove or properly investigate and remediate this radioactive contamination, and allowing such contamination to remain on Plaintiffs properties and surrounding environment, constitutes a nuisance in that Defendant will now have to engage in extensive and disruptive remediation and removal of these contaminants that will result in unreasonable interference with Plaintiff's and the Class Members' use and enjoyment of their property interests.

149.    Defendant's contamination presently impacts Plaintiffs, causes a diminution in their property values, is a blight on Plaintiff's community, causes annoyance, interference and inconvenience and deprives Plaintiff of his free use and enjoyment of his property, including, but not limited to, the inability to fully use, enjoy and recreate on his outdoor spaces, freely perform certain work and repairs on his property; and requiring his property to be dug up, excavated, handled with extreme caution and otherwise disrupted causing inconvenience and disruption. Plaintiff additionally suffers fear of adverse health effects, including cancer and other latent, serious illness.

30

150.    In the alternative, Defendant's disposal of and/or failure to remove radioactive contaminants from residential areas violates applicable standards and/or regulations, which constitutes a nuisance per se.

151.    Defendant knew that the invasion of contaminants onto Plaintiff's and the Class Members' properties was substantially certain to result from its actions and/or omissions, as aforesaid.

152.    This interference with Plaintiff's and the Class Members' use and enjoyment of their property is and will continue to be substantial, unreasonable, unwarranted and unlawful.

153.    As a result of Defendant's wrongful acts and omissions, Plaintiff and the Class Members have suffered exposure to hazardous substances, annoyance, inconvenience, discomfort, displacement, fear of adverse health effects and economic loss for which damages and medical monitoring are justified.

154.    As a direct and proximate result of Defendant's misconduct, Plaintiff and the members of the Classes have suffered and continue to suffer economic losses and the loss of value to their property and other damages.

155.    The nuisance that Defendant created is a continuing nuisance in that it has continued and remains unabated.

156.    Separate and apart from acting negligently, at all relevant times the Defendant caused injury and damages to the Plaintiff, the Classes and/or their property through acts and omissions actuated by actual malice and/or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by such acts or omissions.

157.    Defendant, despite its knowledge of the serious health and environmental effects associated with exposure to radioactive contaminants failed to properly investigate and remediate

said contaminants from the surrounding environment, while developing real estate for residential use at the same time as failing to warn purchasers and residents of the dangers of such contaminants.

158.   Defendant, despite its knowledge of the serious health and environmental effects associated with exposure to such contaminants, masked the true extent of contamination, thereby enabling the Defendants to avoid taking all appropriate steps to properly remediate said radioactive contamination to mitigate its dangers in the Class Areas.

159.   Defendant, despite its knowledge of the serious health and environmental effects associated with exposure to such contaminants, failed to properly remediate such contamination in the Class Area.

## COUNT IV – STRICT LIABILITY – ABNORMALLY DANGEROUS ACTIVITY

160.   Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs of this complaint as if set forth in full herein.

161.   Defendant, by developing former mining and disposal areas for residential use without remediation or cleanup and without further disclosure of the radiation risk posed by this use of the land has engaged in an activity that is abnormally dangerous, ultrahazardous, and inherently or intrinsically dangerous activities for which they are strictly liable to the Plaintiff and the Class Members.

162.   Defendant's activities pose a high degree of risk of harm to Plaintiffs. The likelihood that the harm that results from the Defendants' activities will be great is based on the fact that the radiation levels are significantly elevated above background and therefore these contaminants present serious health risks (including cancer).

32

163.    Defendant's development of radioactive lands for residential use is abnormally dangerous and that danger cannot be eliminated through the use of reasonable care as such development is inherently unreasonably dangerous.  There is no safe way to house people on these lands that have not been properly treated or remediated and therefore the radiation levels pose unreasonably unsafe hazards.

164.    Defendant's development of these waste areas and failure to properly investigate, delineate, remediate and warn Plaintiffs and the Class Members about the radiation levels in the in the Class Areas was neither a matter of common usage nor appropriate to the place where it was carried out.

