UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOHN J. JERUE and MICHAEL J. FEIST,
On behalf of themselves and all others similarly
situated,

                                    Plaintiffs,                    Civil Action No. 8:17-CV-00587-EAK-AEP

v.

THE DRUMMOND COMPANY, INC.,                        *Document electronically filed.*

                                    Defendant.                    JURY DEMANDED


## PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs, by and through their undersigned attorneys, Lilly O'Toole & Brown L.L.P.,

The Lanier Law Firm, PC, Girardi | Keese PC, Nidel & Nace, PLLC, and German Rubenstein

LLP, bring this civil action on their own behalf and on behalf of the classes they represent to

obtain damages, both compensatory and punitive, injunctive relief, and costs of suit from the

named Defendant, and complain and allege, as follows:

## FACTUAL SUMMARY

1.        This is a civil action to secure redress from The Drummond Company, Inc.

("Drummond" or "Defendant") for damages suffered by members of the putative classes defined

below (the "Class Members") as a result of the contamination of their property by phosphate

mining, pollution, hazardous waste disposal, and subsequent inadequate reclamation and

restoration activities of Drummond without warning the Class Members of, or disclosing, the

radiation contamination it knew permeated the contaminated property.

2.      Plaintiffs and Class Members have been exposed to hazardous substances, including, but not limited to, gamma radiation, released as a result of Drummond and its predecessors' conduct in phosphate mining operations, its pollution of and waste disposal on the mined lands, and its inadequate reclamation and restoration of the former mining lands, including for the use as residential real estate,

3.      Under Florida law, mining companies are required to reclaim and restore former mining lands in a manner that returns the land its original condition prior to mining, mining waste disposal or mining operations. Ch. 378, Fla. Stat. & Ch. 62C-16., Fla. Admin. Code.

4.      Drummond, along with other members of the phosphate industry, has repeatedly assured the public that phosphate mining operations do not present a health risk and nothing to the contrary was provided by Drummond, or by anyone else, to the Class Members. In fact, Drummond's marketing and promotional materials, as well as its oral sales communications, for these neighborhoods convey the exact opposite message than the actual facts.

5.      For example, Drummond's website for Grasslands leads the public and Class Members to believe that it properly reclaimed and restored its former mining sites such that gamma radiation would not be significantly elevated, damage surrounding properties, or increase the risk of disease:

> It was only natural that Drummond Company's mining experience would lead to a significant involvement in land and forestry management. As part of that direction, the real estate division has become an increasingly important component of the Drummond Company.
>
> The real estate developments in Alabama, California and Florida provide the public with readily available examples of Drummond excellence. These communities are the result of a depth of resources and an even deeper commitment to being a model corporate citizen. So, while you will see an abundance of amenities within these developments, you will also find restraint

2

and preservation of the natural environment. This consideration for the whole picture finds expression in every Drummond endeavor.[1]

6.      And as recently as March 22, 2017, Drummond communicated to the Class Members in a letter that misrepresents the truth regarding its restoration and/or reclamation efforts and fraudulently conceals known defects – elevated levels of gamma radiation – it has long known were present at Oakbridge and Grasslands. *See* Mar. 22, 2017 Letter from Drummond to Oakbridge and Grasslands Residents, attached as Exhibit 1.

7.      These assurances to the public have been, and continue to be, echoed by local public officials and health and environmental regulators, who, like Drummond, have concealed the truth from Plaintiffs, Class Members, and the public.

8.      Despite these assurances, the presence of radioactive contamination and hazardous substances on these properties presents a significant health risk to those living and working in, on, and around these properties.

7.      As a result of the false assurances and concealment of the truth from Drummond and public officials and health and environmental regulators, Plaintiffs, members of the Class, and members of the public had no reason to believe that the land they live, work, and play on presents a significant health risk

8.      In unreleased internal agency documents, government scientists have noted with significant concern that the use of phosphate mining slag as fill material resulted in contaminated property with elevated concentrations of a decay products of uranium, including radium-226, in the Class Area's soil..

9.      Radium-226 and other radionuclides found in the Class Area's soil produce

---

[1] https://grasslandshomes.com/about/development/

gamma radiation that can penetrate the body and increase the risk for a variety of cancers. The half-life of radium-226 is approximately 1600 years.

10.     Forms of ionizing radiation are recognized as being human carcinogens by every major human health and regulatory body, including the EPA and the International Agency for Research on Cancer.

11.     Exposure to uranium byproducts can increase the risk of numerous cancers, including, but not limited to, leukemia, lymphoma, and bone and thyroid cancer.

12.     In addition, the decay of radium creates radon, an odorless, radioactive gas that can increase the risk of lung cancer by seeping into Class Area's homes and polluting both indoor and outdoor air. Testing for radon does not detect the presence of gamma radiation, and the absence of elevated levels of radon does not equate to an absence of elevated levels of gamma radiation.

13.     Contamination of the soils with radium-226 leads to high levels of gamma radiation that creates an omnipresent threat to those on or around the contaminated property resulting in unacceptable exposures to residents and children recreating in and around property in the Class Area.

14.     Drummond, a company experienced in mining activities, was, or should have been familiar with, the risks posed by mining wastes and the radioactive contamination created, disposed of, or enhanced by mining activities on these disturbed phosphate lands.

15.     Despite its knowledge of the radioactive threat posed by mining wastes, Drummond improperly disposed of radioactive mining wastes, polluting the lands forming the Class Areas,  and failed to adequately reclaim and restore its phosphate mining lands in such a way that returned the land to its previous condition prior to mining operations because the land,

4

which ultimately became various residential and commercial developments, including Oakbridge and Grasslands, is contaminated with high levels of radium-226 and its decay products, which include gamma radiation.

16.    The Poseidon Mines, which Drummond purchased (and subsequently operated) in 1978, engaged in strip mining activities on these lands evident from aerial photos of the lands which now form, among other things, Oakbridge and Grasslands as shown below:



20.    Despite knowledge of the risks posed by its activities, Drummond sought to repurpose its radioactive mining wastelands to its highest value uses, reclaiming the contaminated land for residential and commercial use—also known to be the most threatening use of toxic wastelands with respect to human health.

21.    Although Drummond took minimal efforts to characterize the radioactive nature of these lands, and despite not having fully characterized the extent of contamination at the property, Drummond knew, as early as October of 1978, that the radioactive radium-226 levels were as high as 22-times the normal levels and that the gamma radiation levels on the properties were on average 2-to-3-times background radiation levels and as high as 5-times background

levels.

22.     Despite its knowledge of radioactive contamination resulting from its mining activities and subsequent failure to adequately restore and/or reclaim its mining lands, the health risks posed by the elevated radiation levels on this land from the use of phosphate mining slag as fill material in the Class Area, and that the area was to be developed into residential and commercial developments, Drummond failed to disclose any of this to purchasers or renters of the homes and commercial establishments built on top of the contaminated land, including the Class Members.

23.     Drummond never informed Plaintiffs or Class Members about the gamma radiation levels on their properties or of the specialized health risks posed by long term exposure to elevated radiation levels, all of which is due to Drummond's use of this land for phosphate mining and subsequent failure to properly reclaim and restore the land by, among other things, using phosphate mining slag as fill material in the Class Area.

24.     To this day, Drummond continues to allow this contaminated land to be developed and sold for residential and commercial uses and continues to fail to disclose the elevated levels of radiation known to be inherent in its property or the health risks associated therewith, despite actual knowledge of its pollution of and subsequent inadequate restoration and/or reclamation of the land.

25.     Drummond's phosphate mining, polluting, and subsequent failure to properly restore and/or reclaim these lands has created an ongoing presence of radioactive contamination that has impacted Plaintiffs, the Class Members and the Class Area properties and deprives Plaintiffs and the Class Members of their free use and enjoyment of their property. The impact of Drummond's failure to properly reclaim and restore such mining waste, impacts the Class

Members and the property in Class Area (as defined below).

26.     The resulting presence of elevated levels of radiation has posed, poses, and will continue to damage Plaintiffs' and Class Members' properties and pose a significant health threat to the resident Class Members and to those within the Class Area.

## PARTIES

### Plaintiffs

27.     Plaintiffs own, reside or have resided on, property located in the Class Area.

28.     Plaintiff John J. Jerue is a resident of the Oakbridge community, Polk County, Florida. Plaintiff John J. Jerue owns the property located within the Class Area at 805 Summerfield Drive, Lakeland, Florida. Plaintiff John J. Jerue is a putative class representative for the Drummond Property Damage Class and for the Medical Monitoring Class.

