UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOHN J. JERUE and MICHAEL J. FEIST,

    Plaintiffs,

v.                 Case No. 8:17-cv-00587-EAK-AEP

DRUMMOND COMPANY, INC.

    Defendant.

_____/

## MOTION TO DISMISS SECOND AMENDED COMPLAINT

Defendant Drummond Company, Inc. ("Drummond") moves to dismiss the Second Amended Complaint ("SAC") filed by Plaintiffs John J. Jerue and Michael J. Feist.

## Introduction

This Court's Order of August 17, 2017, dismissed six out of Plaintiffs' eight claims ("Order"). The Plaintiffs then filed the SAC on September 1, 2017. Notably, the SAC does not mention even one physical injury that allegedly occurred on the reclaimed lands during the past 40 years. After decades of development and residential use, there is not one documented case of cancer or other illness allegedly related to Defendant's mining and reclamation activity. Plaintiffs Jerue and Feist have clearly not experienced any injury or illness allegedly caused from years of living in Oakbridge and Grasslands. For example, Mr. Feist claims to have lived in Grasslands since 2001 (sixteen years), yet has alleged no health effects whatsoever. SAC ¶29. Jerue has lived in Oakbridge since 2004 (thirteen years) with no alleged health effects. Order at 15. Plaintiffs have not even alleged any actual gamma radiation levels on their own properties, which is very telling. Without any physical injuries, Plaintiffs are claiming economic losses only. As this Court stated: "all of these claims are based on the same purely economic damages, i.e., diminution in the

value of Plaintiffs' properties." Order at 8. However, the Court noted that these alleged economic losses were caused by Plaintiffs' own self-publication of their allegations. Order at 9.

Plaintiffs' claims are baseless. According to the EPA, solid waste from phosphate mining is not a hazardous waste. See 40 C.F.R. §261.4(b)(7). In addition, the Plaintiffs cannot establish that alleged gamma radiation from phosphate mining causes any particular individual's illness or cancer. See *McMunn v. Babcock & Wilcox Power Gen. Group, Inc.*, 869 F. 3d 246, 255, 272 (3d Cir. 2017) (exposure from ionizing radiation cannot be shown to cause any particular person's illness or cancer). No case has ever found that residential use of former phosphate lands caused any person's illness as a result of exposure to gamma radiation. Plaintiffs' irresponsible allegations are not based on credible facts or valid legal claims. Instead, they are designed to create fear and headlines. As a result, Plaintiffs have created their own "fake news."

## Facts

Polk County and the State of Florida have benefitted tremendously from phosphate mining for over 100 years. It is well known that central Florida is the home of some of the world's best and most accessible phosphate deposits. Phosphorus is an essential plant nutrient. According to the Florida Department of Environmental Protection ("Florida DEP"), "mined phosphate includes several naturally occurring minerals that contain phosphorus as well as other elements. It is primarily used to produce fertilizers for food production. It may also be used in animal feed supplements, food preservatives, and many industrial products." http://www.dep.state.fl.us/water/mines/manpho.htm. Polk County has supplied phosphate for national and international farming for many decades. The Florida DEP's website states that 75% of America's phosphate comes from Florida. By utilizing these and other nutrients, American farmers became the largest producers of grain and other crops in the 20th century.

The Florida DEP website discusses the history of phosphate mining as well as mining techniques.  *Id.*  Phosphate mining is a relatively simple process.  The miner first removes the "overburden" or top soil.  Below the overburden is soil consisting of sand, clay, and phosphate, roughly in equal parts.  This is referred to as the "matrix."  The matrix material is mixed with water to make a slurry.  The slurry is piped to a nearby beneficiation plant.  The beneficiation plant simply separates the sand and clay from the phosphate "pebbles."  As discussed by the Florida DEP:

> Following clearing and site preparation, large draglines are used to conduct the mining. The dragline bucket holds from 45 to 65 cubic yards of material and is large enough to hold a truck or van. It scoops up the top 15 to 30 feet of earth known as overburden and dumps it in spoil piles to the side of the mine pit. The dragline then digs out what is known as the matrix, which consists of about equal parts phosphate rock, clay and sand.

> Matrix material is then dumped in a pit where high-pressure water guns create a slurry that can then be pumped to the beneficiation plant, which can be several miles away. At the beneficiation plant the phosphate is separated from the sand and clay.

