UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOHN J. JERUE and MICHAEL J. FEIST, on
behalf of themselves and all others similarly
situated,

      Plaintiffs,

v.                              Case No.:  8:17-cv-587-EAK-AEP

THE DRUMMOND COMPANY, INC.,

      Defendant.
_____

## ORDER

Before the Court is Defendant Drummond Company, Inc.'s ("Drummond") motion to dismiss (Doc. 41) ("Motion") Plaintiffs', John J. Jerue and Michael J. Feist, second amended complaint (Doc. 36) ("Operative Complaint").  Plaintiffs filed a response in opposition (Doc. 46), to which Drummond replied (Doc. 50).  The Court has considered the Parties' briefings, the pertinent portions of the record, and is otherwise fully advised on the premises.  For the reasons set forth below, the Motion is **DENIED**.

I.    **Introduction and Conclusions**

Several decades ago, Drummond operated a phosphate mine in Polk County, Florida.  In the early-1980s, however, Drummond ceased its mining efforts and began developing the former mining lands for residential and commercial use, part of which now encompasses two residential developments—the communities of Oakbridge and Grasslands.  Plaintiffs Jerue and Feist, respectively, own homes in those two developments.

Phosphate mining and subsequent reclamation of former mining lands essentially works like this:  mining companies, like Drummond, remove the top layer of soil, called

"overburden," to access "the matrix" beneath it.  This matrix consists of equal parts sand, clay, and raw phosphate ore.  Water is introduced into the matrix to create a "slurry."  This slurry is then pumped to a beneficiation plant, and the plant, through certain processes, removes the raw phosphate ore from the slurry for processing into fertilizers, animal feed supplements, food preservatives, and other industrial products.  Finally, the remaining "waste," a mixture of sand and clay is returned to the mining site and used as fill material in the reclamation process.[1]  This is what occurred at Oakbridge and Grasslands.

Raw phosphate ore is known to contain radioactive elements, such as uranium and its daughter products, including radium-226, which decays to form radon gas.  *See* (Doc. 36, at ¶12, 45).  And Plaintiffs allege that the phosphatic mining waste used by Drummond to reclaim its former mining lands was thus "enriched in . . . radioactive elements."  *Id.* at ¶46.  Plaintiffs further allege that this has contaminated the land on which the Oakbridge and Grasslands developments now sit and created a substantial health hazard for residents of those communities.  *Id.* at ¶48.  According to Plaintiffs, the level of radiation exposure identified in Oakbridge and Grasslands through both state and federal environmental studies "translates to residents receiving over one chest x-ray per week."  *Id.* at ¶86.  In addition, Plaintiffs allege that Drummond, in fact, knew that its former mining and reclamation efforts had contaminated the land and exposed residents to unsafe levels of cancer-causing radiation, but told no one.  *Id.* at ¶¶90–104.  Plaintiffs

---

[1]   *See* Florida Department of Energy, *Phosphate,* (Data as of April 16, 2018), https://floridadep.gov/water/mining-mitigation/content/phosphate); U.S. Department of Energy, *Energy and Environmental Profile of the U.S. Mining Industry*, (Data as of April 18, 2018), https://www.energy.gov/sites/prod/files/2013/11/f4/phosphate.pdf;  Florida Industrial and Phosphate Research Institute, *Phosphate Primer*, (Data as of April 18, 2018), http://www.fipr.state.fl.us/about-us/phosphate-primer/introduction; *see also* Fed. R. Civ. P. 201(b).

2

consequently filed this putative class action demanding that the former mining lands be cleaned up, that Drummond fund a "medical monitoring" regime that provides Plaintiffs with routine medical testing and observation, and that Drummond compensate them for, among other things, diminution in the value of their property and their fear over the risks posed by exposure to dangerous radiation.

For their part, Drummond calls applesauce.  After decades of "development and residential use," says Drummond, "there is not one documented case of cancer or other illness." *See* (Doc. 41, at 1).  Drummond further contends that "Plaintiffs have not even alleged any actual gamma radiation levels on their own properties," and that Plaintiffs' damages "were caused by Plaintiffs' own self-publication of their allegations." *Id.* at 1–2. Drummond accordingly calls for dismissal of Plaintiffs' lawsuit, contending that Plaintiffs' claims rest on "rank speculation." *Id.* at 5.

That being the case, the Court must now do some mining of its own, but obviously not for phosphatic ore, and, at this juncture, not even for the "truth;" of course, when ruling on a motion to dismiss, the Court must accept as true Plaintiff's well-pled factual allegations.  Rather, the Court must dig through Plaintiffs' Operative Complaint for deposits of facially plausible allegations of wrongdoing by Drummond.  Should the Court indeed unearth any, those portions of Plaintiffs' Operative Complaint should survive.

To that end, as is more fully set forth below, the Court concludes that the allegations contained in Plaintiffs' Operative Complaint state plausible claims for relief, in all respects.  Drummond's Motion is therefore due to be denied in its entirety.


[space intentionally left blank]

## II.    Background and Procedural History

### A. The Parties

Defendant Drummond, an Alabama corporation, is a phosphate mining company and a developer of residential and commercial property.  *See* (Doc. 36, at ¶¶16, 33, 50). In 1978, Drummond, initially through the Poseidon Mining Company,[2] began phosphate strip mining operations on approximately 1,400 acres of mining lands in Polk County, Florida.  *Id.* at ¶¶16, 34–35.  Drummond subsequently discontinued its mining activities in 1982 and began reclamation efforts on the land.  *Id.* at ¶¶42, 50.  Drummond thereafter developed the reclaimed land into residential and commercial plots, which it later sold (and, to-date, continues to sell).  *Id.* at ¶¶48, 50.  Two of those developments are the residential communities of Oakbridge and Grasslands.  *Id.*

Plaintiff Jerue owns real property located in the Oakbridge development.  *Id.* at ¶28.  Jerue acquired the property from Edward M. Kwasnick, Jr. via a warranty deed dated May 4, 2004.  *See* (Doc. 16-3).  Mr. Kwasnick had previously acquired the property from Drummond via a warranty deed dated September 10, 2001.  *See* (Doc. 16-1).

Plaintiff Feist owns real property located in the neighboring Grasslands development.  *Id.* at ¶29.  Feist acquired the property from Rekha Holdings, LLC via a quitclaim deed dated March 31, 2006.  *See* (Doc. 16-6).  Rekha Holdings, LLC acquired the property from Ms. Helena Mahais, who had previously acquired the property from Drummond via a warranty deed dated December 3, 2004.  *See* (Doc. 16-4, 16-5).

---

[2] Drummond merged with the Poseidon Mining Company on March 31, 1984.  *See* (Doc. 36, at ¶35).

4

Prior to Plaintiffs obtaining their interests in the developments, in September of 1985, Drummond and the State of Florida entered into the Drummond Properties Lakeland Development Agreement with the Department of Community Affairs and Central Florida Regional Planning Council (the "Development Agreement"). *See* (Doc. 36, at ¶66 and Doc. 16-2).  Plaintiffs assert that Drummond's conveyance of title to Plaintiffs and/or Plaintiffs' predecessors-in-interest was expressly subject to, among other things, this Development Agreement.  *See id.*

### B. Jerue's Original Complaint

Jerue initiated this purported civil class action against Drummond on March 10, 2017.  Jerue alleged that Drummond's mining and reclamation activities caused the land upon which the Oakbridge and Grasslands developments sit to be contaminated with harmful radiation, and that Drummond was, in fact, aware of the contamination and the associated risks posed to residents but kept quiet.  *See generally* (Doc. 1).

In support of his allegations, Jerue cited to both a 2003 Environmental Protection Agency ("EPA") report on Florida's phosphate mining and reclamation activities and an undated Department of Energy ("DOE") report related to its assessment of the same. Both the EPA and DOE reports paid particular attention to the Oakbridge development, in addition to other Drummond plots.  The EPA concluded that individuals residing in those areas may be exposed to unsafe levels of radiation.  *Id.* at ¶61.  The EPA accordingly urged that steps be taken to assess (1) the extent of the contamination and exposure and (2) the need for mitigative efforts to reduce the potential risks to residents of Oakbridge.  *Id.* at ¶62. Jerue alleged that the EPA's findings were not shared with the public, and were marked as exempt from federal freedom of information laws.  However,

according to Jerue, the EPA's findings were shared with Drummond (along with other members of the phosphate mining industry), which, in response, "pressured the EPA (both directly and through state and/or federal legislators) to cease its investigation into the risks of reclaimed phosphate mining lands," while, at the same time, "touting Oakbridge as a 'good' example of successful reclamation of former mining land." *Id.* at ¶¶61, 63–64.

