UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOHN J. JERUE and MICHAEL J. FEIST,

    Plaintiffs,

v.                                                                            Case No. 8:17-CV-00587-EAK-AEP

DRUMMOND COMPANY, INC.,

    Defendant.

_____

**PLAINTIFFS' SUPPLEMENTAL RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ACCESS FOR TESTING BY THE FDOH**

On October 11, 2018, Plaintiffs filed their Opposition to Defendant's Motion to Compel Access for Testing by the FDOH in which they expressed concern regarding the reliability of the FDOH's testing that took place after the filing of this lawsuit.  On October 12, 2018, Plaintiffs deposed two FDOH officials – Tim Dunn,[1] an environmental manager who conducts gamma radiation surveys and testing, and John Williamson,[2] the environmental administrator for the Bureau of Radiation Control within the FDOH. Because the FDOH testimony confirmed Plaintiffs' suspicions regarding the reliability of the testing at issue, Plaintiffs now supplement their response to Defendant's motion to inform the Court regarding this new evidence that was not available when Plaintiffs filed their original response in opposition.[3]

The Federal Rules provide two ways in which Drummond can attempt to get the FDOH testing admitted into evidence – either as a basis upon which one of its own experts bases his or her opinion or through a request to take judicial notice.  Both methods require that the information be reliable. Regarding the former, it is well settled that an expert's opinion must be

---

[1] *See* Deposition of Tim Dunn, attached as Ex. 1.
[2] *See* Deposition of John Williamson, attached as Ex. 2.
[3] The parties did not receive the transcripts from these two depositions until the evening of Friday, October 19, 2018.

based upon reliable scientific knowledge and methods. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 591-93 (1993).

Regarding judicial notice, Federal Rule of Evidence 201 permits a court to take judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b). Federal courts have construed Rule 201 to require reliability and hold that evidence requiring a *Daubert* analysis is inappropriate for judicial notice. *United States v. Gaines*, 979 F. Supp. 1429, 1430 (S.D. Fla. 1997) ("A *Daubert* hearing was found to be particularly appropriate since the Eleventh Circuit Court of Appeals has not rendered any opinion permitting federal district courts to take judicial notice of the reliability of PCR (or any other) DNA-based analysis."); *United States v. Mitchell*, 365 F.3d 215, 252 (3d Cir. 2004) (ruling that a scientific/technical question that merited a *Daubert* hearing "surely was not suitable for resolution by judicial notice").

Thus, the FDOH testing is useless, as it cannot be admitted into evidence, unless and until Defendant establishes its reliability. After only the first two FDOH depositions it is clear that the FDOH's radiation testing, entirely conducted after the instant lawsuit was filed, is based on flawed methodologies, leading to biased and unreliable results.

As an initial matter, and directly related to Defendant's motion, the two FDOH officials testified that the FDOH only tests properties upon which it has obtained permission to test and that it will not test a property if the owner does not consent. Ex. 1, at 149:17-24; Ex. 2, at 56:24-57:3. And Mr. Williamson testified that the FDOH does not take sides in litigation and is to remain neutral. Ex. 2, at 56:9-16. Thus, as relevant to the motion pending, FDOH cannot be "designated" an expert by either party.

## I.     The FDOH's Mobile GPS Radiation Surveys

Plaintiffs originally filed this lawsuit on March 10, 2017. In response, shortly thereafter, the FDOH conducted two mobile GPS radiation surveys as a "preemptive strike," before any residents requested any testing, on March 24 and April 13, 2017. Ex. 2, at 59:5-11. The data from these two surveys, the so-called "40,000 data points" Defendant touts in its motion, were previously touted by FDOH and Dr. Brian Birky of the Florida Industrial and Phosphate Research Institute at a June 6, 2017 meeting with Oakbridge and Grasslands residents as the basis for the FDOH's and Birky's representations that the radiation levels in the neighborhoods were not elevated and were at or below background. *See* Ex. C to Defendant's Motion to Compel, Doc. No. 63-4; Ex. 2, at 29:11-14 & 31:6-9. But, as discussed below, the "40,000 data points" were so flawed that Mr. Williamson admitted that they are irrelevant to the radiation levels contained in the homes and yards in Oakbridge and Grasslands. Ex. 2, at 31:22-32:2.

The gamma radiation at issue in this case is caused by uranium and its decay products including radium-226, which has a half-life of 1,600 years, contained in soil and rocks in the ground, which are collectively known as "naturally occurring radioactive material" or "NORM." Ex. 1, at 11:15-12:20 & 33:11-12. Certain materials, such as cement, concrete, asphalt, soil, and vehicles, can reduce radiation levels by blocking the electromagnetic rays, which is known as shielding. Ex. 1, at 19:4-20:11 & 30:11-23; Ex. 2, at 46:8-10, 62:15-63:8 & 63:18-24. Because of the varied and significant impact of shielding, so-called background radiation levels are taken three feet above the soil – and not inside of vehicles and/or on top of cement or concrete. Ex. 1, at 20:12-20; Ex. 2, at 32:15-33:3 & 42:23-45:8.