165.    Residential exposure to significantly elevated levels of radiation leading to the increased risk of health impacts, including cancer, is a critical societal problem in Florida, and thus, the value of Defendant's activities of developing these waste lands for residential use, if any, is substantially outweighed by the serious health and environmental and health problems caused by them.

166.    As a direct and proximate result of Defendant' misconduct as set forth herein, Plaintiffs and the members of the classes have suffered and continue to suffer enhanced risk of future personal injury; economic losses, such as costs of medical monitoring; the loss of value to their property; and other damages as set forth herein.

167.    Separate and apart from acting negligently, at all relevant times the Defendant caused injury and damages to the Plaintiff and/or their property through acts and omissions actuated by actual malice and/or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by such acts or omissions.

33

168.    Defendant, despite its knowledge of the serious health and environmental effects associated with exposure to radiation failed to properly investigate and remediate said contaminants from the land before developing for residential uses while failing to warn residents and purchasers of the dangers of such contamination.

169.    Defendant, despite its knowledge of the serious health and environmental effects associated with exposure to such contaminants, masked the true extent of contamination, thereby enabling it to avoid taking all appropriate steps to properly remediate the contamination or to mitigate dangers in the Class Areas.

170.    Defendant, despite its knowledge of the serious health and environmental effects associated with exposure radiation failed to properly remediate such contamination prior to development for residential use.

## JURY TRIAL DEMAND AND PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that the Court enter an order or judgment against Drummonds as follows:

A.    Enter an Order pursuant to Federal Rule 23 permitting this action to be maintained as a class action, Plaintiff as the representative of the Medical Monitoring and Property Classes and appointing Plaintiff's counsel as counsel for such classes;

B.    Enter judgment against Drummond for compensatory damages; the prompt testing, assessment, excavation and removal of all radioactive wastes and related contaminants to levels otherwise representative of background levels from Plaintiff and Class Members' properties; the cost of periodic medical examinations necessary to detect the onset of physical harm, including, serious latent injury and/or disease that may be caused by radioactive contaminants on and around Plaintiff's property; attorney's fees, costs of suit

34

as provided for by law; and such other relief as the Court may deem just and proper in favor of Plaintiff and the Class Members against Drummond for loss of property value, and for all other relief, in an amount to be proven at trial, as to which they may be entitled, including interest, expert fees and costs of this suit;

C.      Enter an injunction requiring Drummond to promptly and completely remediate radiation levels to, or below, background levels from the Plaintiff's and Class Members' properties;

D.      Award prejudgment and post-judgment interest as provided by law;

E.      Award punitive damages; and

F.      Such other relief as this Court deems necessary, just and proper.

Plaintiff demands a trial by jury as to all claims so triable in this action.

Dated:  March 9, 2017

By: _____

Neal O'Toole, Esquire
Trial Counsel
Florida Bar # 0691267
**Lilly, O'Toole & Brown, LLP**
800 Florida Ave South
Lakeland, FL 33801
(863) 683-1111
Email: notoole@loblawyers.com
Secondary: sstrickland8389@gmail.com


W. Mark Lanier, Esq.
Richard Meadow, Esq.
Chris Gadoury, Esq.
Ryan Ellis, Esq.
(to be admitted *pro hac vice*)
**The Lanier Law Firm, P.C.**
6810 FM 1960 West
Houston, Texas 77069
(713) 659-5200

Thomas Girardi, Esq.
**Girardi | Keese**
1126 Wilshire Boulevard
Los Angeles, CA 90017
Phone: 213-262-6777
Phone: 888-397-7655

Christopher T. Nidel, Esq.
(to be admitted *pro hac vice*)
**Nidel & Nace, P.L.L.C.**
Jonathan Nace, Esq.
(to be admitted *pro hac vice*)
5335 Wisconsin Ave., NW
Suite 440
Washington, D.C. 20015
(202) 558-2030

Joel M. Rubenstein
**GERMAN RUBENSTEIN LLP**
Steven J. German, Esq.
Joel M. Rubenstein, Esq.
19 West 44th Street, Suite 1500
New York, NY 10036
Telephone: (212) 704-2020
Facsimile: (212) 490-4800