29.     Plaintiff Michael J. Feist is a resident of the Grasslands community, Polk County, Florida. Plaintiff Michael J. Feist owns the property located within the Class Area at 651 Grasslands Village Cr., Lakeland, Florida. Prior to living at that address, Mr. Feist owned two other houses in Grasslands dating back to 2001. Plaintiff Michael J. Feist is a putative class representative for the Drummond Property Damage Class, the Medical Monitoring Class, and the Fraud Class Members.

30.     As a result of Drummond's actions, specifically it and its predecessor's mining, polluting and subsequent inadequate restoration and/or reclaimation activities, mining waste and radioactive substances have entered onto Plaintiffs' and the Class Members' properties and have contaminated their property, air, land, groundwater, dwelling and surrounding environment, thereby causing Plaintiffs and the Class Members to suffer damage to property and personal finance, emotional distress, personal injuries in the form of the increased risk of latent disease,

7

and loss of the use and enjoyment of property and destruction of their community.

31.     As a result of the actions of Drummond, mining waste and radioactive and hazardous substances at and from Drummond's mining, disposal, reclamation, rehabilitation and development operations have entered onto Plaintiffs' and the Class Members' person, property, air, land, and dwelling, thereby causing them an increased and significant risk to their health necessitating medical monitoring.

32.     As a result of the actions of Drummond, mining waste and radioactive and hazardous substances at and from Drummond's mining, disposal, reclamation, rehabilitation and development operations have entered onto Plaintiffs' and the Class Members' neighbors' properties depriving John J. Jerue and the Class Members of their free use and enjoyment of their properties.

### Defendant

33.     The Drummond Company, Inc. ("Drummond") is an Alabama Corporation with its principal place of business in Vestavia Hills, Alabama.

34.     In or around 1978, Drummond purchased the Poseidon Mining Company along with more than 1400-acres of mining lands in Polk County, Florida.

35.     Drummond initially operated Poseidon as a wholly owned subsidiary, Poseidon Mines, Inc., but in or around March 31, 1984, Drummond merged with Poseidon.

36.     At all relevant times hereto, Drummond was authorized to do business, routinely did substantial business, and owned property in the State of Florida.

37.     Drummond, its predecessors, or wholly owned subsidiaries, mined, disposed of wastes, and "reclaimed" the land that became known as the Oakbridge and Grasslands developments in Polk County, Florida.

8

38.     At all times relevant hereto, Drummond was involved in the mining and processing of phosphate, phosphate products, and restoration and/or reclamation of phosphate mines in the State of Florida.

## JURISDICTION AND VENUE

39.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiffs and Drummond are citizens of different states and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

40.     This Court has personal jurisdiction over Drummond because this suit arises out of Drummond's contacts with this judicial district and because Drummond has had continuous and systematic contacts with this judicial district. Drummond is deemed to reside in this judicial district because its contacts are sufficient to subject it to personal jurisdiction here. Drummond may be served with process by delivering a copy of the Summons and Complaint to its registered agent, CT Corporation System, at its registered office, 1200 S. Pine Island Road, Plantation, Florida 33324.

41.     Venue is appropriate in the Middle District of Florida because the acts which give rise to this Complaint occurred and continue within the District and a substantial part of property that is the subject of this action is situated in this District.

## FACTUAL ALLEGATIONS

42.     Plaintiffs and the Class Members have incurred damages as a result of the contamination of their property by the phosphate mining, pollution, and inadequate restoration and/or reclamation activities of Drummond and its real estate division, which subsequently developed the reclaimed land into residential and commercial properties and sold it to homebuyers and businesses, despite knowing that the reclaimed land under the homes is

9

contaminated with hazardous substances and radioactive materials that expose Plaintiffs and other residents to cancer-causing radiation well in excess of acceptable limits set by the EPA.

43. These hazardous waste materials released radioactive matter that scattered so that persons and properties in the Class Area were and continue to be exposed to hazardous substances. Plaintiffs', the Class Members', and the Class Area properties have been contaminated with hazardous substances, including gamma and other forms of radiation.

44. The presence of radioactive contamination has been and continues to be a source of hazardous substance emissions onto and within the surrounding properties and persons in the Class Areas. The waste contains, and has continuously released into the Class Areas, a variety of radioactive substances and energy.

## Background of Drummond's Phosphate Mining in Florida

45. Seventy-five percent of the nation's phosphate supply and about 25-percent of the world supply comes from the state of Florida. Mining companies, including Drummond, mined land in Polk County to recover phosphate ore, which is rich in radioactive elements, including, but not limited to uranium and its daughter products, including, but not limited to, radium-226, a highly radioactive chemical element with a half-life of 1600 years.

46. Phosphate is removed from the ground and, after removal of the phosphate ore, the remaining slag is enriched in the radioactive elements, thereby enhancing or concentrating the radioactivity of the waste material.

47. Under Florida law, mining companies are required to restore former mining lands in a manner that returns the land its original condition prior to mining or mining operations. Ch. 378, Fla. Stat. & Ch. 62C-16., Fla. Admin. Code. But mining companies, including Drummond, use the slag waste material to "reclaim" the mined lands, filling in the mines with the highly

radioactive materials, mining wastes, clays and slimes in violation of Florida common, statutory, and regulatory law.

48.     After inadequately restoring and/or reclaiming the land, the land was sold as residential communities and commercial developments on top of such contaminated land. Defendant had actual knowledge that the land it and/or its predecessors had polluted and inadequately restored and/or reclaimed would be developed and sold for residential purposes. In many of these developments, including Oakbridge and Grasslands, radioactive contaminants, generating gamma radiation and radioactive gases, permeate the ground surface increasing exposures to those people living or recreating on the land.

49.     Drummond first came to Polk County in 1978 and purchased the Poseidon Mining Company along with more than 1,400-acres of previously mined land in the southwest part of Lakeland.

50.     Subsequently, the Drummond Company Board of Directors decided to cease their mining operations and "reclaim" thereby further contaminating the already contaminated 1,400-acres into what is known today as Oakbridge and Grasslands residential developments, as well as other residential and commercial developments, purportedly restoring them to their state prior to mining and polluting operations.

51.     These efforts resulted in further contaminating the land, through the disposal of clays and slimes that were laced with radioactive and other hazardous materials.

**Drummond Knew That the Land They Owned and They Built and Sold Homes On Was Contaminated, Yet Failed to Disclose to Homebuyers and Plaintiffs**

52.     Despite knowing that the land that they mined, polluted and restored and/or "reclaimed" under and surrounding those homes was contaminated with radioactive materials, and thus that radiation, and radioactive gases, including, but not limited to, radium-226 and

11

gamma rays, permeate the soil, water, air, and buildings in the Class Area, increasing exposures to those people living or recreating on that contaminated land, Drummond knowingly allowed the land to be developed and sold for residential purposes.

53.    Drummond, along with other members of the phosphate industry, has repeatedly assured the public that the presence of mining wastes did not present a health risk and nothing to the contrary was provided by Drummond, or by anyone else, to the Class Members. In fact, Drummond's marketing and promotional materials, as well as its oral sales communications, for these neighborhoods conveys the exact opposite message than the actual facts. For example, Drummond's website represents and warrants that:

> Though [Drummond's real estate] developments are spread across the United States, they all have one thing in common; they are each "Best in Class" in the markets in which they are located. In all development projects, Drummond ensures detailed planning, flawless development execution, the preservation of natural spaces, a dedication to great architecture, the delivery of extraordinary services, and the weaving together of lasting friendships and relationships among owners that becomes the defining fabric of great communities.[2]

54.    Drummond's website for Grasslands leads Plaintiffs, Class Members, and the public to believe that it properly reclaimed and restored its former phosphate mining sites such that gamma radiation would not be significantly elevated:

> It was only natural that Drummond Company's mining experience would lead to a significant involvement in land and forestry management. As part of that direction, the real estate division has become an increasingly important component of the Drummond Company.
>
> The real estate developments in Alabama, California and Florida provide the public with readily available examples of Drummond excellence. These communities are the result of a depth of resources and an even deeper commitment to being a model corporate citizen. So, while you will see an abundance of amenities within these developments, you will also find restraint and preservation of the natural environment. This consideration for the whole

---

[2] http://www.drummondco.com/our-products/real-estate/

picture finds expression in every Drummond endeavor.[3]

55.     Drummond further represented to Plaintiffs, Class Members, and the public that (i) its developments were "skillfully designed to meet every need in your life," (ii) "a home investment in Grasslands is certain to surpass your expectations," and (iii) "the Grasslands community offers excellent values . . . A home investment in Grasslands is one of quality and assured value."[4]

56.     And as recently as March 22, 2017, Drummond communicated to Plaintiffs and Class Members in a letter that misrepresents the truth regarding its reclamation efforts and fraudulently conceals known defects – elevated levels of gamma radiation – it has long known were present at Oakbridge and Grasslands. *See* Mar. 22, 2017 Letter from Drummond to Oakbridge and Grasslands Residents, attached as Exhibit 1.