> After going through beneficiation, the clay slurry is pumped through pipelines into large impoundment areas to allow additional settling of the clays. The sand is pumped through pipelines back to the mine site to be used in reclamation and the phosphate is sent by rail to a separate chemical processing plant where it is processed for use in fertilizer and other products. The chemical processing is done at separate facilities that are not regulated by the Mining and Mitigation Program.

The beneficiation process essentially involves running the soil over screens designed to filter out sand and clay from the phosphate.  This is a process that dates back to the early days of mining.  Techniques for separating phosphate from sand and clay improved during the 20th Century to allow a greater amount of phosphate to be recovered through a process known as "flotation."  This process allowed a higher capture rate for smaller sized phosphate pieces.  The

sand and clay are returned to the land for reclamation.  The overburden is then distributed over the landscape with earth moving equipment.  This process has been followed for many decades in Polk County and Central Florida.  See Florida DEP website.

The Plaintiffs have erroneously confused phosphate mining with chemical processing of phosphate for fertilizer production.  This Court noted that Plaintiffs alleged a discharge of "phosphatic slag" onto their property, yet the mining and beneficiation process does not produce such byproducts.  The Court may take judicial notice of phosphate mining and beneficiation techniques as discussed by the EPA, Florida DEP, and other authoritative sources.  See, e.g., 40 C.F.R. §261.4(b) (discussion of process which  exempts extraction, beneficiation, and processing of phosphate from the definition of hazardous wastes).  As discussed in these materials, the mining and reclamation process involves nothing more than filtering out the phosphate pieces from sand and clay.   Plaintiffs have erroneously alleged the production of "phosphatic slag," which is associated with ore smelting or "elemental phosphorous production," not mining and beneficiation.  See 40 C.F.R. §261.4(b)(7)(ii) (exempting "slag from elemental phosphorous production" from the category of hazardous wastes).  "Slag" is not the product of extraction or beneficiation, which merely separates phosphate pebbles from the surrounding soil.  As discussed in the next section, the EPA has determined that the extraction, beneficiation, and processing of phosphate does not produce "hazardous substances" or pollution.  It merely returns sand and clay to the land, which is not harmful to anyone.  40 C.F.R. §261.4(b)(7).

## Summary of the Argument

Plaintiffs' claims involve several erroneous and speculative concepts.  First, Plaintiffs have persisted in alleging that the sand and clay from the extraction and beneficiation process constitute hazardous solid waste.  Contrary to Plaintiffs' assertions, the EPA has determined that this material

4

is expressly exempt from the category of "hazardous wastes" or "hazardous substances."  See 40 C.F.R. § 261.4(b)(7) (solid waste from the extraction, beneficiation, and processing of phosphate does not constitute hazardous wastes).  Second, Plaintiffs claim that environmental radiation on their property causes cancer, even though no actual injuries have occurred during the past 40 years.  This alleged causal connection forms the basis for Plaintiffs' medical monitoring claim and self-inflicted "economic" damages.  Plaintiffs claim that their property values have been diminished because the property contains radiation that may increase the risk of cancer or other illnesses.  However, these claims are based on "rank speculation."  *McMunn v. Babcock & Wilcox Power Gen. Group, Inc.*, 869 F. 3d 246, 273 (3rd Cir. 2017).  Specifically, Courts have recognized that there is no scientific basis on which to show that ionizing radiation actually causes <u>any particular person's injury</u>.  There is no plausible basis on which to establish that such radiation in a residential setting causes any specific individual's cancer or other illness.  Without the ability to establish injury causation, there is no plausible basis on which to allege recoverable claims in this case.

If Plaintiffs' claims cannot rise above speculation, they should be dismissed.  *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007); *Ashcroft v. Iqbal*, 192 S. Ct. 1937 (2009).  As the Supreme Court held in *Twombly*:  "Factual allegations must be enough to raise a right to relief above the speculative level."  127 S. Ct. at 1965.  In *Jacobs v. Osmose*, 2002 WL 34241682 (S. D. Fla. June 3, 2002), the court dismissed a so called toxic tort because Plaintiff's claim was factually speculative.  In this case, the law of radiation exposure is clear that any alleged harm is based on "rank speculation" and injury causation cannot be established.

In a very recent Third Circuit Court of Appeals case, the court ruled that it is not plausible to conclude that any specific individual's illness resulted from alleged ionizing radiation in a residential setting.  *McMunn v. Babcock & Wilcox Power Gen. Group, Inc.,* 869 F. 3d 246 (3rd Cir.