For its part, the DOE, in conjunction with Argonne National Laboratories, also conducted an assessment of the radiation risks posed to individuals living in communities built atop reclaimed phosphate lands in central Florida. *Id.* at ¶¶66–70. According to the DOE report, "a significant number of residential properties located over former mine areas have the potential to contain radioactivity at levels exceeding current remedial guidelines." *Id.* at ¶69. Specifically, the DOE found that Oakbridge and other Drummond developments were "highly likely" of needing additional remedial action, as the gamma radiation levels found on the land were anywhere from 2.5 to 8 times greater than baseline background levels. *Id.* at ¶70.[3]

Jerue's original complaint accordingly asserted claims against Drummond for strict liability (Counts I and IV), negligence (Count II), private nuisance (Count III), and fraudulent concealment (not as a distinct cause of action, but as grounds for tolling applicable statutes of limitation or repose) and sought, *inter alia*, compensation for loss of property value, for clean-up, and to initiate medical monitoring for certain of Oakbridge and Grasslands residents. *See id.* at ¶¶97–101, 124–170, "WHREFORE" clause.

---

[3] Jerue's original complaint did not specify one way or the other whether Drummond was ever made aware of the DOE's findings.

6

Drummond moved to dismiss Jerue's claims in their entirety (Doc. 10).  But before the Court could issue a ruling on Drummond's motion, Jerue, now joined by Feist, filed an amended complaint as of right on April 20, 2017 (Doc. 12).

### C. Plaintiff's Amended Complaint

Plaintiffs' amended complaint echoed the fundamental allegations levied against Drummond in Jerue's original complaint—namely, Drummond's failure to inform potential buyers of the risks posed by radiation contamination on the formerly mined land that is now the Oakbridge and Grasslands developments—and reiterated previous references to the EPA and DOE reports.  *See generally id*.  However, Plaintiffs' amended complaint also included new references to an October 1978 report by the Florida Radiological and Occupational Health Department and a July 1980 letter written to Drummond by a Florida Public Health Physicist on behalf of the Florida Department of Health, both of which concluded that a significant percentage of homes built in the to-be Drummond developments would have indoor gamma radiation levels above federal guidelines.  *See id.* at ¶¶63–64.

Additionally, Plaintiffs' amended complaint reworked the asserted causes of action.  The amended complaint asserted claims for strict liability pursuant to Chapter 376, Fla. Stat. (Count I), negligence and negligence *per se* (Count II), fraud and fraudulent concealment (Count III), negligent misrepresentation (Count IV), private nuisance (Count V), strict liability for an abnormally dangerous activity (Count VI), and unjust enrichment (Count VII).  *See id.* at ¶¶131–192.  Plaintiffs also maintained their claims that the conditions of contamination caused a diminution in the value of their properties and

necessitated medical monitoring to guard against the contraction of dangerous diseases and other health conditions.  *See id.* at "WHEREFORE clause."

Drummond again moved to dismiss Plaintiffs' claims in their entirety (Doc. 16). Drummond argued that Plaintiffs' claims were barred by applicable statues of limitations and repose.  Drummond also argued that the lack of privity between the Plaintiffs and Drummond negated, as a matter of law, any claims sounding in fraud or negligent misrepresentation due to the Plaintiffs' inability to sufficiently allege reliance.  Drummond further argued that Plaintiffs lacked standing and were otherwise precluded from recovering under a negligence theory of liability due to their failure to allege bodily injury or property damage.  Finally, Drummond argued that Plaintiff's remaining causes of action, including their claims for strict liability based on an abnormally dangerous activity, private nuisance, and unjust enrichment, failed to state a claim under applicable law.

Upon review, the Court granted-in-part and denied-in-part Drummond's motion (Doc. 34).  As an initial matter, the Court concluded that the economic loss rule—a doctrine that transcended many of the parties' arguments—as it has been construed by the Florida Supreme Court, did not preclude Plaintiffs' claims for purely economic injuries. For that reason, the Court denied Drummond's motion as to Plaintiffs' claims for negligence and negligence *per se*, given that Plaintiffs had sufficiently pled Drummond breached its duty to exercise reasonable care in adequately reclaiming its mining lands for residential development.  Along those same lines, the Court concluded that Plaintiffs had Article III standing to pursue their claims, since the intentional torts of fraud and fraudulent concealment in addition to negligence—under Florida's formulation of the economic loss rule—allow plaintiffs to recover purely economic damages, and, thus,

Plaintiffs' alleged injuries were redressable by the Court.  The Court also concluded that only *Jerue's* claims for fraud, fraudulent concealment, and negligent misrepresentation were barred by Florida's twelve-year statute of repose for claims founded upon fraud, and accordingly dismissed those claims *with* prejudice.  With regard to those same claims as asserted by Feist, which the Court found were not time barred, the Court concluded that although Feist failed to state a plausible claim for fraud, fraudulent concealment, and negligent misrepresentation based on statements made by Drummond in its marketing materials and/or its previous correspondence to residents, he should be permitted an opportunity to re-plead those claims based on alleged misrepresentations or omissions in the Development Agreement.  The Court further concluded that Plaintiffs could proceed with their Chapter 376 strict liability claim, as they had sufficiently pled that there had been a "discharge" of "hazardous substances into or upon the surface or ground waters of the state or lands" pursuant to Sections 376.313(3) and 376.302(1)(a), Florida Statutes. Finally, as to Plaintiffs' remaining substantive claims, the Court concluded that Plaintiffs did not—and, in fact, could not—state a plausible claim for private nuisance or strict liability for ultrahazardous or abnormally dangerous activities, and accordingly dismissed those claims *with* prejudice.  However, the Court dismissed Plaintiffs' claims for unjust enrichment and medical monitoring *without* prejudice, and granted Plaintiffs an opportunity to re-plead those claims.

### D. Plaintiffs' Operative Complaint

Plaintiffs timely filed their now thrice-amended, Operative Complaint on September 1, 2017.  And, like their prior renditions, the fundamental bases of Plaintiffs' allegations remain unchanged, *i.e.*, that Drummond knew of the risks posed by the radioactive

contamination caused by its negligent reclamation and development of the land that now constitutes the Oakbridge and Grasslands communities, and yet concealed those risks from new home buyers or otherwise failed to warn them of the same.

However, Plaintiffs have altered the specifics of their pleading in three main respects: first, they abandoned their claim for unjust enrichment; second, they heeded the Court's prior directive to plead their claim for medical monitoring as a separate, standalone cause of action; and third, they designated a new "Fraud Class,"[4] of which only Feist is named as the purported class representative, that includes "[a]ll persons who purchased property in Oakbridge or Grasslands Communities within 12 years of March 10, 2017." *See generally* (Doc. 36).  Additionally, Feist's fraud and misrepresentation allegations now rely solely on specific representations and/or omissions contained in the Development Agreement. *See id.* at ¶¶152–170.  As a result, Plaintiffs' claims are currently presented in the Operative Complaint as follows: strict liability pursuant to Chapter 376, Fla. Stat. (Count I); negligence and negligence *per se* (Count II); fraud and fraudulent concealment (Count III, Feist only); negligent misrepresentation (Count IV, Feist only); and medical monitoring (Count V).

Drummond filed the instant Motion on October 13, 2017 (Doc. 41). Notwithstanding the Court's prior Order permitting Plaintiffs to proceed with their Chapter 376 strict liability and negligence claims, Drummond again contends that those same

---

[4]  Plaintiffs' prior pleadings separated the purported class members into just two groups: (1) the Drummond Property Damage Class ("Property Class"), which included "[a]ny and all persons that own any real property in the Oakbridge & Grasslands Communities[,]" and (2) the Medical Monitoring Class, which included "[a]ll persons who ever resided on property located within the [Oakbridge & Grasslands Communities] for a minimum of four years." *See* (Doc. 1, at ¶103 and Doc. 12, at ¶109).

claims are subject to dismissal. As to the former, Drummond argues that Plaintiffs have failed to sufficiently allege both a "discharge" and a "condition of pollution" in order to proceed on their Chapter 376 strict liability claim because phosphate mining wastes, says Drummond, are excluded from CERCLA[5] liability by provisions of the RCRA[6]. As to the latter, Drummond argues that Plaintiffs' negligence and negligence *per se* claims fail because Plaintiffs, as a matter of law, will never be able to prove injury causation or damages.