The FDOH's mobile GPS radiation surveys were conducted by placing multiple radiation detectors on top of a platform inside of a FDOH minivan that, for the vast, vast majority of the

3

data points (about 99 percent) drove on top of paved roads. Ex. 1, at 54:25-57:13; Ex. 2, at 28:25-29:10. Thus, given that the radiation detectors were 1) mounted to a platform, that was 2) inside of a minivan, that was 3) driving on top of paved roads, the 40,000 data points are fundamentally flawed data when comparing to the relevant "background" as done by both Defendants and FDOH due to the significant shielding between the radiation in the ground and the detectors inside of the minivan. And the majority of these points, including thousands upon thousands of these measurements, were taken outside of Oakbridge and Grasslands, in places like Interstate 4 and along the Polk County Parkway, and while parked in a parking lot near a mall and apartment complex and while parked on a street in front of a house. Ex. 2, at 30:2-4, 31:10-21, 63:25-66:21, 122:24-124:10, 124:19-129:19, 131:25-132:6; *see also* Ex. 8 & Ex. 9. Not surprisingly, the relatively few measurements that were when the minivan drove off road onto some vacant lots, the radiation levels immediately increased significantly. Ex. 2, at 62:15-63:8 & 63:18-24. Tellingly, this fact was not discussed at the June 2017 meeting with the residents. *Id.*

Upon being presented with the serious flaws with the 40,000 data points, Mr. Williamson admitted that none of these data points are relevant to the radiation levels contained in the homes and yards in Oakbridge and Grasslands because none of the data points came from those locations and that if one wants to know what's in the soil in the neighborhoods, you have to go off road into the soil where the people live. Ex. 2, at 31:22-32:2 & 59:12-15. Thus, while it has been presented by both FDOH and Defendants as significant in informing the safety of the community, the mobile GPS survey was irrelevant to individual residents. Ex. 2, at 131:25-132:6. Although the FDOH did tell residents that the most appropriate means to determine the actual radiation levels in and around their homes was to conduct a hand-held survey of their

properties (Ex. 2, at 32:4-9), as discussed below, these hand-held surveys were just as flawed and biased as the mobile GPS survey.

## II. FDOH's Handheld Residential Radiation Surveys Using the Radeye PRD

Gamma radiation levels can be measured by using a variety of different hand-held radiation detectors. For example, in order to protect public health and safety, the FDOH is required by law to conduct environmental radiation surveys of both pre/unmined lands and post-mined/reclaimed lands and produce annual reports detailing the survey results. Fla. Stat. 404.051(7); Ex. 2, at 53:1-12. These FDOH radiation surveys include alpha and gamma radiation testing, soil sampling, and water sampling. Ex. 1, at 9:17-25; Ex. 2, at 53:13-54:1. Mr. Dunn was one of the FDOH employees who conducted these radiation surveys and testified that to test for gamma radiation, FDOH used either a Ludlum 12s (*see* Ex. 3) or a Ludlum 2401-P (*see* Ex. 4). Ex. 1, at 10:21-11:3, 41:23-42:4, 132:3-5 & 150:23-151:1.

After Plaintiffs filed this lawsuit and after FDOH conducted its mobile GPS radiation surveys, residents in Oakbridge and Grasslands began calling FDOH to request radiation testing in and around their homes. For some unknown reason, rather than using the radiation detectors that FDOH uses for its statutorily-mandated gamma surveys performed for annual reports for decades, some unknown person made the decision was made to use a different type of radiation detector for this testing, the Radeye PRD, manufactured by Thermo Scientific (*see* Ex. 5). Ex. 1, at 35:19-36:4 & 86:21-24; Ex. 2, at 49:3-5 & 87:18-22.

Simply put, the Radeye PRD is the wrong type of detector to use for this application, which is to detect elevated levels of naturally occurring radioactive material (NORM), such as uranium and radium-226, as opposed to an entirely different application of detecting artificial/man made radiation used in devices such as nuclear weapons, improvised nuclear

5

devices, or radiological dispersal devices. As discussed above and as Mr. Dunn testified, the FDOH has historically used the Ludlum detectors for the former application.