57.     These assurances to the public have been, and continue to be, echoed by local public officials and health and environmental regulators, who, like Drummond, have concealed the truth from Plaintiffs, Class Members, and the public.

58.     In fact, unreleased testing at Oakbridge prior to development showed average radiation levels significantly higher than the EPA's acceptable risk limit.

59.     Radium-226 produces gamma rays that can penetrate the body and increase the risk for a variety of cancers. Inhaling or ingesting radium-226 can increase the risk of leukemia, lymphoma, and bone cancer, specifically.

60.     Drummond knew of the risks posed by the radioactive contamination on the land prior to developing the Oakbridge and Grasslands neighborhoods and selling the homes to

---

[3] https://grasslandshomes.com/about/development/
[4] https://grasslandshomes.com/about/grasslands-community/

homebuyers, Plaintiffs and Class Members, yet chose not to restore the land to its original state, remove the dangerous radiation, and protect the Plaintiffs and Class Members from what Drummond knew would be dangerous exposure to radiation.

61.     Upon information and belief, at least as early as 1975, Drummond and other mining companies learned of the risks of radioactive contamination of reclaimed former mining lands, and the dangerous levels of exposure that people living and recreating on those contaminated lands would be subjected to, via non-public reports and testing done by the EPA and other agencies that were shared with the phosphate mining industry, including Drummond.

62.     In September of 1975, the EPA Administrator informed the Governor of Florida that the EPA had found elevated levels of radiation in buildings constructed on land reclaimed from phosphate mining areas and recommended that due to the presence of radioactive contamination, the construction of new buildings on the contaminated phosphate mining lands be "discouraged".[5]

63.     In October 1978, the Florida Radiological and Occupational Health Department conducted a radiological survey of Drummond's proposed residential and commercial development. *See* Oct. 9, 1978 Radiological and Occupational Health Memo, attached as Exhibit 2. The survey divided the land into two sections and measured the gamma radiation levels in both areas. The first section had a mean gamma radiation level of 15 microroentgens/hour and a high of 35 microroentgens/hour. *Id*. The second section had a mean gamma radiation level of 20 microroentgens/hour and a high of 40 microroentgens/hour. *Id*. The average background gamma radiation level is 5-7 microroentgens/hour. *Id*. Thus, the Radiological and Occupational Health

---

[5] INDOOR RADIATION EXPOSURE DUE TO RADIUM-226 IN FLORIDA PHOSPHATE LANDS, Office of Radiation Programs, U.S. Environmental Protection Agency (July 1979).

Department concluded that 33% of homes built in the first section would have indoor gamma radiation levels above federal guidelines and that a "large percentage" of homes built in the second section would have indoor gamma radiation levels above federal guidelines. *Id.*

64.     On July 14, 1980, on behalf of the Florida Department of Health and Rehabilitative Services, District Eight/Polk County Health Department, the same state of Florida Public Health Physicist that drafted the October 1978 Memo, referenced above, wrote a letter to Drummond "in response to [Drummond's] request for a Radiation Survey on [its] Lakeland property." *See* July 14, 1980 Letter from Florida Dept. of Health to Drummond, attached as Exhibit 3. The State of Florida informed Drummond that the results of radiation survey reflected average gamma radiation level of 18.1 microroentgens/hour and a high of 36 microroentgens/hour. *Id.* The State of Florida further instructed Drummond that between 38-42 percent of the structures built on this land will have indoor gamma radiation levels above federal guidelines. *Id.* The State of Florida concluded to Drummond that "the major conclusion that can be drawn concerning this piece of property, is that it has a higher average measurement than normal background (2 to 3 time higher) and that a significant number of the homes built on this property will probably have indoor radiation levels greater than the recommended federal guidelines." *Id.* Thus, Drummond clearly had knowledge of elevated gamma radiation levels on its land prior to developing it for residential and commercial development. But despite knowledge of this known defect, Drummond failed to disclose this to Plaintiffs or Class Members.

65.     In 1980, the Department of Natural Resources published an evaluation of disturbed phosphate lands recommending, "[r]adiation levels should be determined if the site

might be used for residential housing after reclamation."[6]

66.    In September 1985 Drummond and the State of Florida entered into the Drummond Properties Lakeland Development Agreement with the Department of Community Affairs and Central Florida Regional Planning Council (the "Development Agreement"). *See* Doc. No. 16-2. Drummond's conveyance of title to Plaintiffs and/or Plaintiffs' predecessors-in-interest was expressly subject to, *inter alia*, the Development Agreement. *See* Doc. No. 16-1; Doc. No. 16-4; Doc. No. 16-5; Doc. No. 16-6.  In the Development Agreement, Drummond made the following representations that Plaintiffs relied upon to their detriment:

(i)    "The Drummond properties were previously mined for phosphate rock and have been under reclamation during recent years. Some of the funding for this reclamation has been provided through the Department of Natural Resources from the State Nonmandatory Reclamation Trust Fund." Doc. No. 16-2, at 2;

(ii)    "Drummond proposes to continue to reclaim some portions of the tract . . . subject to the additional restrictions set forth below. Drummond also proposes to reclaim the southeast, Southwest and Northwest quadrants. . . . The development authorized by this paragraph will occur on land suitable for development and will not cause any material adverse impacts on regional resources or facilities." *Id.* at 3;

(iii)    "Drummond affirms that all representations and statements made to the [State of Florida] contained in this [Development] Agreement are true and accurate, to the best of its knowledge. Based on these representations, the [State of Florida] finds that this [Development] Agreement is in the best interest of the State [of Florida]." *Id.* at 5; and

(iv) "Drummond agrees to utilize . . . control technology . . . in construction for all proposed dwelling units on reclaimed phosphate lands in order to mitigate any potential adverse impacts due to radon gas emissions or other radiation effects considered possible to occur on such lands. The purpose of this section is to establish control technology to reduce the exposure of the occupants of a residential structure to the influx of radionuclides into the structure by use of certain building techniques. These building techniques shall be mandatory for the construction of all residential structures authorized by this Agreement and shall be

---

[6] EVALUATION OF PRE-JULY 1, 1975 DISTURBED PHOSPHATE LANDS, Department of Natural Resources Division of Resource Management Bureau of Geology, (August 1980).

16

included in the plans submitted to the appropriate permitting agency in Lakeland before a permit is granted and construction begins." *Id*. at 6-7 (emphasis added).

67.     By at least 2003, the EPA had established its "Florida Phosphate Initiative" or "Florida Phosphate Mining Initiative" (the "Phosphate Initiative").

68.     As part of the Phosphate Initiative, the EPA evaluated the risks posed by these contaminated reclaimed mining lands as well as various cleanup alternatives, and, by September of 2003, the EPA had compiled a binder of materials related to the Phosphate Initiative.

69.     The EPA's Phosphate Initiative materials were not shared with or accessible to Plaintiffs or the public, and in fact were marked as exempt from Federal freedom of information laws ("FOIA-exempt"). Upon information and belief, such materials, however, were shared with Drummond and other mining companies.

70.     Among the materials that the EPA shared with the mining industry, including, upon information and belief, Drummond, but did not share with Plaintiffs or the public, was the following statement summarizing the agency's main concern (emphasis added):

> The main concern is that **people may be exposed to unsafe levels of radiation in cases where residential dwellings have been constructed over former phosphate mi**nes. Phosphate mining results in the redistribution of Radium226 (Ra226), a radioactive contaminant of the phosphate ore, from buried deposits to the land surface. The radioactive contaminant emits gamma radiation which has been determined to be **a cancer causing agent**. The Ra226 eventually degrades into Radon gas which is another known carcinogen. Preliminary estimates indicate that approximately 40,000 residential dwellings have been built over former phosphate mines in Polk County, Florida. Many of these homes are believed to have **elevated levels of Ra226 or gamma radiation that exceeds EPA's safe standards**. [7]

71.     The EPA's investigation paid special attention to Drummond's mining and

---

[7] EPA Florida Phosphate Initiative, "Talking Points", July 1, 2003, attached as Exhibit 4 (emphasis added).

reclamation activities in the area that became the Oakbridge development, noting that:

> Steps are urgently needed to assess the degree of contamination and exposure, and as appropriate, implement mitigative measures to reduce the potential risks to individual living in this subdivision.[8]

72.      At the same time, the phosphate mining industry in Central Florida, including, upon information and belief, Drummond, was touting the mining site that became Oakbridge as a model of a "good" example of successful reclamation of former mining land.[9]

73.      In fact, the Florida phosphate mining industry, including, upon information and belief, Drummond, pressured the EPA (both directly and through state and/or federal legislators) to cease its investigation into the risks of reclaimed phosphate mining lands.