2017).  This recent case was decided <u>after</u> this Court issued its Order of August 17, 2017, and is dispositive of Plaintiffs' claims.  The *McMunn* case involved alleged radiation exposure to residents who lived near a uranium processing plant.  It clearly holds that the current state of medical science is unable to establish that exposure to environmental ionizing radiation in a residential setting causes cancer or other illnesses in any particular individual.  As the court stated:

> Even with state-of-the-art data, it is <u>impossible to determine</u> with certainty that radiation is the cause of a given incidence of cancer for three reasons.  First, <u>numerous factors other than radiation may cause cancer</u>.  That is, "a given percentage of a defined population will contract cancer even absent any exposure to ionizing radiation."  *Id.* at 643–44.8 [quoting *In re: TMI Litigation*, 193 F. 3d 613 (3d Cir. 1999)].  Second, <u>there is no clear difference between cancers caused by radiation or by other factors</u>.  No characteristic of a given cancer (such as its type or severity) are known to suggest that "manmade" radiation or even any radiation was the cancer's cause.  *See id.* at 643.  ("[M]<u>edical evaluation, by itself, can neither prove nor disprove that a specific malignancy was caused by a specific radiation exposure."</u>)  Third, <u>because the relevant changes occur on the cellular level, they are not detected or detectable at the time they occur</u>.  It can take many years—seemingly a variable number of years—between an exposure to radiation and the "possible detection of a resulting cancer."  *Id.*  (defining the "latency period" as "[t]he period between exposure to radiation and possible detection").  Thus, in a case like this one, the factfinder will always have to use ex-post data to ascertain whether any radiation—let alone any particular radioactive exposure—disrupted the cell in the past.

*McMunn* at 255.  (Emphasis added.)  As the Court concluded:

> Consider how a trial would unfold.  Plaintiffs would present a general causation expert who opines that any amount of ionizing radiation could cause cancer.  Then, Plaintiffs would present [a witness] who would state that each of the Plaintiffs lived or worked near the Apollo facility and would therefore be assumed to have been exposed to some radiation from airborne uranium effluent from the Apollo facility.  [The witness] would then presumably testify that he is certain that the additional radiation specifically from the airborne uranium was a substantial factor in causing the cancer of each of the Plaintiffs.  Finally, the jury would decide whether more than a dozen different illnesses suffered by more than seventy

> people were each caused by the radiation from the airborne uranium
> from the Apollo facility.
>
> How?  Without any ability to compare any plaintiff's frequency,
> proximity, or regularity to any evidence showing that a given
> frequency, proximity, or regularity is correlated with any particular
> increase in risk—let alone the ability to perform the ideal
> comparison between dose and the dose-responsiveness of a given
> illness—the jury would be engaging in rank speculation.

*McMunn* at 272-273.  (Emphasis added.)  As a result, Plaintiffs will never be able to establish causation.

This recent Third Circuit ruling is consistent with Florida law that mere alleged exposure to radiation (or other substances) does not state a recoverable claim for any damages.  *Morgan v. W. R. Grace & Co.*, 779 So. 2d 503 (Fla. 2d DCA 2000); *Jacobs v. Osmose, Inc.*, 2002 WL 34241682 (S.D. Fla. 2002) (mere exposure to alleged chemical contaminants cannot establish an injury). Claims for "enhanced risk of cancer" has been soundly rejected by Florida courts.  See *Petito v. A.H. Robbins Co., Inc.*. 750 So. 2d 103, 105 (Fla. 3d DCA 1999) ("a plaintiff cannot recover for the enhanced risk that they will contract a disease"); *Eagle-Picher Ind., Inc. v. Cox*, 481 So. 2d 517, 526 (Fla. 3d DCA 1985) ("we hold that damages are not recoverable for the future risk of cancer").  As a result, Plaintiffs have no claim for the alleged "enhanced risk" of cancer based on exposure to gamma radiation.  Thus, there can be no recoverable diminution of property values based on the speculative risk of cancer associated with the property.  *Id.*  Moreover, Plaintiffs are the sole cause of their alleged economic losses.[1]  Thus, as a matter of law, science, and common sense, Plaintiffs will never be able to establish damages caused by the alleged presence of gamma

---

[1] As the Court noted, Plaintiffs caused the alleged economic losses here by filing this lawsuit.  All of Plaintiffs' claims require causation and damages; without those two elements, there is no claim. Surely the law does not permit a party to create a claim where none exists by causing its own damages.