Drummond also contends that Plaintiffs' remaining fraud-based and medical monitoring claims are likewise due to be dismissed. Specifically, Drummond argues that Feist has failed to plead his fraud, fraudulent concealment, and negligent misrepresentation claims with the requisite specificity under Rule 9, and that those claims otherwise fail to state a claim under applicable law. Further, Drummond argues that Plaintiffs' medical monitoring claim fails because Plaintiffs cannot establish either injury causation or that medical monitoring is reasonably necessary under the circumstances. And, finally, Drummond argues that Plaintiffs have improperly claimed damages for emotional distress because Plaintiffs have failed to allege any physical injury as required by Florida's "impact rule."

## III. **Standard of Review**

Rule 8 requires complaints to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12 allows the

---

[5]  All references to "CERCLA" are to the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601–9675.

[6]  All references to "RCRA" are to the Resource Conservation Recovery Act, 42 U.S.C. §§ 6901–6992k.

Case No.:  8:17-cv-587-EAK-AEP

Court to dismiss a complaint for "failure to state a claim upon which relief can be granted."

Fed. R. Civ. P. 12(b)(6).  To avoid dismissal, a plaintiff must state a claim that is "plausible

on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."  *Id.*  The Court must accept all factual

allegations in the complaint as true, but does not credit "mere conclusory statements" or

"[t]hreadbare recitals of the elements of a cause of action."  *Id.*  Further, dismissal is

warranted under Rule 12(b)(6) if, assuming the truth of the complaint's factual allegations,

a dispositive legal issue precludes relief.  *Neitzke v. Williams,* 490 U.S. 319, 326 (1989).

When a plaintiff's complaint alleges a cause of action sounding in fraud, however,

the plaintiff must also satisfy the more specific pleading requirements of Federal Rule of

Civil Procedure 9(b) by alleging "the circumstances constituting the fraud . . . with

particularity." Fed. R. Civ. P. 9(b).  The purpose of Rule 9(b) is to alert defendants "to the

precise misconduct with which they are charged" and to protect defendants "against

spurious charges of immoral and fraudulent behavior."  *Brooks v. Blue Cross & Blue

Shield of Fla., Inc.*, 116 F.3d 1364, 1370–71 (11th Cir. 1997).  Rule 9(b) does "not

abrogate the concept of notice pleading" but "is satisfied if the complaint sets forth (1)

precisely what statements or omissions were made in what documents . . . (2) the time

and place of each such statement and the person responsible for making (or, in the case

of omissions, not making) them, (3) the content of such statements and the manner in

which they [were misleading], and (4) what the defendants obtained as a consequence

of the fraud."  *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (internal

quotations omitted).  Failure to satisfy Rule 9(b) is grounds for dismissal.  *See Corsello v. Lincare, Inc.*, 28 F.3d 1008, 1012 (11th Cir. 2005).

## IV.   Discussion

The Court will discuss each of Plaintiffs' substantive causes of action in turn and, as to each, address whether Plaintiffs have stated a claim upon which relief can be granted.

### A. Chapter 376 Claim

In its prior order, the Court determined that Plaintiffs' allegations that Drummond used phosphatic mining waste, which contains radium-226 and other radionuclides, as fill material in the Oakbridge and Grasslands developments were sufficient to state a claim under Chapter 376, Florida Statutes.  *See id.* at 21–22.  That is to say, the Court determined that "the allegations in the Amended Complaint, accepted as true, demonstrate that there has been a 'discharge' of 'hazardous substances into or upon the surface or ground waters of the state or lands' under Sections 376.313(3) and 376.302(1)(a) of the Florida Statutes."  *Id.* at 21.

Plaintiffs' Chapter 376 allegations have not changed, and therefore it would seem that neither should this Court's prior determination.  However, in the instant Motion, Drummond asserts a new, additional ground for dismissal of Plaintiffs' Chapter 376 claim. Now, Drummond argues that the phosphatic mining waste it used as fill material in the Oakbridge and Grasslands developments does not constitute a "hazardous substance" under Chapter 376 because the EPA specifically exempted such material from the category of hazardous wastes under the RCRA.  As Plaintiffs point out, this argument was available to Drummond in the prior round of briefing, but was not raised.

Nevertheless, since the issue, if decided in Drummond's favor, would be legally dispositive of Plaintiffs' Chapter 376 claim, the Court will entertain the argument.  *See Neitzke,* 490 U.S. at 326.   Doing so requires the Court to answer two questions: (1) whether the RCRA's "mining waste exclusion" operates to *entirely* exclude mining waste (including its constituent parts, *e.g.*, radium-226) from CERLCA coverage; and (2) if not, whether the phosphate mining waste Drummond used to reclaim the land on which the Oakbridge and Grasslands developments sit otherwise falls under CERCLA's definition of "hazardous substances" for purposes of liability under Chapter 376.   The Court will answer each in turn below.

1.  *Scope of RCRA "mining waste exclusion" under section 9601(14)(C) of CERCLA*

As the Court explained in its prior order, Chapter 376 creates a private cause of action "for all damages resulting from a discharge or other condition of pollution covered by [Sections] 376.30–376.317[.]"  *See* Fla. Stat., § 376.313(3); *see also Italiano v. Jones Chemicals, Inc.*, No. 95-1161-CIV-T-17A, 1997 WL 118426, at *2 (M.D. Fla. Feb. 21, 1997) (unpublished) (recognizing that Chapter 376 creates a private right of action, and permitting the plaintiffs to proceed on their Chapter 376 claim in a case in which the plaintiffs sought damages for contamination that reduced the value of their residential properties).  As the Court further explained, "with respect to 'a discharge or other condition of pollution,' Section 376.301(13) defines '[d]ischarge' broadly to include 'any spilling, leaking, seeping, pouring, misapplying, emitting, emptying, releasing, or dumping of any *pollutant* or *hazardous substance* which occurs and which affects lands and the surface and ground waters of the state.'"  *See* (Doc. 34, at 20) (quoting Fla. Stat., § 376.301(13)) (emphasis in original).   However, section 376.301 does not itself define the contours of

14

what, in fact, constitutes a "hazardous substance."   Instead, "hazardous substances" under section 376.301 are "those substances defined as hazardous substances in [CERCLA.]"  Fla. Stat., § 376.301(21).

CERCLA, in turn, defines a "hazardous substance" as:

(A) any substance designated pursuant to section 311(b)(2)(A) of the Federal Water Pollution Control Act [33 U.S.C. § 1321(b)(2)(A)];

(B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of [CERCLA];

(C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C. § 6921] (*but not including any waste the regulation of which under the Solid Waste Disposal Act [42 U.S.C. § 6901, et seq.] has been suspended by Act of Congress*);

(D) any toxic pollutant listed under section 307(a) of the Federal Water Pollution Control Act [33 U.S.C. § 1317(a)];

(E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 U.S.C. § 7412]; and

(F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 7 of the Toxic Substances Control Act [15 U.S.C. § 2606].

42 U.S.C. § 9601(14) (emphasis added).  Drummond's argument that phosphatic mining waste is exempt from CERCLA's definition of "hazardous substances" is grounded in the parenthetical clause found in subsection (C), which expressly refers, for definitional purposes, to the Solid Waste Disposal Act ("SWDA"), 42 U.S.C. § 6901, *et seq.*

A brief history of the SWDA is necessary to properly analyze Drummond's argument.  The SWDA was enacted in 1965, but was substantially amended by the by the RCRA in 1976.  RCRA Subtitle C (Sections 3001–3023, 42 U.S.C. §§ 6921-6939e) addresses hazardous wastes, and empowers the EPA "to regulate hazardous wastes from cradle to grave, in accordance with the rigorous safeguards and waste management

procedures of Subtitle C[.]" *Chicago v. Environmental Defense Fund.*, 511 U.S. 328, 331 (1994).  To that end, section 3001 of the RCRA authorizes the EPA to specifically identify and define hazardous wastes subject to regulation under Subtitle C.  42 U.S.C. § 6921(b)(1).  Thus, as initially enacted, the RCRA itself did not identify those wastes that were to be considered "hazardous" and therefore subject to federal regulation; Congress expressly left that determination to the EPA.  However, before any of the EPA's proposed regulations took effect, Congress enacted the Solid Waste Disposal Act Amendments of 1980 (commonly referred to as the "Bevill Amendment"), which statutorily excluded several categories of industrial wastes pending further study by the EPA.  *See* 42 U.S.C. § 6921(b)(3)(A).  Specifically, the Bevill Amendment suspended RCRA regulation of "solid wastes from the extraction, beneficiation, and processing of ores and minerals."  *Id.* at § 6921(b)(3)(A)(ii).  After concluding its study (and through some protracted litigation not relevant to the Court's analysis), the EPA finally determined that regulation under Subtitle C was not warranted for some Bevill Amendment wastes, including "mining overburden returned to the mine site," and "[s]olid waste from the extraction, beneficiation, and processing of ores and minerals," including "phosphate rock" and "[s]lag from elemental phosphorus production[.]"  40 C.F.R. §§ 261.4(b)(3), (7)(ii)(E).