The Radeye PRD is designed for the latter application, as it uses patented technology called "natural background rejection" that "leverages the signature to quickly differentiate between natural and artificial radiation **by stripping away any natural background radiation that's registering during the scan.**" Ex. 5; *see also* Ex. 1, at 74:18-75:4, 75:15-77:23, 132:21-133:15 & 150:3-16 (emphasis added). In other words, the Radeye PRD differentiates between NORM, such as uranium and radium-226, and artificial/manmade radiation and automatically rejects radiation that it identifies as NORM. Ex. 1, at 150:3-16. Because NORM is *the particular form of radiation enhanced and disposed of during mining*, the Radeye PRD is designed to reject the very radiation that it is relevant to the inquiry. This fundamental flaw in the FDOH surveys provides sufficient additional basis to discount FDOH's flawed data, in addition to the flawed and biased data points to the 40,000 FDOH generated from the mobile GPS surveys.

Furthermore, there are also questions regarding the calibration of the Radeye PRDs. The calibration certificate produced by FDOH (Ex. 7) shows that the device was calibrated at radiation levels 20-times higher than the levels in and around Oakbridge and Grasslands. Ex. 1, at 104:18-106:13. But standard practice would suggest calibrating the device in the range of the radiation levels one expects to find in the field. *Id.*; Ex. 2, at 72:7-73:5.

After FDOH conducted the radiation testing, Mr. Williamson sent each resident a letter stating that all of their results were within background levels of radiation, despite the fact that even with the Radeye PRD rejecting NORM, the testing did reveal some radiation levels that were significantly higher than background. Ex. 2, at 90:13-24. To do this, FDOH makes the concept of background radiation a moving target to the public. Mr. Williamson agreed that the

FDOH uses 6 microrem per hour, and he instructed Dr. Birky as such. Ex. 2, at 32:15-33:3. Mr. Dunn erroneously testified that background can be as high as 20 microrem per hour. Ex. 1, at 13:4-17. And Mr. Williamson's letters to residents used a variety of background numbers, instructing that radiation levels of up to 17 microrem per hour (almost three times background) were actually within background. It is unclear why the Department would send conflicting information to these residents, but this inconsistency and its factual baselessness calls the FDOH's role into further question.

And the conclusion that the radiation levels were all within background seems to have been preordained. Prior to this testing with the Radeye PRDs, Mr. Williamson drafted a protocol for gamma survey measurements (Ex. 6) for the FDOH employees who were to conduct the testing. Ex. 1, at 87:21-89:24. Before any testing was even conducted, Mr. Williamson's protocol instructed the FDOH employees doing the testing to represent to the homeowners that "there is no reason to be concerned." Ex. 6; Ex. 1, at 94:25-95:25.

## Conclusion and Prayer for Relief

Thus, both the mobile GPS surveys and the handheld residential radiation surveys using the Radeye PRD are fundamentally flawed and unreliable. Accordingly, the Court should deny Defendant's motion to compel and grant Plaintiffs all other relief to which they are justly entitled.

*Signatures on following page*

Dated:  October 21, 2018        By:        /s/ *Christopher L. Gadoury*
                                           Neal O'Toole, Esq.
                                           310 East Main Street
                                           Bartow, FL  33830
                                           Telephone: (863) 533-5525
                                           Neal.Otoole@OToolePa.com

                                           W. Mark Lanier, Esq.
                                           (admitted *pro hac vice*)
                                           Richard Meadow, Esq.
                                           (admitted *pro hac vice*)
                                           Chris Gadoury, Esq.
                                           (admitted *pro hac vice*)
                                           **The Lanier Law Firm, P.C.**
                                           6810 FM 1960 West
                                           Houston, Texas 77069
                                           Telephone: (713) 659-5200
                                           wml@lanierlawfirm.com
                                           Richard.Meadow@lanierlawfirm.com
                                           Chris.Gadoury@lanierlawfirm.com

                                           Christopher T. Nidel, Esq.
                                           (admitted *pro hac vice*)
                                           Jonathan Nace, Esq.
                                           (admitted *pro hac vice*)
                                           **Nidel & Nace, P.L.L.C.**
                                           5335 Wisconsin Ave., NW, Suite 440
                                           Washington, D.C. 20015
                                           Telephone:  (202) 558-2030
                                           chris@nidellaw.com

                                           Steven J. German, Esq.
                                           (admitted *pro hac vice*)
                                           Joel M. Rubenstein, Esq.
                                           (admitted *pro hac vice*)
                                           **German Rubenstein LLP**
                                           19 West 44th Street, Suite 1500
                                           New York, NY 10036
                                           Telephone: (212) 704-2020
                                           sgerman@germanrubenstein.com
                                           jrubenstein@germanrubenstein.com

## **CERTIFICATE OF SERVICE**

   I hereby certify that on October 21, 2018, a true and correct copy of the foregoing was served electronically on all parties registered to receive electronic notice via the Court's CM/ECF system.

                 */s/  Christopher L. Gadoury*
                 Christopher L. Gadoury