74.      As a result of that pressure from Drummond and elected officials, in 2014 the EPA officially abandoned its plans for further assessment and potential remediation of the contaminated mining areas under the Federal Superfund program, including those comprising the Oakbridge and Grasslands developments.

75.      Argonne National Laboratories and the Department of Energy ("DOE") were also involved in the assessment of the radiation risks on reclaimed phosphate lands in Central Florida.

76.      The federal government has triggers for remedial action that include levels for gamma radiation detected on property (20 uR/hr) and radium concentration in soil (5 piC/g).

77.      According to the DOE, background levels of gamma radiation generally are approximately 6 uR/hr, and in phosphate mining areas are often in the range of 20-40 uR/hr, however, surveys conducted on reclaimed phosphate mining lands in Central Florida found that

---

[8] *Id.*

[9] *See e.g.*, "Polk County has Good, Bad Examples of Reclaimed Land," Kevin Bouffard, The Ledger (Feb. 17, 2003).

gamma radiation levels can be as high as ~100 uR/hr.[10]

78.     Based on the DOE's review of the available survey data, they concluded that "The surveys provide evidence that a significant number of residential properties located over former mine areas have the potential to contain radioactivity (Ra-226) at levels exceeding current remedial action guidelines". [11]

79.     As part of their review, the DOE prioritized the surveyed areas based on the "Probable need for additional action" of High (H), Medium (M), and Low (L) - the Oakbridge development, as well as other parcels located on land reclaimed by Drummond, was noted as "H" or highly likely of needing additional action with gamma radiation levels generally 15-25 uR/hr, or 2.5-8 times the background gamma levels with a high level of 50 uR/hr.[12]

80.     Based on these EPA and DOE reports and testing results, Drummond knew, or should have known, by at least 1975 that the land comprising the Class Area communities in Polk County, Florida were contaminated and the contamination of the land and the health threats that it posed made the land unfit for residential development due to the presence of radioactive materials on, in, and around these properties.

81.     Drummond knew that this wasteland that Drummond and its predecessors created and subsequently failed to restore, was comprised of radioactive and other hazardous substances that pose a threat to the health and wellbeing of those people living and recreating on the property as well to the use and enjoyment of those same people, including Plaintiffs and the Class Members.

---

[10] "Summary and Impact of Florida Department of Health (FDOH) Historical Radiological Survey Data", Argonne National Laboratory (undated presentation).
[11] *Id.*
[12] Table 1 "Summary of Historical Florida Department of Health Radiological Survey Results for Selected Subdivisions and Property Developments" (undated spreadsheet table).

82.     In fact, as the potential of ionizing radiation to cause cancer has become better understood in the last ten years, Drummond became even more aware of the risks Plaintiffs had been, and continued to be, subjected to from its contaminated lands.

83.     In 2006, the National Academies of Sciences published its "Health Risks from Exposure to Low Levels of Radiation" which concluded based on its review of available science and epidemiology that there is no threshold for ionizing radiation's cancer-causing abilities. Thus, every incremental dose carries with it an increased risk of disease.[13]

84.     Based on the National Academies' determination, experts in the medical, dental, and occupational fields have evaluated the safety of exposure to ionizing radiation for things like medical and dental x-rays with health organizations recommending against dosing patients with radiation unless medically necessary.

85.     But as Drummond knew and failed to disclose, the land comprising the Oakbridge and Grasslands neighborhoods is contaminated with radioactive materials, including, but not limited to radium-226, and thus Plaintiffs and Class Members living, working, and playing in the Oakbridge, Grasslands, and surrounding residential and commercial developments are exposed to radiation levels that are significantly above background levels.

86.     Exposure to levels of radiation contamination similar to those identified in the Oakbridge development translates to residents receiving over one chest x-ray per week—with obviously no diagnostic or health purpose whatsoever.

87.     Drummond, intentionally and/or negligently concealed and failed to disclose, and continues to conceal and fail to disclose, to Plaintiffs and the Class Members material facts

---

[13] *See generally*, Committee to Assess Health Risks from Exposure to Low Levels of Ionizing Radiation, National Research Council. Health risks from exposure to low levels of radiation. BEIR VII phase 2. Washington, DC: The National Academies Press; 2006.

concerning the nature, extent, magnitude, and effects of the exposure of Plaintiffs, the Class Members and/or their property to these toxic and hazardous substances.

88.     Drummond knew and/or reasonably should have known that Plaintiffs, the Class Members, and/or their property would be exposed to hazardous materials and contaminants. Drummond knew and understood, and/or reasonably should have known and understood, that its concealment of such information would subject and continue to subject Plaintiff, the Class Members, and/or their property to continued exposure to hazardous materials and contaminants.

89.     Despite this knowledge, Drummond did not take sufficient measures to prevent the mining waste from being used in a manner that resulted in harm, or threatened harm, to the property, health, safety, and welfare of Plaintiffs, and did not disclose to Plaintiffs, Class Members or the public that the land upon which it mined and reclaimed land that was later built and sold as the Oakbridge and Grasslands homes were contaminated and radioactive.

**Plaintiffs and Residents Left Completely in the Dark**

90.     No one, including Drummond, or its agents, notified Plaintiffs or Class Members of the significantly elevated presence of radium-226 in and around their properties.

91.     No one, including Drummond, or its agents, notified Plaintiffs or Class Members of the significantly elevated presence of gamma radiation in and around their properties.

92.     No one, including Drummond, or its agents, notified Plaintiffs or Class Members of the significantly elevated cancer risks posed by the presence of gamma radiation in and around their properties.

93.     No one, including Drummond, or its agents, notified Plaintiffs or Class Members of the internal concerns raised by various Federal environmental and health agencies about the use of their properties.

94.     No one, including Drummond, or its agents, notified Plaintiffs or Class Members of the fact that EPA had considered emergency actions to remove the threats posed to people living on comparable lands or that their properties had been determined to be highly likely to require further action to be safe for residential uses.

95.     No one, including Drummond, or its agents, notified Plaintiffs or Class Members that the EPA had recommended against further development of contaminated phosphate lands, because the lands had not been safely reclaimed, such as those used for the Oakbridge and Grasslands developments, for residential purposes.

96.     Rather, Drummond, its agents, and the phosphate mining industry have continued to assure Plaintiffs, Class Members and the public in general that there is no threat posed by developing former phosphate lands for residential use.

97.     Plaintiffs and the Class Members reasonably believed that the groundwater, air, soil, and natural resources in the Oakbridge and Grasslands developments did not pose any greater health hazard than any other groundwater, air, soil, and natural resources.

98.     Plaintiffs and the Class Members have each been exposed to radioactive and other hazardous materials due to Drummond's negligence in remediating and producing, handling, storing, disposing of, and/or failing to properly remediate hazardous substances contaminating the Class Area.

99.     Plaintiffs, the Class Members, and their properties have each been exposed to radioactive and other hazardous materials due to Drummond's negligence in reclaiming their former phosphate mining lands and developing their former phosphate mining lands for residential use without the adequate and appropriate testing, sampling, remediation, disclosures, warnings, and other precautions.

22

100.     Plaintiffs and the Class Members seek redress and damages for property damages, impairment of their property, personal injury in the form of increased risk of latent disease, emotional distress, remediation, cleanup, economic losses, such as loss of property value, and the interference with the use and enjoyment of their property; the prompt cleanup, excavation, treatment, and removal of radioactive wastes and related contaminants from their properties; medical monitoring; and punitive damages and other damages as the result of the carelessness, recklessness, negligence and willful and wanton violation of law by the Drummond.

101.     Separate and apart from acting negligently, at all relevant times Drummond caused injury and damages to Plaintiff, the Class Members, and/or their property through acts and omissions actuated by actual malice and/or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by such acts or omissions.

102.     Drummond, despite its knowledge of the serious health and environmental effects associated with radioactive waste, released, discharged, stored, mishandled, exposed, processed, enhanced, disposed of and dumped mining waste throughout the Class Area and the surrounding environment, while failing to warn the public in general and the Class Members in particular of the dangers that the historical use of the property posed.

103.     Drummond, despite its knowledge of the serious health and environmental effects associated with radiation exposure, and despite continued warnings from health and environmental regulators, masked the true extent of contamination and its associated risks, thereby enabling it to avoid taking all appropriate steps to properly remediate these properties.