7

radiation on their property.  Very recent Eleventh Circuit rulings have reaffirmed the rule that a plaintiff's inability to establish an injury requires dismissal of the case.  *See Reilly v. Chipotle Mexican Grill, Inc.*, 2017 WL 4410952 (11th Cir. Oct. 4, 2017) (inability to show damages from non-GMO animal feed); *DOES 1-98 v. Boies, Schiller & Flexner,* LLP, No. 17-11993 (11th Cir. Oct. 4, 2017) (inability to show damages from alleged malpractice).  In this case, it is not only that Plaintiffs' damage claims consist of "rank speculation."  The law governing radiation exposure is clear that the requirement of damage causation cannot be established.  *McMunn*.  Because Jerue or Feist are legally unable to establish damage causation, and their claims are based on "rank speculation," their claims are not plausible and should be dismissed.  *E.g., Twombly*.

The lack of damage causation eliminates Plaintiffs' claims for medical monitoring.  Among other things, medical monitoring requires that the exposure to or ingestion of an alleged substance is a proximate cause of a specific injury or illness.  In such a case, medical monitoring is needed in order to detect the likely injury, if and when it manifests.  In this case however, there is no ability to establish a causal connection between exposure and any person's illness beyond rank speculation.  As a result, medical monitoring would be futile and wasteful.  In addition, there is no basis for economic damages.  Plaintiffs' claim for economic loss is an alleged loss of property values, not physical damage to any house or real property.  It is clear that building a house in a former phosphate area does not cause any physical injury or damage to the structure.  The homes in Oakbridge and Grasslands are structurally sound.  Therefore, any alleged economic injury would purportedly be caused by the alleged presence of radiation on the property.  Such a condition could only pose a risk if it caused the occupants to contract a specific illness.  However, as the Third Circuit ruled, Plaintiffs will never be able to establish that residential radiation exposure causes any specific harm to the occupants of the house.  As a result, the property damage claim fails

because there is no way to establish that radiation on Plaintiffs' property ever caused anyone's illness or will likely cause anyone's illness.  Because residential exposure cannot be shown to cause any illness, Plaintiffs cannot establish any economic damages caused by Defendant, and, as previously noted, Plaintiffs caused their own alleged diminution of value by filing this lawsuit. They are left with nothing more than the alleged "enhanced risk of cancer," which is not actionable. *Eagle-Picher Indus., Inc. v. Cox*, 481 So. 2d 517 (Fla. 1986) (enhanced risk of contracting cancer is not actionable).

Third, Plaintiffs' fraud and misrepresentation claims should be dismissed.  This Court made it clear in the Order that Mr. Feist must allege the "who, what, when, where, and how" of any misrepresentation.  Order at 4.  Feist has completely failed to do so.  In addition, Feist has failed to allege fraudulent concealment or fraud by omission.  Defendant was not a party to Feist's transaction and had no legal duty to speak.  Feist's claims for fraud and negligent misrepresentation should therefore be dismissed with prejudice.

## Legal Standard

This Court previously discussed the legal standard in its Order.  After eliminating the boilerplate and legal conclusions, a claim must allege sufficient facts to be "plausible on its face." Order at 3, quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Factual allegations must be sufficient to raise a right of relief "above the speculative level." *Twombly* .  Claims based on "rank speculation" are not plausible.  *Id*.

I.    Count I Should be Dismissed.

As discussed earlier, phosphate mining is the simple mechanical extraction of phosphate pebbles from the soil "matrix."  Phosphate mining consists of removing soil, separating the phosphate "pebbles," and replacing the soil on the land as part of the reclamation process.  After the soil is replaced, the site is leveled or contoured with earth moving equipment.  None of these

activities involve chemical processing of phosphate into fertilizer.  Plaintiffs have alleged that this mining and reclamation process produces solid waste that was discharged onto their property.  This "solid waste" is essentially the sand and clay that are separated from the matrix at the beneficiation plant and returned to the property.  Plaintiffs claim that this solid waste constitutes "hazardous waste" or "hazardous substances."  SAC at 133, 135.  This alleged discharge of solid waste forms the basis of Plaintiffs' claim under Chapter 376.

Plaintiffs, however, have failed to inform this Court that the solid waste byproduct of phosphate mining has been expressly excluded from the definition of hazardous substances by the EPA.  40 C.F.R. §261.4(b)(7).  As this Court noted in its Order, Florida Statutes section 376 adopts Federal definitions of hazardous substances.  Section 376.301 states that hazardous substances are those defined in the Comprehensive Environmental Response, Compensation Liability Act of 1980 (CERCA).  42 U.S.C.A. § 9613.  According to CERCA, hazardous substances are defined pursuant to section 6921 of the Solid Waste Disposal Act.  42 U.S.C. § 6921 (2006).  Section 6921 of the Solid Waste Disposal Act specifically grants the EPA the authority to "promulgate regulations identifying the characteristics of hazardous wastes."  *Id.*  Pursuant to the authority granted by the Solid Waste Disposal Act, the EPA defined hazardous substances in the RCRA.  The EPA excluded solid waste from phosphate mining from the category of hazardous wastes.  40 C.F.R. §261.4(b)(7).