From this exclusion, Drummond draws the conclusion that the phosphatic mining waste it used in its reclamation of the land on which the Oakbridge and Grasslands developments sit are therefore excluded entirely from CERCLA's definition of "hazardous substances."  Consequently, says Drummond, this precludes a finding of liability under Chapter 376.  Of course, Plaintiffs disagree.  Plaintiffs insist that the subsection (C) mining waste exclusion does not preclude CERCLA coverage of a waste, so long as that waste

and/or its constituents fall under any one of the five other subparts of section 9601(14), *i.e.*, 42 U.S.C. § 9601(14)(A), (B), (D)–(F).  Whether mining wastes excluded from RCRA coverage by the Bevill Amendment may be regulated under CERCLA notwithstanding the exclusionary reference in section 9601(14)(C) is an issue of first impression for the Court.

In support of its position, Drummond relies on *United States v. Iron Mountain Mines, Inc.*, a case decided by United States District Judge Milton L. Schwartz of the Eastern District of California.  812 F. Supp. 1528 (E.D. Cal. 1992).  In *Iron Mountain*, the United States and the State of California brought an action against the owners/operators of an iron, zinc, silver, gold, and pyrite mine for past and future CERCLA response costs stemming from clean-up of severe acid mine drainage (*i.e.*, mining wastes) caused by the defendants' intensive mining activities.  *Id.* at 1532.  Like Drummond, the defendants argued that the plaintiffs had failed to state a claim for relief "because mining wastes are excluded from CERCLA's definition of hazardous substances" under subsection (C) of section 9601(14).  *Id.* at 1537.  The plaintiffs countered that the subsection (C) mining waste exclusion did not preclude CERCLA coverage of a mining waste if the constituents of that waste are described in any other part of section 9601(14).  *Id.*

Based on his analysis of both the statute's construction and CERCLA's legislative history, Judge Schwartz sided with the defendants.  According to Judge Schwartz, reading the statute any other way would effectively render the exclusion in section 9601(14)(C) inoperative, violating well-established principles of statutory interpretation.  *Id.* at 1539.  Additionally, Judge Schwartz reasoned that placement of the exclusion within subdivision (C)—as opposed to at the end of section 9601(14), like those for petroleum and natural gas—made sense.  *Id.*  This is because, Judge Schwartz explained, "[e]ach

subdivision of [section 9601(14)] defines hazardous substances by reference to other environmental statutes."  And since "[subsection (C)] incorporates those wastes defined by SWDA section 3001," and "[b]ecause SWDA section 3001 itself contains the Bevill Amendment exclusion," Judge Shwartz concluded that "[subsection (C)] of CERCLA section [9601(14)] is the rational place to include that exclusion."  *Id.*  Finally, Judge Schwartz found convincing Senate Report 96–848, which noted that "any substance or material for which regulation is specifically suspended by Act of Congress under the [SWDA] is excluded from designation as a hazardous substance for the purpose of S. 1480, notwithstanding the presence in such substance of any hazardous or toxic chemical."  *Id.*  This, Judge Schwartz reasoned, established clear legislative intent to "effectuate the exclusion regardless of its placement in the statute."  *Id.*

    Upon further review by the Court, however, *Iron Mountain* appears more an anomaly than accepted precedent.  Moreover, *Iron Moutain* is no longer good law, as it was implicitly overruled by the Ninth Circuit's opinion in *Louisiana-Pac. Corp. v. ASARCO Inc.*, which held that "the specific exception for slag in subsection (C) of [section 9601(14)] of CERCLA *applies only to that subsection*, and that slag and its components *are regulated* to the extent they fall within *any of the other subsections of [section 9601(14)]*."  24 F.3d 1565, 1574 (9th Cir. 1994), *as amended* (Aug. 30, 1994) (emphasis added).  In so holding, the panel rejected, although not expressly, much of the rationale espoused by Judge Schwartz in *Iron Mountain*.  In the panel's view, the intent of the exclusion created by subsection (C) is made clear by a facial review of both the plain language of subsection (C) and the construction of section 9601(14) as a whole.  Specifically, the panel reasoned that if Congress wished to create a general and complete exclusion for

mining slag, as opposed to only excluding it from subsection (C), as a plain reading of the statute so instructs, it could have included such an exclusion at the end of section 9601(14), just as it did with the general exclusion for petroleum products. *Id.* at 1573. Since it did not, the panel concluded that slag *is* regulated as a hazardous substance under CERCLA to the extent that it falls under any of the other subparts of section 9601(14). *Id.*

Further, in assuming for sake of argument that section 9601(14) was facially ambiguous—which the panel determined it was not—the panel dismissed the appellant's reliance on Senate Report 96–848, which arguably can be read to mean that the exception set forth in subparagraph (C) extends throughout all of section 9601(14).[7] *Id.* at 1573–1574. Rather, the panel determined that, at best, Congress's intent with respect to the operation of subsection (C) is unclear.[8] *Id.* For that reason, applying *Chevron* principles, the panel found reasonable and, thus, more authoritative the EPA's own interpretation of section 9601(14), which has interpreted that section to mean "that the Bevill Amendment exception in subsection (C) *refers only to that subsection.*" *Id.* at 1574

---

[7] As detailed *supra*, Senate Report 96–848 states, "It should be noted that any substance or material for which regulation is specifically suspended by Act of Congress under the Solid Waste Disposal Act *is excluded from designation for the purpose of S. 1480, notwithstanding the presence in such substance of any hazardous or toxic chemical.*" Sen. Rep. No. 96–848, *reprinted in* The Environmental Law Institute, Superfund: A Legislative History, at 12 (emphasis added).

[8] For example, it should be noted that the RCRA, in exempting mine and mill wastes from regulation pending an EPA study, specifically states that "each waste listed below shall . . . be subject only to regulation under *other* applicable provisions of Federal or State law in lieu of this subchapter[.]" 42 U.S.C. § 6921(b)(3)(A) (emphasis added). This evidences a contrary legislative intent, *i.e.*, that Congress did, in fact, intend that mine and mill wastes be regulated under other federal laws, which, of course, includes those listed in the other subsections of section 9601(14).

(citing 48 Fed. Reg. 40663 (1983)) (emphasis added).[9]

Finally, the panel rejected the appellant's argument that adopting such an interpretation would result in "complete nullification of the Bevill Amendment exception in subsection (C)[.]"  *Id.*  The appellant contended that the constituents of nearly all Bevill Amendment wastes fall under at least one of the other five categories of "hazardous substances" in section 9601(14).  It thus follows, the appellant argued, that anything less than a complete exemption of mining slag would render subsection (C)'s incorporation of the Bevill Amendment exception meaningless, because what the Bevill Amendment exempts would be cancelled out by the inclusion of mining slag components in the other subparts of section 9601(14).  The panel rejected the appellant's position on the ground that it rested on a "false premise."  *Id.*  The panel explained:

> [The appellant's position] assumes that Congress meant for the statute to say something other than what it plainly says.  What is clear is that Congress

---

[9]  *See also* Amendment to National Oil and Hazardous Substance Contingency Plan; National Priorities List, 48 FR 40658-01, which states:

> Some commenters presented the view that CERCLA does not authorize EPA to respond to releases of mining wastes, and that sites involving mining wastes should not be included on the NPL. This view is based on the interpretation that mining wastes are not considered hazardous substances under CERCLA.  CERCLA includes in its definition of hazardous substances materials that constitute hazardous wastes under the Resource Conservation and Recovery Act (RCRA). In the 1980 amendments to RCRA, the regulation of mining wastes under Subtitle C of RCRA was temporarily suspended and that suspension is presently in effect. For that reason, the commenters believe that mining wastes should not be considered hazardous substances under CERCLA.

> *EPA disagrees with the commenters' interpretation. The Agency believes that mining wastes can be considered hazardous substances under CERCLA if it meets any of the other statutory criteria (e.g., if the material is also a hazardous air pollutant listed under section 112 of the Clean Air Act).*

(Emphasis added).

> thought about an exemption for petroleum products and about hazardous
> wastes, including slag which is covered by the Bevill Amendment.
> Congress expressly provided a general exemption for petroleum products.
> It provided an exemption for slag only in subsection (C).