104.     Drummond, despite its knowledge of the serious health and environmental effects associated with mining waste exposure, and despite orders and warnings from health and environmental regulators, failed to properly remediate such radiation in the class areas.

<u>LIMITATIONS DOES NOT BAR ANY OF THE CLASS MEMBERS' CLAIMS</u>

105.    Plaintiffs and Class Members reallege and incorporate by reference all preceding paragraphs.

106.    As a result of the acts and omissions of Drummond and various public officials and health and environmental regulators, under the delayed discovery doctrine, Plaintiffs and Class Members could not have reasonably known or have learned through the exercise of reasonable diligence that Plaintiffs' and the Class Member's properties were contaminated with significantly elevated levels of gamma radiation and that those risks were the direct and proximate result of Drummond's acts and omissions in inadequately reclaiming and restoring the former mining lands. Thus, the applicable limitations periods did not begin to accrue until Plaintiffs and Class Members discovered, or through the exercise of reasonable diligence should have discovered, Drummond's tortious acts and omissions.

107.    In addition, the running of any statute of limitations has been tolled by Drummond's fraudulent concealment. Drummond, through its affirmative misrepresentations and omissions, actively concealed from Plaintiffs and Class Members the radioactive contamination present on their properties. In fact, Drummond continues its fraudulent concealment to this day because as recently as March 22, 2017, Drummond communicated to the Class Members in a letter that misrepresents the truth regarding its reclamation efforts and fraudulently conceals known defects – elevated levels of gamma radiation – it has long known were present at Oakbridge and Grasslands. *See* Exhibit 1.

108.    Furthermore, Drummond is equitably estopped from asserting any limitations defense because of its fraudulent concealment of the true character, quality and nature of the properties developed as parts of the Class Area when it had a duty to disclose such information

as a matter of law. Drummond was aware of the non-public nature of the true character, quality, and nature of the properties developed as parts of the Oakbridge and Grasslands neighborhoods because this was non-public information over which Drummond had and continues to have control, and because Drummond knew that this information was not available to residential purchasers and ultimate owners of the properties, including the Plaintiffs and the Class Members and continued to intentionally concealed such facts.

109.   In addition, any applicable limitations periods are equitably tolled based on Plaintiffs and Class Members have been misled, lulled into inaction, prevented from asserting their rights, and, thus excusably ignorant of the claims that they now bring in this action. As a result of the acts and omissions of Drummond and various public officials and health and environmental regulators, all of whom knew about the presence of elevated levels of gamma radiation on Drummond's land yet said nothing, Plaintiffs and the Class Members had no knowledge of the causes of action that they now assert in this action.

## CLASS ALLEGATIONS

110.   This Class Action is being filed by the Plaintiffs, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and others similarly situated.

111.   Plaintiffs seek to certify the following class, defined as:

**Drummond Property Damage Class ("Property Class")**: Any and all persons that own any real property in the Oakbridge & Grasslands Communities (collectively, the "Class Area") in Polk County, Florida.

**Medical Monitoring Class**: All persons who ever resided on property located within the Class Area for a minimum of four years.

Fraud Class: All persons who purchased property in the Oakbridge or Grasslands Communities within 12-years of March 10, 2017.

112.   To the extent revealed by discovery and investigation, there may be additional

appropriate classes and/or subclasses from the above class definitions which are broader and/or narrower in time or scope of exposure.

113.    Excluded from the classes are Drummonds' officers, directors, agents, employees and members of their immediate families; and the judicial officers to whom this case is assigned, their staff, and the members of their immediate families.

114.    Excluded from the classes are any local, state, or federal government entities.

115.    This Court may maintain these claims as a Class Action pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3) and/or 23(c)(4).

116.    Numerosity – Fed. R. Civ. P. 23(a)(1): The members of each class are so numerous that joinder of all members is impractical.

117.    The number of properties located within the Class Area exceeds 100 and, therefore, the number of members of each class likely also exceeds 100 people, in satisfaction of Fed. R. Civ. P. 23 (a)(1).

118.    Commonality – Fed. R. Civ. P. 23(a)(2): There are common questions of law and fact that affect the rights of every member of each respective class, and the types of relief sought are common to every member of each respective class. The same conduct by Drummond has injured or will injure every member of the Class.

119.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy, in satisfaction of Fed. R. Civ. P. 23(a)(2). Common questions of law and/or fact common to each respective class include, but are not limited to:

      a.     Whether Drummond discharged (or caused any other condition of pollution) a hazardous substance into the land or water on or under the respective Class Area;

      b.     Whether Drummond is strictly liable for discharging (or caused any other condition of pollution) a hazardous substance into the land or water on or

under the Class Area.

c.      Whether Drummond, through its acts or omissions, is strictly liable for the contamination on, in, and around the Class Area under Fl. Stat. § 376.313;

d.      Whether Drummond was negligent in its polluting, contaminating, restoring and/or reclaiming, handling, storing, remediating, using, and disposing the presence of radioactive materials and related contamination in the Class Area;

e.      Whether Drummond, through its acts or omissions, proximately caused property damage, diminution of property values, cleanup costs and health risks due to radioactive materials and related contaminants mined, deposited, released, enhanced, or abandoned in the Class Area;

f.      Whether Drummond, through its acts or omissions, deprived Class Members of the free and reasonable use and enjoyment of their properties due to the contamination of neighboring properties in the Class Area;

g.      Whether Class Members, through Drummond's acts, omissions and/or discharges (or other condition of pollution), have suffered damages, including but not limited to property and economic damages; and

h.      Whether, as a proximate result of Drummond's conduct, Medical Monitoring Class Members are at a significantly increased risk of disease due to exposures to Drummond's radioactive materials, such that they will benefit from ongoing medical monitoring.

120.    These questions of law and/or fact are common to the class and predominate over any questions affecting only individual Class Members.

121.    Typicality – Fed. R. Civ .P. 23 (a)(3): The claims of John J. Jerue and Michael J. Feist are typical of the claims of the Drummond Property Class and the Medical Monitoring Class, as required by Fed. R. Civ. P. 23(a)(3), in that all claims are based upon the same factual and legal theories. The principal issues in this matter involve Drummond's conduct in wrongfully handling, releasing, discharging (or other condition of pollution), enhancing, storing, transporting, processing, disposing of, and/or failing to remediate, its toxic and hazardous mining wastes and substances and by-products as well as its reckless and negligent decision to develop

these reclaimed phosphate lands into residences where people live, work, and play, which impact all Class Members.

122.     Adequacy – Fed. R. Civ. P. 23(a)(4): Plaintiffs John J. Jerue and Michael J. Feist will fairly and adequately represent and protect the interests of the Class Members, as required by Fed. R. Civ. P. 23(a)(4).  Plaintiffs have retained counsel with substantial experience in the prosecution of environmental class actions and lawsuits involving phosphate waste in Florida. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the class, and they have the financial resources to do so. Neither Plaintiffs nor counsel has any interest adverse to those of the class.

123.   Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by individual members of the classes would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Drummond and/or because adjudications respecting individual members of the class would, as a practical matter, be dispositive of the interests of the other members or would risk substantially impairing or impending their ability to prosecute their interests.

124.   Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because Drummond has acted or refused to act on grounds generally applicable to all members of the classes, thereby making relief in the form of an injunction requiring the prompt excavation and removal of all radioactive waste and related contaminants from the class properties and because Drummond has acted or refused to act on grounds generally applicable to all members of classes, thereby making relief in the form of an injunction requiring the prompt excavation and removal of all mining waste, slag and related contaminants from the properties of Plaintiffs and the Class Members appropriate.

28

125.    In addition, Plaintiffs and the members of the Medical Monitoring Class ("Medical Monitoring Class Members") allege that:

a.      Plaintiffs and the Medical Monitoring Class Members have each been exposed to toxic and hazardous substances, including radioactive materials, at levels greater than normal background, due to Defendants' negligence in reclaiming the land and in handling, storing, use, disposal and/or failure to properly remediate such toxic and hazardous substances.

b.      The toxic and hazardous substances, including radioactive materials, at issue in this case are proven hazardous substances.

c.      As a proximate result of the exposure to toxic and hazardous substances, including radioactive materials, Plaintiffs and the Medical Monitoring Class Members have a significantly increased risk of contracting serious latent diseases, including, without limitation, cancer.

d.      The significant increased risk of contracting serious latent diseases, including, without limitation, cancer and thyroid diseases, makes periodic diagnostic medical examinations, testing and monitoring reasonable and necessary.

e.      A monitoring procedure exists that makes early detection of these potential diseases possible.

f.      The prescribed monitoring regiment is different from that normally recommended in the absence of exposure to toxic and hazardous substances.

g.      The prescribed monitoring regiment is reasonable and appropriate according to contemporary medical and scientific principles.