The Environmental Protection Agency defines hazardous waste in section 261.4 of the Resource Conservation and Recovery Act (RCRA).  40 C.F.R. § 261 (2017).  Section 261.4(b) provides:

Solid wastes which are <u>not</u> hazardous wastes.  The following solid wastes are <u>not</u> hazardous wastes:

* * *

(3) mining overburden returned to the mine site.

* * *

(7) Solid waste from the <u>extraction</u>, <u>beneficiation</u>, and <u>processing</u> of ores and minerals (including coal, <u>phosphate rock</u>, and overburden from the mining of uranium ore), except as provided by § 266.112 of this chapter for facilities that burn or process hazardous waste.

(i) For purposes of § 261.4(b)(7) beneficiation of ores and minerals is restricted to the following activities; crushing; grinding; washing; dissolution; crystallization; filtration; sorting; sizing; drying; sintering; pelletizing; briquetting; calcining to remove water and/or carbon dioxide; roasting, autoclaving, and/or chlorination in preparation for leaching (except where the roasting (and/or autoclaving and/or chlorination)/leaching sequence produces a final or intermediate product that does not undergo further beneficiation or processing); gravity concentration; magnetic separation; electrostatic separation; flotation; ion exchange; solvent extraction; electrowinning; precipitation; amalgamation; and heap, dump, vat, tank, and in situ leaching.

(ii) For the purposes of § 261.4(b)(7), solid waste from the processing of ores and minerals includes only the following wastes as generated:

* * *

(D) Phosphogypsum from phosphoric acid production;

(E) Slag from elemental phosphorus production;

* * *

(P) Process wastewater from phosphoric acid production;

40 C.F.R. §261.4(b)(3) & (7). (Emphasis added.) These sections specify that phosphate extraction, beneficiation, and processing are all activities that are <u>expressly</u> <u>excluded</u> from the definition of hazardous substances. The detailed description of these activities by the EPA makes it abundantly clear that all of the activities alleged in the SAC are encompassed in the exclusion.

Plaintiffs have misunderstood this applicable authority. Plaintiffs suggest that section 6921(b)(3)(A)(ii) of the Solid Waste Disposal Act supports their allegation that the solid waste byproduct of phosphate mining is defined as a hazardous waste. 42 U.S.C. § 6921(b)(3)(A)(ii)

(2006).   Contrary to Plaintiffs' allegations, section 6921(b)(3)(A)(ii) does not define "hazardous waste."   Section 6921(b)(3)(A)(ii) was a temporary congressional response to the EPA's initial attempt at regulating solid waste.   *See U.S. v. Iron Mountain Mines, Inc.*, 812 F. Supp. 1528, 1538 (1992).   This provision only placed a temporary hiatus on the EPA's regulation of certain hazardous waste until the EPA conducted and submitted a comprehensive study of these wastes in the 1980s, a fact that Plaintiffs have ignored.   *Id.*   The actual text of section 6921(b)(3)(A)(ii) states:

> 3)(A) Notwithstanding the provisions of paragraph (1) of this subsection, each waste listed below shall, except as provided in subparagraph (B) of this paragraph, be subject only to regulation under other applicable provisions of Federal or State law in lieu of this subchapter until at least six months after the date of submission of the applicable study required to be conducted under subsection (f), (n), (o), or (p) of section 6982 of this title and after promulgation of regulations in accordance with subparagraph (C) of this paragraph:
> (i) Fly ash waste, bottom ash waste, slag waste, and flue gas emission control waste generated primarily from the combustion of coal or other fossil fuels.
>
> (ii) Solid waste from the extraction, beneficiation, and processing of ores and minerals, including phosphate rock and overburden from the mining of uranium ore.