*Id.*

In the end, the panel concluded that because the components of the mining slag (*e.g.*, copper, lead, arsenic, and zinc) fell within subparts (A), (B), and (D) of section 9601(14), the mining slag constituted a "hazardous substance" under CERCLA.  *Id.*

The Ninth Circuit is not the only court to have decided the issue this way.  Indeed, at least one other federal appellate court and several other district courts have also concluded that the specific exclusion in subsection (C) applies *only* to that subsection. The D.C. Circuit, in *Eagle-Picher Indus., Inc. v. U.S. E.P.A.*, for example, held that that mining wastes and fly ash, exempted from regulation under the RCRA and, therefore, the parenthetical clause in subsection (C) of section 9601(14), were still considered "hazardous substances" under CERCLA because they were covered under subsection (A) of section 9601(14).  759 F.2d 922, 930 (D.C. Cir. 1985).  Furthermore, virtually every United States District Court to take up the issue has concluded likewise.  *See, e.g., United States v. Gadsden Indus. Park, LLC*, No. 4:14-CV-00992-HGD, 2015 WL 1499142, at *1 (N.D. Ala. Feb. 11, 2015) (unpublished), *report and recommendation adopted,* No. 4:14-CV-00992-KOB, 2015 WL 1499203 (N.D. Ala. Apr. 1, 2015) (mining slag that contained arsenic, chromium, copper, lead, manganese and zinc covered notwithstanding subsection (C)); *Hous. Auth. of City of Los Angeles v. PCC Tech. Indus., Inc.*, No. 11-1626 FMO (CWX), 2015 WL 13654008, at *8 (C.D. Cal. Jan. 26, 2015) (unpublished) (slag produced from steel mill operations covered notwithstanding subsection (C)); *B.F. Goodrich Co. v. Murtha*, 754 F. Supp. 960, 968 (D. Conn. 1991), *aff'd,* 958 F.2d 1192 (2d

Cir. 1992) (household waste, which is excluded under RCRA, covered notwithstanding subsection(C)); *T & E Indus., Inc. v. Safety Light Corp.*, 680 F. Supp. 696, 708 (D.N.J. 1988) (carnotite ore tailings covered notwithstanding subsection (C)); *State of Idaho v. Hanna Min. Co.*, 699 F. Supp. 827, 833 (D. Idaho 1987) , *aff'd,* 882 F.2d 392 (9th Cir. 1989) (copper and cobalt tailings covered notwithstanding subsection (C)); *United States v. Union Gas Co.*, 586 F. Supp. 1522, 1525 (E.D. Pa. 1984) (coal tar constituents covered notwithstanding subsection (C)); *United States v. Metate Asbestos Corp.*, 584 F. Supp. 1143, 1148 (D. Ariz. 1984) (asbestos tailings covered notwithstanding subsection (C)).

Accordingly, the Court sides with the majority of authority on this issue, and concludes that although the Bevill Amendment excludes coverage for mining wastes under the RCRA, and thus under subdivision (C) of section 9601(14) of CERCLA, mining wastes may still be regulated under CERLCA as "hazardous substances" if the mining waste and/or its constituents fall within another subpart of section 9601(14).

### 2.  Applicability of remaining subparts of section 9601(14)

Having so decided, the next question the Court must answer is whether the phosphatic mining waste—including its constituents—used by Drummond to reclaim the Oakbridge and Grasslands developments are covered by any other subdivision of section 9601(14), *i.e.,* section 9601(14)(A), (B), (D), (E), and/or (F).  The Court can easily dispose of this question.

Plaintiffs allege that the phosphate mining waste Drummond used to reclaim the land on which the Oakbridge and Grasslands developments now sit contains radioactive materials—namely, radium-226. *See* (Doc. 38, at ¶¶8–9, 12–13, 15, 45, 52, 85, 90, 152). "Radium-226 decays to form a gas, radon–222, and solid 'daughter products.'" *Amoco*

*Oil Co. v. Borden, Inc.*, 889 F.2d 664, 668–69 (5th Cir. 1989), *as clarified on denial of reh'g* (Jan. 23, 1990).  "Radon and its daughter products are considered radionuclides, which are defined as 'any nuclide that emits radiation.'"  *Id.* (quoting 40 C.F.R. § 61.91(c) (1988)).[10]  "Under CERCLA, the term 'hazardous substance' includes 'any element, compound, mixture, solution, or substance designated pursuant to section 9602 of [CERCLA] . . . [and] any hazardous air pollutant listed under section 112 of the Clean Air Act...[.]'"  *Id.* (quoting § 9601(14)(B), (E)).  "The EPA has designated radionuclides [including radium-226] as hazardous substances under § 9602(a) of CERCLA."  *Id.* (citing 40 C.F.R. § 302.4 (1988)).  "Additionally, the regulations promulgated by the EPA under § 112 of the Clean Air Act, 42 U.S.C. § 7412, list radionuclides as a hazardous air pollutant."  *Id.* (citing 40 C.F.R. § 61.01(a) (1988)).  Therefore, radionuclides—including radium-226—constitute hazardous substances under § 9601(14)(B) and (E) of CERCLA, and thus the radioactive constituents of the phosphatic mining waste alleged to be currently sitting under the Oakbridge and Grasslands developments are hazardous substances within the meaning of Chapter 376.  As such, the Court stands by its prior determination that "the allegations in the Amended Complaint, accepted as true, demonstrate that there has been a 'discharge' of 'hazardous substances into or upon the surface or ground waters of the state or lands' under Sections 376.313(3) and 376.302(1)(a) of the Florida Statutes."  *See* (Doc. 34, at 21).

---

[10]  *See also* James R. Cox, *Revisiting RCRA's Oilfield Waste Exemption As to Certain Hazardous Oilfield Exploration and Production Wastes*, 14 Vill. Envtl. L.J. 1, 10 (2003) ("Radium is a radionuclide whose daughter products—which include radon gas—emit radioactive alpha particles, beta particles, and gamma rays.").

The Court accordingly denies Drummond's Motion as to Count I of Plaintiffs' Operative Complaint.[11]

## B. Negligence and Negligence *Per Se*

In its prior motion to dismiss Plaintiffs' amended complaint, Drummond argued that Plaintiffs' negligence-based claims failed because Plaintiffs could not establish the existence of a valid legal duty owed to Plaintiffs.  *See* (Doc. 16, at 17) ("There is no tort duty in Florida of a prior owner who did nothing more than mine and reclaim phosphate land, even if the formerly mined land has gamma radiation emanating from the underlying rock.").  However, after fleshing out the threshold issue of whether Florida's economic loss rule bars claims sounding in negligence for purely economic injuries—which the Court found that it did not—the Court concluded that Drummond *did* owe a general duty of care to Plaintiffs in light of (1) the Florida Supreme Court's expansive definition of the duty owed relative to the phosphate business in *Curd*,[12] (2) its subsequent, further narrowing of the economic loss rule in *Tiara*,[13] and (3) the position of the Third Restatement with respect to the duty owed by vendors of land to disclose to purchasers

---

[11]   The Court rejects Drummond's remaining arguments in support of dismissal of Count I of Plaintiffs' Operative Complaint (*e.g.*, that Plaintiffs have failed to allege violation of specific Florida DEP standards and that Plaintiffs are unable to establish damage causation for purposes of Chapter 376 liability) for the reasons stated in Plaintiffs' response (Doc. 46).  Further, as noted in section IV.D, *infra*, issues of causation are typically not susceptible to resolution at the motion to dismiss stage.  *See Hosler v. Alcon Labs., Inc.*, No. 12-60025-CIV, 2012 WL 4792983, at *8 (S.D. Fla. Oct. 9, 2012) (unpublished).

[12]   *Curd v. Mosaic Fertilizer*, LLC, 39 So.3d 1216 (Fla. 2010).

[13]   *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos.*, 110 So.3d 399 (Fla. 2013).

dangerous, latent conditions on the land.  *See* (Doc. 34, at 22–26).  The Court accordingly denied Drummond's motion as to Plaintiffs' negligence and negligence *per se* claims.