126.    Plaintiffs and the Class Members have suffered, and will continue to suffer, harm and damages as a result of Drummond's unlawful and wrongful conduct, including but not limited to its discharge (or other condition of pollution) of hazardous substances into the land and water of and under the Class Area.

127.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy under Fed. R. Civ. P. 23 (b)(3). Absent a class action, most members of the classes likely would find the cost of litigating their claims to be prohibitive, and

will have no effective remedy at law. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

128.    Class certification is also appropriate because this Court can designate particular claims or issues for class-wide treatment and may designate one or more subclasses pursuant to Fed. R. Civ. P. 23(c)(4).

129.    Maintenance of this action as a class action is a fair and efficient method for adjudication of this controversy. It would be impracticable and undesirable for each member of the class who has suffered harm to bring a separate action. In addition, the maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all members of such class.

130.    No unusual difficulties are likely to be encountered in the management of this action as a class action.

131.    Class certification is also appropriate because Drummond has acted on grounds generally applicable to the members of the classes, making relief appropriate with respect to the classes. Specifically, Plaintiffs and the Class Members seek compensation for loss of use and enjoyment of their property, diminution in property value, removal of contamination from their property, medical monitoring (with respect to the Medical Monitoring Class) and other relief deemed just and proper.

## CAUSES OF ACTION

132.    Plaintiffs and Class Members reallege and incorporate by reference the preceding paragraphs.

## COUNT I. STRICT LIABILITY PURSUANT TO CH. 376, FLA. STAT.

133.    Drummond's wrongful acts and omissions in releasing and discharging (or other conditions of pollution) toxic pollutants, hazardous substances and other contaminants onto the lands and water of the state of Florida in general, and the Class Area in particular, as is alleged in more detail above, was in violation of various environmental statutes in the State of Florida, including but not limited to the following:

a.     Discharging (or other condition of pollution) of any pollutants or hazardous substances into or upon land (or water) in violation of § 376.302(1)(a) Fla. St.; and

b.     Failure to immediately remediate, contain, remove and abate the discharges in violation of § 376.305(1) Fla. St.

134.    Plaintiffs are each a "person[s]" who may bring a cause of action for damages under § 376.313.

135.    Plaintiffs have alleged damages resulting from Drummond's discharge of hazardous substances onto their land, as those terms are defined in Fla. Stat. §§ 376.30 – 376.319.

136.    Drummond is strictly liable for damages to Plaintiffs and the Class Members resulting from such discharges (or other conditions of pollution) covered by §§ 376.30 – 376.319 Fla. St., and Plaintiffs and the Class Members are not required to plead or prove negligence in any form or manner, pursuant to § 376.313 Fla. St., because it is sufficient to plead and prove, as set forth in various paragraphs above, that the prohibited discharges or other polluting conditions occurred.

137.    Drummond's acts and omissions violate numerous Department of Environmental

Protection ("DEP") standards as well as other state and federal standards adopted by the DEP including, *inter alia*, Chapters 62-730, 62-777, 62-780, 62C-16, and/or 64E-5 of the Florida Administrative Code, Part II of Chapter 378, Florida Statutes, 40 C.F.R. §6262.11, 42 U.S.C. § 6925(a), 40 C.F.R. Part 264, Subparts A-G, K, and CC, and/or 40 C.F.R. Part 268 (collectively the "Applicable Legal Standards").

## COUNT II – NEGLIGENCE AND NEGLIGENCE PER SE

138.    At all relevant times hereto, Drummond owed to Plaintiffs and Class Members who foreseeably could be injured by its negligence, a duty to exercise reasonable care in releasing, polluting, reclaiming, restoring, discharging (or other conditions of pollution), concentrating, freeing, or stockpiling toxic contaminants, including radioactive materials, that it knew, or should have known, could result in damage and injury to Plaintiff, Class Members and their property.

139.    Drummond also owed a duty of care to Plaintiff and Class Members to exercise reasonable care in the use of contaminated land for residential and commercial uses, to include living, working, and playing.

140.    These duties to exercise reasonable care arose out of the common law of Florida, as well as relevant Federal and state environmental statutes and regulations, including the Applicable Legal Standards.

141.    Drummond breached its duty, over a period of years, in at least the following respects:

   a.    Drummond failed to adequately restore and/or reclaim and restore its mining lands in a manner that returned the land to its original condition prior to mining operations, as required by Florida common law, statutes,

and regulations.

b.    Drummond failed to restore the land it to its original condition, but rather further polluted the land making it an ongoing threat to those thereon.

c.    Drummond further polluted, contaminated, and increased the hazardous nature of this land by disposing of radioactive wastes, soils, clays, and slimes into and onto the property, increasing the hazards that it poses to Plaintiffs, Class Members, and to the public.

d.    Drummond acted with knowledge of the widespread presence of contamination in the form of hazardous substances, including radioactive materials, on the former phosphate lands that became lands forming the Class Area along with the knowledge of the health and environmental risks that this radiation posed for those engaged in residential activities on these lands, and despite that it continued developing and ultimately profiting by putting these contaminated lands into commerce for development into residential property on this contaminated land.

e.    Disposing of hazardous wastes and other substances onto the land.

f.    Failing to safely and properly remove and dispose the hazardous substances, including radioactive materials.

g.    In failing to warn Plaintiff and Class Members of the contamination on, in, and around their properties, and the risks that it posed to them and to their families, and the likelihood that they were being exposed to carcinogenic radiation.

142.    As a result of Drummond's acts and omissions, as further detailed above,

33

extensive contamination has existed, exists and will continue to exist and has been documented in the Class Area.

143.   As a result of Drummond's misconduct as set forth herein, Plaintiffs and Class Members have suffered and continue to suffer damages, including, but not limited to, the significant property damage, impairment of their property, loss of value to their property and the loss of the use and enjoyment of their property and an increased risk of serious latent injury/illness.

144.   At all relevant times, Drummond caused injury, impairment of property and property and other damages to Plaintiffs and the Class Members and/or their property through acts and omissions actuated by actual malice and/or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by such acts or omissions.

145.   Drummond, despite its knowledge of the serious health and environmental effects associated with exposure to such hazardous substances, including radioactive materials, and having contaminated the lands with its mining and disposal activities, inadequately restored and/or reclaimed phosphate lands with knowledge that they would be developed for residential use that were unfit for residential purposes due to the presence of elevated levels of contamination in the form of radiation in, on, and around the land comprising the Class Area and subsequently failed to warn Plaintiffs, the Class Members, and the public of the dangers such activities posed.

146.   Drummond, despite its knowledge of the serious health and environmental effects associated with radiation exposure masked the true extent of contamination, thereby enabling the Drummond to avoid taking all appropriate steps to properly remediate the hazardous substances and levels of radiation in, on, and around the Class Area or to remediate and mitigate dangers

34

created by its development of radioactive phosphate lands for residential use.

147.    As a direct and proximate result of the Drummond's wrongful acts and omissions, Plaintiffs and Class Members properties have been and will continue to be contaminated and unfit for residential and routine contact.

148.    As a direct and proximate result of the Drummond's wrongful acts and omissions, Plaintiffs and the Class Members currently suffer an increased risk of serious latent disease, including a number of types of cancer that are associated with exposure to ionizing radiation.

149.    As a direct and proximate result of the Drummond's wrongful acts and omissions, Plaintiffs and Drummond Property Damage Class Members currently suffer property damage, diminution in the value of their property, cleanup costs, loss of use and enjoyment of their property and destruction of their community.

150.    Because Drummond's acts and omissions violated the Applicable Legal Standards, referred to above, in addition to breaching the common law duty of care, Drummond's acts and omissions constitute negligence per se.

151.    Plaintiffs and Class Members seek to recover against the Drummond for property damage, including diminution of property values, the cost of remediation of properties, as well as the cost of periodic medical examinations necessary to detect the onset of physical harm that may be caused by radioactive contaminants on and around Plaintiff's property.

## COUNT III – FRAUD AND FRAUDULENT CONCEALMENT

## FRAUD CLASS ONLY

152.    Drummond concealed or failed to disclose material facts to Plaintiff Feist and Fraud Class Members, including, without limitation, that its former phosphate mining lands contain elevated levels of radioactive contamination, including radium-226 and gamma radiation,

which it has known about for decades, and the elevated cancer risks posed by the presence of gamma radiation in and around these residential and commercial properties.

153.    Drummond knew or should have known about these material facts. Not only does Drummond have extensive experience in the mining industry, but it was expressly put on notice of the elevated radiation levels on its former phosphate mining lands by the state of Florida.