Nothing in this section purports to define or identify "hazardous waste."   The proper applicable definition of "hazardous waste" under the Solid Waste Disposal Act can be found in section 6921(b)(1).   42 U.S.C. § 6921(b)(1) (2006).   This section explicitly grants the EPA the power to "promulgate regulations identifying the characteristics of hazardous waste, and list[] particular hazardous wastes. . ."   *Id.*   The Environmental Protection Agency defined hazardous waste in section 261.4 of the Resource Conservation and Recovery Act (RCRA).   40 C.F.R. § 261 (2017), and excluded phosphate mining extraction, beneficiation, and processing.

Furthermore, natural emissions of gamma radiation are not classified as pollutants. Although 42 U.S.C. section 7412(b)(1) classifies "radionuclides (including radon)" as an air pollutant, it is silent with respect to gamma radiation found in the soil.

Plaintiffs further allege that gamma radiation is included in the definition of "pollution" under Florida Statutes section 376 because the legislature's definition of the term "pollutants" is non-exhaustive. However, "pollutants" are defined in section 376.301(36) as "any 'product' as defined in 377.19, pesticides, ammonia, chlorine, and derivatives thereof, excluding liquefied petroleum gas." Fla. Stat. § 376.301(36). Section 377.19 defines "product" as "a commodity made from oil or gas." Fla. Stat. § 377.19. There is nothing in language of this statute indicating this is a "non-exhaustive list of examples" as Plaintiff would have this Court believe. Further, the legislature's definition of "pollution" and "pollutants" is devoid of any reference to gamma radiation, which is a natural substance and not a "product" or "commodity." Accordingly, gamma radiation is not classified as a pollutant under Chapter 376.

Moreover, Plaintiffs have failed to allege specific Florida DEP standards that have been allegedly violated. Plaintiffs did not comply with the requirements of section 376.302(1)(a). Fla. Stat. § 376.302(1)(a) (2014). Section 376.302(1)(a) requires Plaintiffs to show a violation of "any departmental 'standard' as defined in s. 403.803(13)." *Id.* The term "standard" "means any rule of the Department of Environmental Protection relating to air and water quality, noise, solid-waste management, and electric and magnetic fields associated with electrical transmission and distribution lines and substation facilities." Fla. Stat. § 403.803(13) (1994).

Although Plaintiffs broadly allege violations of various Department of Environmental Protection standards, Plaintiffs failed to provide a proper factual basis to support these allegations. First, the Florida standards Plaintiffs cited do not reference gamma radiation, nor do they classify

gamma radiation as a pollutant.  Second, both the Florida and federal standards Plaintiffs cited adopt the EPA's definition of "hazardous waste," which specifically excludes phosphate mining, extraction, beneficiation, and processing.  40 C.F.R § 261.4(b)(7) (2017).  Third, Plaintiffs broadly allege a violation of Florida Statutes section 378 and 62C-16 of the Florida Administrative Code. These standards outline the proper procedure for reclaiming land after it is mined.  Plaintiffs do not provide proper factual allegations that the reclamation was improper under these standards. Further, Plaintiffs failed to satisfy the pleading requirement because their broad allegations do not rise above mere speculation.  Accordingly, Plaintiffs' claim should be dismissed as to Count I because they have failed to show a violation of "any departmental 'standard'" as required by Florida Statutes section 376.302(1)(a).  Fla. Stat. § 376.302(1)(a) (2014).

In addition, this Court has ruled that Section 376.313(3) creates a private right of action "for all damages resulting from" a discharge or other condition of pollution.  Order at 19.  See also *Curd v. Mosaic Fertilizer, LLC,* 39 So. 3d 1216 (Fla. 2010).  As discussed earlier, there is no way to establish that exposure to radiation in a residential setting causes anyone's particular illness. *McMunn*.  Thus, for the reasons discussed earlier, Plaintiffs are unable to establish damage causation for either physical or economic damages "resulting from" the alleged discharge of pollution.  *McMunn*.  Without such causation, there is no recoverable claim under Fla. Stat. §376.313.  In addition, the mere risk of incurring damages is not recoverable in Florida.  *Eagle-Picher*, 481 So. 2d at 526.

II.    <u>Count II Should be Dismissed</u>.

As the Florida Supreme Court stated in *Curd v. Mosaic Fertilizer, LLC*, 39 So. 3d 1216, 1227 (Fla. 2010):

Four elements are necessary to sustain a negligence claim:

1. A duty, or obligation, recognized by the law, requiring the [defendant] to conform to a certain standard of conduct, for the protection of others against unreasonable risks.

2. a failure on the [defendant's] part to conform to the standard required:  a breach of the duty….

3. A reasonably close causal connection between the conduct and the resulting injury.  This is what is commonly known as "legal cause," or "proximate cause," and which includes the notion of cause in fact.