Nevertheless, as it does with respect to Plaintiffs' Chapter 376 claim, Drummond offers, for the first time, a new argument supporting dismissal of Plaintiffs' negligence-based claims:  that, as a matter of law, Plaintiffs will *never* be able to carry their burden of establishing injury causation.  Specifically, Drummond contends that the law governing radiation exposure is clear that a causal relationship between exposure to radiation or other toxic substances and resulting damages simply *cannot* be established.  *See* (Doc. 41, at 7–8).  Moreover, according to Drummond, since Plaintiffs will never be able to establish a causal link between increased exposure to radiation and actual, subsequent development of cancer, and, further, because Florida law does not recognize claims for "enhanced risk of cancer," Plaintiffs will never be able to state a recoverable claim for damages. *Id.*  This is true even with respect to Plaintiffs' claims for purely economic damages, says Drummond, because those claims (*e.g.*, diminution in property values) stem directly from "the speculative risk of cancer associated with [those properties]."  *Id.*

In support of its position, Drummond relies on the Third Circuit's recently issued opinion in *McMunn v. Babcock & Wilcox Power Gen. Group, Inc.*, 869 F.3d 246 (3rd Cir. 2017).[14]  *McMunn* involved more than seventy plaintiffs who brought suit under the Price-Anderson Act and Atomic Energy Act against successors-in-interest to the former operator of a nuclear processing facility in Appollo, Pennsylvania, near which the plaintiffs lived and worked.  *Id.* at 250–251.  The plaintiffs sought to recover damages resulting

---

[14]  As Drummond points out, *McMunn* was decided after the Court issued its ruling on Drummond's prior motion to dismiss Plaintiffs' amended complaint.

from exposure to radioactive uranium and plutonium allegedly released from facility.  *Id.*
The plaintiffs claimed that they developed cancer after being exposed to excessive levels
of radiation produced as a consequence of the facility's operations.  *Id.*  The district court
determined that the defendants were entitled to summary judgment on the plaintiffs' Price-
Anderson claims because the plaintiffs failed to show that there was a genuine dispute of
material fact as to, *inter alia*, the element of damage causation.

The Third Circuit affirmed the district court's grant of summary judgment in favor
of the defendants, agreeing that the plaintiffs failed to show a genuine dispute of material
fact with regard to causation.  *Id.* at 274.  In so holding, however, the panel *did not*
conclude, as Drummond suggests, that plaintiffs can *never* establish causation in a
radiation exposure case.  While it's true, as Drummond points out, that the panel posited
that "it is impossible to determine with *certainty* that radiation is the cause of a given
incidence of cancer," the panel ultimately affirmed dismissal of the plaintiffs' claims
because the evidence adduced through expert discovery "would not allow a jury to find
*sufficient* frequency, proximity, and regularity" so as to establish that the defendants' acts
were a substantial factor in bringing about the plaintiffs' harm.  *Id.* at 255, 269–273
(emphasis in original).  In other words, the plaintiffs had simply lost the so-called "battle
of the experts," and thus failed to meet their specific causation burden based on the facts
and evidence presented in that particular case.

Here, Drummond's heavy reliance on *McMunn* in arguing for dismissal of Plaintiffs'
negligence-based claims is misplaced.  As an initial matter, the Court would be remiss in
failing to note that it is not bound to follow opinions issued by the Third Circuit.  Further,
even if *McMunn* were binding—as opposed to merely persuasive—authority, Drummond

extends the application of *McMunn* too far.  Indeed, nothing in the opinion convinces the Court that it should summarily reject Plaintiffs' negligence-based claims on grounds that Plaintiffs are wholly incapable, *as a matter of law*, of establishing that Drummond's conduct is the factual and legal cause of their alleged injuries, whether physical or economic in nature.  *This is especially true given that issues of causation are typically not susceptible to resolution at the motion to dismiss stage.  See Hosler*, 2012 WL 4792983, at *8.  At this juncture, Plaintiffs' allegations that Drummond discharged hazardous substances (*e.g.*, phosphatic mining waste containing radium-226) onto the land it later developed into the Grasslands and Oakbridge communities, knowing that radiation would emit into homes built on the properties, and yet failed to either disclose the presence of those hazardous substances and/or undertake appropriate remedial efforts, "thereby causing Plaintiffs . . . to suffer damage to property and personal finance, emotional distress, personal injuries in the form of the increased risk of latent disease [necessitating medical monitoring]. . . loss of the use and enjoyment of property and destruction of their community . . . property damages, [and] economic losses, such as loss of property value" state a facially plausible claim for negligence.[15]  *See* (Doc. 36, at ¶¶15, 21–22, 30, 98–100).

The Court accordingly denies Drummond's Motion as to Count II of Plaintiffs' Operative Complaint.

[space intentionally left blank]

---

[15]  For the reasons stated in its prior Order, since the Court has concluded that the Plaintiffs have stated a claim for negligence, it necessarily follows that the Plaintiffs have also stated a claim for negligence *per se*.  *See* (Doc. 34, at 26 n.7).

## C. Fraud and Fraudulent Concealment

Pursuant to the Court's Order on Drummond's prior motion to dismiss, *see* (Doc.
34, at 16), Plaintiff Feist, on behalf of himself and the purported "Fraud Class" members,
is the sole plaintiff now alleging fraud-based claims against Drummond.

A claim for fraudulent misrepresentation requires proof of the following elements:
"(1) a false statement concerning a material fact; (2) the representor's knowledge that the
representation is false; (3) an intention that the representation induce another to act on it;
and, (4) consequent injury by the party acting in reliance on the representation." *Johnson
v. Davis*, 480 So.2d 625, 627 (Fla. 1985).   A claim for fraudulent concealment, on the
other hand, is very similar to a claim for fraudulent misrepresentation, except that it allows
a plaintiff to recover if a defendant intentionally *suppresses* material facts, as opposed to
affirmatively misrepresenting them.   *See Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172,
1182 (11th Cir. 2002) ("To prove a prima facie case for fraud, [plaintiff] had to produce
evidence that . . . [defendants] made a false statement *or omission of a material fact.*")
(emphasis added); *Ward v. Atl. Sec. Bank*, 777 So. 2d 1144, 1146 (Fla. 3d DCA 2001)
("Fraud also includes the intentional omission of a material fact."); *Palm Beach Roamer,
Inc. v. McClure*, 727 So. 2d 1005, 1007 (Fla. 5th DCA 1999) ("To prove a prima facie case
of fraud . . . [plaintiff] had to produce evidence sufficient to show that . . . [defendant]
knowingly made a false statement of material fact *or concealed a material fact.*")
(emphasis added).   Otherwise, the elements of a claim for fraudulent concealment are
essentially no different, *i.e.*, knowing suppression of a material fact, an intention that the
other party act on the suppression, and injury to the other party caused by the
suppression.   *See Grills v. Phillip Morris USA, Inc.*, 645 F. Supp. 2d 1107, 1119 (M.D.

Case No.:  8:17-cv-587-EAK-AEP

Fla. 2009) (unpublished); *Jones v. Gen. Motors Corp.*, 24 F. Supp. 2d 1335, 1339 (M.D.

Fla. 1998) (unpublished).

However, for purposes of a fraudulent *concealment* claim, the plaintiff must also

allege facts supporting a special relationship between the parties that would give rise to

a duty to speak.  *See TransPetrol, Ltd. v. Radulovic*, 764 So.2d 878, 879–80 (Fla. 4th

DCA 2000); *Regions Bank v. Kaplan*, 258 F. Supp. 3d 1275, 1292 (M.D. Fla. 2017)

(citations omitted).   Such a duty may arise where: (1) one party to a transaction who

speaks has a duty to say enough to prevent his words from misleading the other party;

(2) one party to a transaction who has special knowledge of material facts to which the

other party does not have access may have a duty to disclose those facts to the other

party; or (3) one party to a transaction who stands in a confidential or fiduciary relation to

the other party has a duty disclose material facts.  *Kaplan*, 258 F. Supp. 3d at 1292

(citations omitted).

Here, Feist contends that Drummond engaged in acts of both passive concealment

and affirmative misrepresentation.   As outlined directly above, these two theories of

recovery, although both grounded in fraud, are technically separate causes of action,

each requiring subtly different factual allegations necessary to substantiate them.

Nonetheless, the Court feels obliged to, at the outset, bring to the Parties' attention the

Florida Supreme Court's decision in *Johnson v. Davis*, 480 So. 2d 625 (Fla. 1985), which

is pertinent to the case at bar.  As the *Johnson* court explained:

> The difference between misfeasance and nonfeasance, action and inaction
> is quite simple and obvious; however, in practice it is not always easy to
> draw the line and determine whether conduct is active or passive.  That is,
> where failure to disclose a material fact is calculated to induce a false belief,
> the distinction between concealment and affirmative representations is
> tenuous.  Both proceed from the same motives and are attended with the

same consequences; both are violative of the principles of fair dealing and
good faith; both are calculated to produce the same result; and, in fact, both
essentially have the same effect.

*Id.* at 628.

With that backdrop squarely in mind, the Court turns to its analysis of the
sufficiency Feist's allegations.  Put in their simplest form, Feist's fraud-based allegations
are thus:  notwithstanding its knowledge that the Oakbridge and Grassland developments
were contaminated with "unsafe" levels of radiation, Drummond not only hid that fact from
Feist (and the other putative "Fraud Class" members), but it also affirmatively
mischaracterized, through the Development Agreement, both the true character, quality,
and risks posed by contamination of the land in addition to Drummond's efforts at
remediating the same.  *See* (Doc. 36, at ¶¶1, 4, 21–23, 52–97, 102–103, 152–170).