154.    Drummond knew or intended that its concealment of, or failure to disclose, the material facts would induce the plaintiffs to act. Drummond knew that if it disclosed the truth regarding the elevated gamma radiation levels, Plaintiff Feist and Fraud Class Members would not have purchased or leased their residential and/or commercial properties.

155.    Drummond's failure to disclose the elevated levels of radiation blanketing the property forming the Oakbridge, Grasslands, and surrounding areas, despite knowledge of this contamination, constitutes fraud by omission.  Drummond's concealment of what was known to them to be a material defect in the property it sold constitutes an act of fraud, without which Plaintiff Feist and the Fraud Class Members would not have purchased their property or continued to reside on this property to their detriment.

156.    Drummond had a duty to disclose the material facts for several reasons. First, it is well established that Drummond had a duty to disclose known defects to its land, namely elevated levels of gamma radiation, which it created by failing to properly reclaim and restore the land in accordance with Florida law. In addition, when Drummond spoke in its written marketing and promotional materials, in conversations with Plaintiff Feist and the Fraud Class Members during the sales process, and in the March 22, 2017 Letter (Ex. 1), it had the duty to speak the entire truth, not to tell half-truths, and to prevent its words from misleading to Plaintiff Feist and Fraude Class Members. And because Drummond had knowledge of material facts to

36

which Plaintiff Feist and the Fraud Class Members did not have access, it had duty to disclose these facts.

157.    Plaintiff Feist and the Fraud Class Members detrimentally relied on Drummond's misinformation. If Plaintiff Feist and the Fraud Class Members had known the actual facts regarding the elevated levels of gamma radiation on their residential and commercial properties, they would not have entered into the transactions to buy or lease the residential and/or commercial properties.

158.    Specifically, in September 1985 Drummond and the State of Florida entered into the Drummond Properties Lakeland Development Agreement with the Department of Community Affairs and Central Florida Regional Planning Council (the "Development Agreement"). See Doc. No. 16-2. Drummond's conveyance of title to Plaintiffs and/or Plaintiffs' predecessors-in-interest was expressly subject to, inter alia, the Development Agreement. See Doc. No. 16-1; Doc. No. 16-4; Doc. No. 16-5; Doc. No. 16-6.  In the Development Agreement, Drummond made the following representations that Plaintiffs relied upon to their detriment:

(i)    "The Drummond properties were previously mined for phosphate rock and **have been under reclamation during recent years**. **Some of the funding for this reclamation has been provided through the Department of Natural Resources from the State Nonmandatory Reclamation Trust Fund**." Doc. No. 16-2, at 2 (emphasis added);

(ii)    "Drummond proposes **to continue to reclaim some portions of the tract** . . . subject to the additional restrictions set forth below. Drummond also **proposes to reclaim** the southeast, Southwest and Northwest quadrants. . . . The development authorized by this paragraph will occur on land **suitable for development and will not cause any material adverse impacts on regional resources or facilities**." *Id*. at 3 (emphasis added);

(iii)    "Drummond affirms that all representations and statements made to the [State of Florida] contained in this [Development] Agreement **are true and accurate**, to the best of its knowledge. Based on these representations, the [State of Florida] finds that this [Development] Agreement is in the **best interest of the State [of Florida]**." *Id*. at 5; and

37

(iv)    "Drummond agrees to utilize . . . **control technology** . . . in construction for **all proposed dwelling units on reclaimed phosphate lands** in order to **mitigate any potential adverse impacts due to** radon gas emissions **or other radiation effects** considered possible to occur on such lands. **The purpose of this section is to establish control technology to reduce the exposure of the occupants of a residential structure to the influx of radionuclides into the structure by use of certain building techniques. These building techniques shall be mandatory** for the construction of all residential structures authorized by this Agreement and shall be included in the plans submitted to the appropriate permitting agency in Lakeland before a permit is granted and construction begins." *Id*. at 6-7 (emphasis added).

159.    The presence of significantly elevated levels of gamma radiation in, on, and surrounding the properties forming Oakbridge and Grasslands make it clear that Drummond did not mitigate any and all adverse impacts that were known or foreseen due to the presence of radiation or any other "radiation effects."

160.    Given that Drummond knew for decades that its phosphate mining lands had elevated levels of gamma radiation, its affirmative statements of fact contained in its written marketing and promotional materials (including, without limitation, the statements contained in Paragraphs 52-54 above), in sales conversations and negotiations with Plaintiff Feist and the Fraud Class Members, and the public, and in the March 22, 2017 Letter (attached as Ex. 1) constitute fraudulent misrepresentations. Drummond represented to Plaintiff Feist and the Fraud Class Members, and the public that Oakbridge, Grasslands, and other residential and commercial developments located on its phosphate mining lands were, among other things, habitable, safe, high quality, good investments, good values, "the result of a depth of resources and an even deeper commitment to being a model corporate citizen," and that they exhibited the "preservation of the natural environment." These representations constitute false statements of material facts or, alternatively, misleading and partial half-truths that fail to disclose all material facts.

161.    Drummond knew that these representations are false, given its extensive mining operations and that the state of Florida expressly informed it of the elevated levels of gamma radiation on its phosphate mining lands.

162.    Drummond intended that these representations induce Plaintiff Feist and the Fraud Class Members, and the public to act on them by purchasing or renting its residential or commercial properties.

163.    Consequently, Plaintiff Feist and the Fraud Class Members relied on these misrepresentations, thereby causing them injury. Had Plaintiffs and Class Members known the truth, they would not have entered into the transactions at issue.

## COUNT IV – NEGLIGENT MISREPRESENTATION

## FRAUD CLASS ONLY

164.    Drummond made false representations of material facts. Given that Drummond knew for decades that its phosphate mining lands had elevated levels of gamma radiation, its affirmative statements of fact contained in its written marketing and promotional materials (including, without limitation, the statements contained in Paragraphs 52-54 above), in sales conversations and negotiations with Plaintiff Feist and the Fraud Class Members, and the public, and in the March 22, 2017 Letter (attached as Ex. 1) constitute fraudulent misrepresentations.

165.    Drummond represented to Plaintiff Feist and the Fraud Class Members, and the public that Oakbridge, Grasslands, and other residential and commercial developments located on its phosphate mining lands were, among other things, habitable, safe, high quality, good investments, good values, "the result of a depth of resources and an even deeper commitment to being a model corporate citizen," and that they exhibited the "preservation of the natural

environment." These representations constitute false statements of material facts misleading and partial half-truths that fail to disclose all material facts.

166.     Specifically, in September 1985 Drummond and the State of Florida entered into the Drummond Properties Lakeland Development Agreement with the Department of Community Affairs and Central Florida Regional Planning Council (the "Development Agreement"). See Doc. No. 16-2. Drummond's conveyance of title to Plaintiffs and/or Plaintiffs' predecessors-in-interest was expressly subject to, inter alia, the Development Agreement. See Doc. No. 16-1; Doc. No. 16-4; Doc. No. 16-5; Doc. No. 16-6.  In the Development Agreement, Drummond made the following representations that Plaintiffs relied upon to their detriment:

(i)     "The Drummond properties were previously mined for phosphate rock and **have been under reclamation during recent years**. **Some of the funding for this reclamation has been provided through the Department of Natural Resources from the State Nonmandatory Reclamation Trust Fund**." Doc. No. 16-2, at 2 (emphasis added);

(ii)     "Drummond proposes **to continue to reclaim some portions of the tract** . . . subject to the additional restrictions set forth below. Drummond also **proposes to reclaim** the southeast, Southwest and Northwest quadrants. . . . The development authorized by this paragraph will occur on land **suitable for development and will not cause any material adverse impacts on regional resources or facilities**." *Id*. at 3 (emphasis added);

(iii)     "Drummond affirms that all representations and statements made to the [State of Florida] contained in this [Development] Agreement **are true and accurate**, to the best of its knowledge. Based on these representations, the [State of Florida] finds that this [Development] Agreement is in the **best interest of the State [of Florida]**." *Id*. at 5; and

(iv)     "Drummond agrees to utilize . . . **control technology** . . . in construction for **all proposed dwelling units on reclaimed phosphate lands** in order to **mitigate any potential adverse impacts due to** radon gas emissions **or other radiation effects** considered possible to occur on such lands. **The purpose of this section is to establish control technology to reduce the exposure of the occupants of a residential structure to the influx of radionuclides into the structure by use of certain building techniques. These building techniques shall be mandatory** for the construction of all residential structures authorized by this Agreement and shall be included in the plans submitted to the appropriate

permitting agency in Lakeland before a permit is granted and construction begins." *Id*. at 6-7 (emphasis added).