4. Actual loss or damage….

As discussed earlier, Plaintiffs will never be able to establish the third and fourth requirement for negligence: causation and actual damages.  *McMunn.*  Also as discussed, the alleged enhanced risk of cancer is not actionable in Florida.  *Eagle-Picher*, 481 So. 2d at 526.

In addition, Plaintiffs have improperly claimed emotional distress based on the "risk" of injury or illness.  Any potential claim for emotional distress damages (SAC ¶ 30) requires physical injuries, which Plaintiffs have failed to allege.  *Elliott v. Elliott*, 58 So. 3d 878 (Fla. 1st DCA 2011), *Lang Behn v. Pub. Health Trust*, 661 F. Supp. 2d 1326 (S.D. Fla. 2009).

III.     Counts III – IV Plaintiffs' Fraud and Negligent Misrepresentation Claims Should be Dismissed.

Fraud and Negligent Misrepresentation

This Court stated in its Order that:

Moreover, "[i]n alleging fraud or mistake" under Federal Rule of Civil Procedure 9(b), "a party must state with particularity the circumstances constituting the fraud or mistake."  Fed. R. Civ. P. 9(b).  "Particularity means that a plaintiff must plead facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendant's alleged fraudulent acts, when they occurred, and who engaged in them." *U.S. v. McInteer*, 470 F. 3d 1350, 1357 (11th Cir. 2006).  Stated differently, the plaintiff must plead the "who, what, when, where, and how" of the alleged fraud.  *Garfield v. NDC Health Corp.*, 466 F. 3d 1255, 1262 (11th Cir. 2006).  "Because actions for negligent misrepresentation sound in fraud rather than in negligence, the pleading requirements contained in Federal Rule of Civil Procedure 9(b) apply to such actions."  *Poster Indus., Inc. v. Abrams Grp. Const., LLC*,  2012 WL 4194660, *2 (M.D. Fla. Sept. 19, 2012).

Order at 9.

Plaintiffs' claims should be dismissed because they have failed to plead fraud or negligent misrepresentation with particularity and have failed to state a claim. Fraud requires detailed allegations of the following:

> An aggrieved party proves common law fraud by establishing that: (1) the opposing party made a representation of a material fact, (2) the opposing party knew or should have known the falsity of the statement, (3) the opposing party intended to induce the aggrieved party to rely on the false statement and act on it, and (4) the aggrieved party relied on that statement to his or her detriment. *See, e.g., Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010) (listing the elements of fraudulent misrepresentation).

*Jackson v. Shakespeare Foundation, Inc*., 108 So. 3d 587, n.2 (Fla. 2013). *See Hill v. State Farm Ins., Co.*, 181 F. Supp. 3d 980 (M.D. Fla. 2016). Such statements must be made by the defendant to the plaintiff. Id. *See Davis v. Chapon*, 2015 WL 10791962 (M.D. Fla. August 11, 2015). Negligent misrepresentation requires that Plaintiffs plead:

> (1) a misrepresentation of material fact; (2) that defendant knew of the misrepresentation, made the misrepresentation without knowledge of its truth or falsity, or should have known the representation was false; (3) that defendant intended to induce another to act on the misrepresentation; and (4) that an injury resulted in justifiable reliance upon the misrepresentation.

*Principal Bank v. First American Mortgage, Inc*., 2012 WL 473507 (M.D. Fla. Feb. 14, 2012).

Feist has completely failed to allege fraud or negligent misrepresentation with particularity as required by Rule 9(b) and by this Court's order. Mr. Feist is the sole Plaintiff who is now alleging misrepresentation. He has failed to allege:

> (1) precisely what documents or oral representations were made, . . . (2) the time and place of each such statement and the person responsible for making (or in the case of omissions, not making) same, . . . (3) the content of such statements and manner in which they misled the Plaintiffs, and (4) what the Defendant obtained as a consequence of the fraud.

*In re Recoton Corp.*, 358 F. Supp. 2d 1130, 1138 (M.D. Fla. 2005), quoting *Ziemba v. Cascade Int'l, Inc.*, 256 F. 3d 1194, 202 (11th Cir. 2001).   Plaintiffs have alleged absolutely nothing concerning Mr. Feist's various real estate purchase transactions, except that he has owned houses in Grasslands since 2001.   SAC ¶29.   This alone should require dismissal because Feist's allegations are subject to the 12-year statute of repose.  See Order at 15-16.   Nothing else in the SAC satisfies the requirement that the misrepresentations specifically include "who, what, when, where, and how."   Order at 4.   Feist alleges that there were "conversations," but failed to allege any oral communications with Defendant.   Feist also alleges that the Development Agreement with the State of Florida contains false statements, but never allege when or whether Feist even read the Development Agreement prior to purchasing his various houses.   Feist has further failed to identify any of Defendant's authorized representatives who allegedly made any representations to Feist.   Feist persists in referencing the current website and recent letter from Drummond, which the Court has already rejected as a basis for fraud.   This dearth of particular allegations requires dismissal of his claims.