Drummond contends that Feist has failed to plead his fraud-based claims with
specificity, as is required by Rule 9(b), and has otherwise failed to state a claim upon
which relief can be granted.  The Court disagrees.

Feist alleges that "Drummond has repeatedly assured the public that phosphate
mining operations do not present a health risk," *see* (Doc. 36, at ¶4), and that "Drummond
took minimal efforts to characterize the radioactive nature of [the Oakbridge and
Grasslands] developments" and did not "fully characterize[] the extent of contamination
at [those properties.]," *id.* at ¶21.  To substantiate those allegations, Feist relies on specific
statements contained in the Development Agreement:  *e.g.*, Drummond's representations
that "the development will occur on land suitable for development" and that Drummond
would "utilize . . . control technology . . . in construction of all proposed dwelling units on
reclaimed phosphate lands in order to mitigate any potential impacts due to radon gas
emissions or other radiation effects . . . [and] to reduce the exposure of the

occupants . . . to the influx of radionuclides into the structure[.]" *Id.* at ¶158.  Feist goes on to allege that Drummond both (1) knew that these representations were false based on reports by both the Florida Department of Health and Rehabilitative Services and the EPA, which concluded that the land exposed residents to "unsafe levels of radiation" and that "a significant number of the homes built on this property will probably have indoor radiation levels greater than the recommended federal guidelines[,]" and (2) told no one of "the risks of radioactive contamination . . . and the levels of exposure that people living and recreating on those contaminated lands would be subjected to[.]" *Id.* at ¶¶61, 70, 85, 87, 90–94, 152.  Feist further alleges that "Drummond intended that [its] representations induce [he] and the Fraud Class Members . . . to act on them by purchasing or renting its residential or commercial properties[.]" *Id.* at ¶162.  Finally, Feist alleges that he and the purported "Fraud Class" members "relied . . . to their detriment" on the representations made in the Development agreement, and that had he and the purported "Fraud Class" members "known the actual facts regarding the elevated levels of gamma radiation on their . . . properties, they would not have entered into the transactions to buy or lease [those properties]." *Id.* at ¶¶157–158.

The Court finds these allegations sufficiently specific to put Drummond on notice of the alleged fraud. *See Gatfield v. NOC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006).  Furthermore, if Feist could indeed prove these facts, he would prevail on his fraud-based claims.  As such, he has sufficiently stated a plausible claim for both fraudulent misrepresentation and fraudulent concealment.

As an additional ground for dismissal of Feist's fraudulent *concealment* claim, however, Drummond contends that it had no affirmative duty to disclose any material

defects in the land (*e.g.*, unsafe radioactive contamination), rendering that claim defective as a matter of law.  The Court disagrees, and finds that Feist has sufficiently alleged the existence of a duty on the part of Drummond in at least three respects.  First, as the Florida Supreme Court in *Johnson* made abundantly clear, "[W]here the seller of [real property] knows of facts materially affecting the value of the property which are not readily observable and are not known to the buyer, the seller is under a duty to disclose them to the buyer."  480 So. 2d at 629.  And although Drummond counters that it did not actually sell the land to Feist, the Court finds that the inclusion of the Development Agreement in the chain of title provides a sufficient basis for linking Drummond's alleged misrepresentations and omissions to Feist's and the other purported "Fraud Class" members' decisions to purchase their properties.

Second, Feist has alleged that Drummond had knowledge of the EPA's Phosphate Initiative findings (*i.e.*, that people living in residential dwellings in Oakbridge may be exposed to unsafe levels of radiation), and that those findings were marked as exempt from federal freedom of information laws and not otherwise shared with the public.  *See* (Doc. 36, at ¶67–71).  Feist also alleges that Drummond was notified by the Florida Department of Health and Rehabilitative Services that radiation levels on its former mining lands were two to three times greater than background, and that, as a result, a significant number homes built on that land would have indoor gamma radiation levels greater than recommended federal guidelines.  *Id.* at ¶64.  Accepting those allegations as true, the Court finds that Drummond had "special knowledge of material facts" to which Feist and the other purported "Fraud Class" members were not privy, thereby triggering a duty to disclose the same.  *See Kaplan*, 258 F. Supp. 3d at 1292.

And third, by promising to utilize "control technology" in constructing residential dwellings on the land in order to "mitigate" and "reduce" the "potential adverse impacts" of and "exposure of the occupants" to radon and other radionuclides, *see* (Doc. 36, at ¶158), the Court finds that Drummond had a duty to fully disclose the true character, quality, and risks posed by contamination of the land, *Kaplan*, 258 F. Supp. 3d at 1292. ("[O]ne party to a transaction who speaks has a duty to say enough to prevent his words from misleading the other party[.]); *see also* Restatement (Second) of Torts § 533 ("The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved.").  According to Feist, however, Drummond failed to do so.

The Court accordingly denies Drummond's Motion as to Count III of Plaintiffs' Operative Complaint.

### D. Negligent Misrepresentation

"To state a claim for negligent misrepresentation, [the] plaintiff must allege: (1) a misrepresentation of material fact; (2) that [the] defendant knew of the misrepresentation, made the misrepresentation without knowledge of its truth or falsity, or should have known the representation was false; (3) that [the] defendant intended to induce another to act on the misrepresentation; and (4) that an injury resulted in justifiable reliance upon the misrepresentation." *Principal Bank v. First Am. Mortg.*, Inc., 2012 WL 473507, at *5 (M.D. Fla. Feb. 14, 2012) (unpublished).   "Because actions for negligent misrepresentation

sound in fraud rather than negligence, the pleading requirements contained in Federal Rule of Civil Procedure 9(b) apply to such actions." *Postel Indus., Inc. v. Abrams Grp. Const.*, LLC, 2012 WL4194660, *2 (M.D. Fla. Sept. 19, 2012) (unpublished).

Based on the same set of facts alleged in connection with Feist's fraudulent misrepresentation and fraudulent concealment claims, Feist has necessarily stated a claim for negligent misrepresentation.  *See Godelia v. Doe 1*, 881 F.3d 1309, 1321 (11th Cir. 2018) (treating the plaintiff's fraudulent and negligent misrepresentation claims identically).  The Court need not undertake further analysis.

The Court accordingly denies Drummond's Motion as to Count IV of Plaintiffs' Operative Complaint.

### E. Medical Monitoring

In its prior Order, the Court dismissed without prejudice Plaintiffs' medical monitoring claim due to their failure to plead it as a standalone cause of action. *See* (Doc. 33, at 33–34).  Plaintiffs have cured that pleading deficiency.  The Court must now determine whether Plaintiffs' claim for medical monitoring is facially plausible.  It is.

Although Plaintiffs have not specifically requested damages for personal, physical injuries, Plaintiffs have asked the Court to establish a medical monitoring fund to cover costs associated with routine medical testing, monitoring, and study of Plaintiffs and purported class members for the remainder of their lives.  *See* (Doc. 36, at ¶¶171–180). In *Petitio v. A.H. Robbins Co., Inc.*, the Florida Court of Appeals for the Third District held that a court of equity may establish a medical monitoring plan under prescribed circumstances to fund the monitoring of the condition of plaintiffs.  750 So. 2d 103, 106

(Fla. 3d DCA 1999).[16]  The *Petito* Court recognized a right to medical monitoring even in the absence of a physical injury.  *Id.* at 105–108.  To use its equitable powers to create and supervise a fund for medical monitoring purposes, a court must find that plaintiffs have alleged facts sufficient to make a threshold showing of the following elements:

> (1) exposure greater than normal background levels; (2) to a proven hazardous substance; (3) caused by the defendant's negligence; (4) as a proximate result of the exposure, plaintiff has a significantly increased risk of contracting a serious latent disease; (5) a monitoring procedure exists that makes the early detection of the disease possible; (6) the prescribed monitoring regime is different from that normally recommended in the absence of the exposure; and (7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

*Id.* at 106–07.