167.    The presence of significantly elevated levels of gamma radiation in, on, and surrounding the properties forming Oakbridge and Grasslands make it clear that Drummond did not mitigate any and all adverse impacts that were known or foreseen due to the presence of radiation or any other "radiation effects."

168.    Drummond was negligent in making these statements because it should have known these representations were false, given its extensive mining operations and that the state of Florida clearly informed Drummond of the elevated gamma radiation levels on its phosphate mining lands.

169.    Drummond intended to induce Plaintiff Feist and the Fraud Class Members to rely on its misrepresentations.

170.    Injury resulted to the Plaintiffs and Class Members acting in justifiable reliance upon Drummond's misrepresentations. Had Plaintiffs and Class Members known the truth, they would not have entered into the transactions at issue.

## COUNT V – MEDICAL MONITORING

171.    Plaintiffs and the Medical Monitoring Class Members assert Florida law of equity claims for medical monitoring against Drummond, arising from Drummond's wrongful acts, negligence, and/or violations of Chapter 376 Florida Statute, as each is further detailed above, in its: phosphate mining operations and production; inadequate remediation, reclamation and restoration of the former mining lands; releasing, handling, reclaiming, restoring, discharging (or other conditions of pollution), concentrating, freeing, disposing of and/or stockpiling hazardous substances, including radioactive materials,  including, but not limited to, gamma radiation  on,

41

in and/or around the property located in the Class Area, and use of such contaminated land for developing and selling residential and commercial properties.

172.    As a direct and proximate result of Drummond's wrongful acts, negligence, and/or violations of Chapter 376 Florida Statute, as each is further detailed above, Plaintiffs and the Medical Monitoring Class Members were exposed to hazardous substances, including but not limited to, gamma radiation and radioactive materials, at greater than normal background levels.

173.    As a direct and proximate result of the Drummond's wrongful acts, negligence, and/or violations of Chapter 376 Florida Statute,, as each is further detailed above, and Plaintiffs and the Medical Monitoring Class Members exposure to hazardous substances, including but not limited to, gamma radiation and radioactive materials at greater than normal background levels, Plaintiffs and the Medical Monitoring Class Members have a significantly increased risk of contracting serious latent diseases, including, but not limited to, a number of types of cancer, including, but not limited to, leukemia, lymphoma, bone and thyroid cancer as well as thyroid disorders that are associated with exposure to such hazardous substances such as uranium byproducts.  The significantly increased risks of serious latent disease, including, but not limited to a number of types of cancer and thyroid disorders, makes periodic diagnostic medical examinations reasonable and necessary.

174.    A medical monitoring program is necessary for early detection and treatment of the aforementioned latent conditions including cancer and thyroid disorders, and an easily administered, cost effective monitoring program exists.

175.    The Plaintiffs seek for the Court to exercise its' equitable powers to create, supervise, and implement (or cause to be created, supervised and implemented), and for the Court to order Drummond to fund, an appropriate medical monitoring plan that provides routine

medical testing, monitoring and study of the Plaintiffs and each Medical Monitoring Class Member, for the remainder of each Plaintiffs' and Medical Monitoring Class Member's life.

176.    The Plaintiffs and the Medical Monitoring Class Members seek for such medical monitoring program to institute comprehensive and appropriate diagnostic tests for the early detection and diagnosis of cancers and thyroid disorders and other serious latent diseases. The diagnostic tests may include, without limitation or exhaustion, periodic physical examinations, clinical laboratory tests for appropriate biological markers, electrocardiograms, echocardiography, radionuclide cardiac imaging, CT Scans, MRI Scans, vascular ultra sound, lung perfusion scans, and biopsy and such other tests as to maximize the Plaintiffs and the Medical Monitoring Class Members' opportunity for early detection of such latent diseases, including cancer and thyroid disorders.

177.    The medical monitoring program is reasonable and necessary as a result of Plaintiffs and the Medical Monitoring Class Members increased risk of serious latent diseases, including cancer and thyroid disorders.

178.    The Plaintiffs' and the Medical Monitoring Class Members' increased risk of serious latent diseases, including cancer and thyroid disorders necessitates a more comprehensive medical monitoring program than the ordinary medical screening generally practiced, recommended or required for the unexposed population, thus the required regimen is different from that recommended in the absence of the Plaintiffs' and the Medical Monitoring Class Members' exposure.

179.    The medical monitoring program is reasonably necessary according to contemporary scientific principles, medical literature and expert opinion, as early detection of cancers and thyroid disorders improves prognoses and overall treatment.  Cancer and thyroid

diseases often go undiagnosed and, as a result untreated, while those suffering from them can benefit from medical treatment.

180.    Florida recognizes the Plaintiffs and the Medical Monitoring Class Members' to medical monitoring as a cognizable cause of action, <u>Petito vs. A.H. Robbins, Co., Inc.</u>, 750 So2d 103 (3rd DCA), despite the absence of the manifestations of a present physical injury or symptomatic disease.

## JURY TRIAL DEMAND AND PRAYER FOR RELIEF

Plaintiffs and Class Members hereby demand a trial by jury.

**WHEREFORE**, Plaintiffs and Class Members request that the Court enter an order or judgment against Drummond as follows:

A.    Enter an Order pursuant to Federal Rule 23 permitting this action to be maintained as a class action, Plaintiffs as the representative of the Medical Monitoring and Property Classes and appointing Plaintiffs' counsel as counsel for such classes;

B.    Enter judgment against Drummond for: compensatory damages; the prompt testing, assessment, excavation and removal of all radioactive wastes and related contaminants to levels otherwise representative of background levels from Plaintiffs and Class Members' properties; the cost of periodic medical examinations necessary to detect the onset of physical harm, including, serious latent injury and/or disease that may be caused by radioactive contaminants on and around Plaintiffs' property; attorneys' fees, costs of suit as provided for by law; and such other relief as the Court may deem just and proper in favor of Plaintiffs and the Class Members against Drummond for loss of property value, and for all other relief, in an amount to be proven at trial, as to which they may be entitled, including interest, expert fees and costs of this suit;

C.    Enter an order granting a medical monitoring program, funded by Drummond;

44

D.      Enter an injunction requiring Drummond to promptly and completely remediate radiation levels to, or below, background levels from the Plaintiffs' and Class Members' properties;

E.      Award prejudgment and post-judgment interest as provided by law;

F.      Award punitive damages; and

G.      Such other relief as this Court deems necessary, just and proper.

Plaintiffs demand a trial by jury as to all claims so triable in this action.

Dated: August 31, 2017

*Signatures on following page(s)*

45

By:           /s/ W. Mark Lanier

Neal O'Toole, Esq.
**Lilly, O'Toole & Brown, LLP**
800 Florida Ave S.
Lakeland, FL 33801
Telephone: (863) 683-1111
notoole@loblawyers.com

W. Mark Lanier, Esq.
(admitted *pro hac vice*)
Richard Meadow, Esq.
(admitted *pro hac vice*)
Chris Gadoury, Esq.
(admitted *pro hac vice*)
Ryan Ellis, Esq.
(admitted *pro hac vice*)
**The Lanier Law Firm, P.C.**
6810 FM 1960 West
Houston, Texas 77069
Telephone: (713) 659-5200
wml@lanierlawfirm.com
Richard.Meadow@lanierlawfirm.com
Chris.Gadoury@lanierlawfirm.com
Ryan.Ellis@lanierlawfirm.com

Thomas Girardi, Esq.
(admitted *pro hac vice*)
**Girardi | Keese**
1126 Wilshire Boulevard
Los Angeles, CA 90017
Telephone: (213) 262-6777
tgirardikeese.com

Christopher T. Nidel, Esq.
(admitted *pro hac vice*)
Jonathan Nace, Esq.
(admitted *pro hac vice*)
**Nidel & Nace, P.L.L.C.**
5335 Wisconsin Ave., NW, Suite 440
Washington, D.C. 20015
Telephone:  (202) 558-2030
chris@nidellaw.com

46

Steven J. German, Esq.
(admitted *pro hac vice*)
Joel M. Rubenstein, Esq.
(admitted *pro hac vice*)
**German Rubenstein LLP**
19 West 44th Street, Suite 1500
New York, NY 10036
Telephone: (212) 704-2020
sgerman@germanrubenstein.com
jrubenstein@germanrubenstein.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2017, a true and correct copy of the foregoing Plaintiffs' First Amended Class Action Complaint was served electronically on all parties registered to receive electronic notice via the Court's CM/ECF system.

*/s/ W. Mark Lanier*
W. Mark Lanier

47