<u>Fraudulent by Omission and Concealment</u>

This Court has stated that fraudulent concealment or fraud by omission requires the Plaintiff to establish that:

1.   The defendant concealed or failed to disclose a material fact;

2.   The defendant knew or should have known that the material fact should be disclosed or not concealed;

3.   The defendant acted in bad faith;

4.   The defendant knew that by concealing or failing to disclose the material fact, the plaintiff would be induced to act;

5.   The plaintiff suffered damages as a result of the concealment or failure to disclose.

6.    The defendant had a duty to speak.

*Regions Bank v. Kaplan*, 2017 WL 273 4086 (M.D. Fla. June 23, 2017 at * 11-12). The duty to speak requires special circumstances. These include:

    a.   One party to a transaction who speaks has a duty to say enough to prevent his words from misleading the other party;

    b    One party to a transaction who has special knowledge of material facts to which the other party does not have access may have a duty to disclose those facts to the other party;

    c.   One party to a transaction who stands in a confidential or fiduciary relation to the other party has a duty to disclose material facts.

*Id.* This Court cited to *In re Palm Beach Finance Partners, L.P.,* 517 B.R. 310 335 (Bk. S.D. Fla. 2013). As that court stated, "The common thread running through each scenario that gives rise to a duty to speak is that both the plaintiff and the defendant <u>must have been parties to a transaction or must have some kind of pre-existing fiduciary duty relationship</u>." *Id.* (Emphasis added.) As the Court previously noted, there is no allegation that Defendant sold the property to Feist. Thus, there is no "duty to speak" because Defendant was not a "party to [the] transaction." Even though Defendant was in the earlier chain of title, this does not make Defendant a party to the sale of real property to Mr. Feist. Nor does it create the special relationship required for a duty to speak. Accordingly, Defendant had no duty to speak, and no duty to disclose. Plaintiffs' claim for fraudulent concealment should be dismissed with prejudice.

IV.   <u>Count V Should be Dismissed.</u>

Plaintiffs have sought the equitable remedy of medical monitoring. This remedy requires a high degree of likelihood that a very specific illness or adverse effect is caused by the alleged substance. The purpose of medical monitoring is to identify a definite physical ailment that may manifest in a relatively short amount of time. Among other things, this claim requires Plaintiffs to establish that medical standards can show that exposure or ingestion of the substance causes a particular person's illness or injury. In addition, monitoring must be "reasonably necessary

according to contemporary scientific principles." *See Jacob v. Osmose*, 2002 WL 34241682 * 2-3 (S.D. Fla. 2002). It is not designed to provide free health insurance and diagnostic testing to Plaintiffs for decades to come. Mr. Feist has lived in Grasslands for sixteen years with absolutely no alleged health effects whatsoever. Jerue has lived in Oakbridge for thirteen years with no adverse health effects. There is no reason to conclude that medical monitoring would be reasonably necessary to monitor them for some unknown condition that has not manifested for thirteen to sixteen years. Moreover, based on *McMunn*, Plaintiffs will never be able to establish injury causation. Thus, Plaintiffs are not able to establish that medical monitoring is appropriate and "reasonably necessary." Accordingly, the claim should be dismissed.

<u>Conclusion</u>

For the reasons stated, the Seconded Amended Complaint should be dismissed.

Respectfully submitted,

HOLLAND & KNIGHT LLP

*/s/Charles Wachter*
Joseph H. Varner, III
Florida Bar No. 394904
Frederick J. Grady
Florida Bar No. 437980
Charles Wachter
Florida Bar No. 509418
100 N. Tampa St., Suite 4100
Tampa, Florida 33602
Telephone: (813) 227-8500
Facsimile: (813) 229-0134

*Trial Counsel for Drummond Company, Inc.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 13, 2017, I electronically filed the foregoing with the Clerk of the Court by using the Court's CM/ECF system, which will transmit the foregoing document via email to all counsel of record.

*/s/Charles Wachter*
Attorney