Here, the Court is satisfied that Plaintiffs have sufficiently pled each of the required elements.  Plaintiffs allege that as a result of Drummond's discharge of hazardous mining waste onto the land it later inadequately reclaimed and developed into the Grasslands and Oakbridge communities, Plaintiffs (and the other residents of the communities) have been exposed to "unsafe levels of . . . gamma radiation . . . anywhere from 2.5 to 8 times greater than baseline background levels" based on evaluations conducted by both the EPA the DOE.  *See* (Doc. 36, at¶¶15, 67–79).  Plaintiffs further allege that exposure to such radiation has significantly increased their risk of a developing a variety of cancers and thyroid disorders (including leukemia, lymphoma, and bone and thyroid cancer), and

---

[16]  The Florida Supreme Court denied review of the 3d DCA's opinion in *Petitio*, *see A.H. Robins Co. v. Petito*, 780 So. 2d 912 (Fla. 2001), and it has not issued a decision regarding the propriety of claims for medical monitoring.  In applying Florida law, the Court is "bound to adhere to decisions of [Florida's] intermediate appellate courts absent some persuasive indication that [Florida's] highest court would decide the issue otherwise."  *Silverberg v. Webber, Jackson & Curtis, Inc.,* 710 F.2d 678, 690 (11th Cir.1983).

that periodic physical examinations, clinical laboratory tests, advanced medical imaging techniques, scans, and biopsies can be utilized to proactively detect the development of these latent conditions. *Id.* at ¶¶8–13, 31, 70, 86, 173, 176.  Plaintiffs also allege that due to the serious nature of the potential latent illnesses associated with exposure to gamma radiation, this more comprehensive medical monitoring/screening regime would, of course, be different than that which Plaintiffs would normally undergo in the absence of such exposure.   *Id.* at ¶178.    Finally, Plaintiffs allege that this medical monitoring/screening regime is reasonably necessary in order to proactively detect the development of cancer and/or thyroid disorders, as contemporary scientific principles, medical literature, and expert opinion show that these latent illnesses often go undiagnosed, and that early detection improves prognosis and overall treatment.  *Id.* at ¶179.  Therefore, the Operative Complaint "alleges the bare minimum to survive a motion to dismiss—that Plaintiffs have been exposed to contaminants through the negligence of Defendant and those exposures have increased the risk of contracting serious latent diseases for which means of early detection are available."  *Swartout v. Raytheon Co.*, No. 8:08-CV-890-T26TGW, 2008 WL 2824953, at *1 (M.D. Fla. July 16, 2008) (unpublished).[17]

The Court accordingly denies Drummond's Motion as to Count V of Plaintiffs' Operative Complaint.

[space intentionally let blank]

---

[17]   Drummond also challenges Plaintiffs' medical monitoring claim on the basis that Plaintiffs will not be able to establish injury causation, relying on *McMunn*.  The Court rejects Drummond's contention for the same reasons explained in section IV.B, *supra*.

### F. Emotional Distress Damages

In their Operative Complaint, Plaintiffs have now added to their requested relief damages for emotional distress stemming from the alleged increased risk of latent illness caused by over-exposure to radium-226. *See* (Doc. 36, at ¶¶30, 100). In Florida, whether a plaintiff can recover damages for emotional distress typically hinges on whether the plaintiff has or has not suffered a physical impact from an external force. *See Willis v. Gami Golden Glades, LLC*, 967 So. 2d 846, 850 (Fla. 2007). "If the plaintiff has suffered an impact, Florida courts permit recovery for emotional distress stemming from the incident during which the impact occurred[.]" *Id.* Where, on the other hand, the plaintiff has not sustained an "impact," the so-called "impact rule" bars the plaintiff from recovering for purely emotional injures unless the claim falls within one of the rule's recognized exceptions. *Id.* The rule serves as "a threshold indicator of significant injury so the courts may feel satisfied that an emotional distress-based injury has actually occurred." *Bodine v. Fed. Kemper Life Assur. Co.*, 912 F.2d 1373, 1376 (11th Cir. 1990) (applying Florida law) (internal quotations and citations omitted).

Drummond contends that emotional distress damages are unavailable in this case due to Plaintiffs' failure to allege that they've suffered actual physical injuries. However, in its most recent decision involving the impact rule, the Florida Supreme Court clarified that when there *is* an impact, no showing of a physical injury is necessary. *See Willis*, 967 So. 2d at 850; *see also Pineda v. PRC, LLC*, No. 1:11-CV-20894-JLK, 2011 WL 3022564, at *3 (S.D. Fla. July 22, 2011) (unpublished) ("Impact" is not synonymous with "injury."). In other words, "[w]hen an impact or touching has occurred *the rule has no application*" and a plaintiff may recover damages for emotional injury without ever having

to show a physical manifestation of that injury.  *Id.* (emphasis in original).  The question for the Court thus becomes, "Have Plaintiffs sufficiently alleged an 'impact?'"  If they have, their claim for emotional distress damages escapes the grasp of the impact rule and should survive Drummond's Motion.  For their part, Plaintiffs contend that the slow decay of the radioactive constituents of the mining waste underneath their property (*e.g.,* radium-226) "produce gamma rays that can penetrate the body[.]"  *See* (Doc. 36, at ¶59).  This, Plaintiffs argue, constitutes an "impact" for purposes of recovery of emotional distress damages.  The Court agrees.

As first explained in *Eagle–Picher Industries, Inc. v. Cox,*[18] and approved by the Florida Supreme Court in *Willis*, "The essence of impact . . . is that the outside force or substance, *no matter how large or small, visible or invisible, and no matter that the effects are not immediately deleterious*, touch or enter into the plaintiff's body."  *Id.* (emphasis added).  Thus, "for a plaintiff to have endured an impact or contact sufficient to render an action sustainable, the 'plaintiff may meet rather slight requirements.'"  *Willis,* 967 So. 2d at 850 (quoting *Zell v. Meek*, 665 So. 2d 1048, 1050 n.1 (Fla. 1995)).  For example, in *Clark v. Choctawhatchee Elec. Co-op., Inc.*, the Florida Supreme Court held that an invisible electric shock constituted an impact sufficient to support a mental distress claim.  107 So. 2d 609, 612 (Fla. 1958).  In so holding the court reasoned,

> We think too much emphasis has been placed on the absence from the appellant's body of evidence of trauma such as burns, bruises, or scars.  In our opinion, an electrical shock, or trauma, or impact may be administered and not leave an outward sign.

---

[18]  481 So.2d 517, 527 (Fla. 3d DCA 1985).

*Id.*  Similarly, in *Eagle-Picher*, the Florida Court of Appeals for the Third District held that inhalation of asbestos particles constituted an impact sufficient to support a mental distress claim.  481 So. 2d at 526; s*ee also Herber v. Johns-Manville Corp.*, 785 F.2d 79, 85 (3d Cir. 1986) (holding that inhalation of asbestos fibers, although resulting in slight impact, was sufficient to permit appellant to introduce evidence of emotional injury); *Plummer v. United States*, 580 F.2d 72, 76 (3d Cir. 1978) (holding that microscopic intrusion of tubercle bacilli into the bodies of the plaintiffs constitutes a sufficient "impact" to allow compensation for resulting mental affliction).  And in *Hagan v. Coca-Cola Bottling Co.*, the Supreme Court of Florida held likewise when presented with facts that the appellants had consumed Coca-Cola containing mold.  804 So. 2d 1234, 1240 (Fla. 2001); *see also Merry v. Westinghouse Elec. Corp.*, 684 F. Supp. 847 (M.D. Pa. 1988) (finding that fact issue existed as to whether owners had suffered physical injury or impact from exposure to contaminated well water).

Therefore, if receiving an invisible electric shock, inhaling toxic particles, and ingesting contaminated beverages each provide a sufficient basis for concluding that a plaintiff has suffered an "impact," the Court sees no reason why a contrary finding should result when presented with facts evidencing exposure to penetrating gamma radiation. And the Court is not alone in that respect.  *See, e.g., McCafferty v. Centerior Serv. Co.*, 983 F. Supp. 715, 720 (N.D. Ohio 1997) (finding that exposure to radiation constitutes a physical impact); *see also Brafford v. Susquehanna Corp.*, 586 F. Supp. 14, 18 (D. Colo. 1984) (denying summary judgment because, inter alia, "given the levels of radiation to which plaintiffs were allegedly exposed, plaintiffs have at least raised a question of fact with respect to whether a present injury in the form of chromosome damage was suffered

by plaintiffs as a result of their exposure to . . . radiation").  As such, the Court cannot say that Plaintiffs have failed to plausibly allege entitlement to damages for emotional distress. The Court accordingly denies Drummond's Motion to the extent it requests dismissal of Plaintiffs' request for such an award.

## V.   Conclusion

Accordingly, it is

**ORDERED** that Drummond's Motion to Dismiss Second Amended Complaint (Doc. 41) is **DENIED**.  Drummond shall answer Plaintiffs' Second Amended Class Action Complaint (Doc. 36) within 14 days from the date of this Order.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida this *19th* day of April, 2018.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record