# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

JOHN J. JERUE (Dismissed) and
MICHAEL J. FEIST,

      Plaintiffs,

v.                            Case No. 8:17-CV-00587-TPB-AEP

DRUMMOND COMPANY, INC.,

      Defendant.

                               /

## DEFENDANT DRUMMOND COMPANY, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

HOLLAND & KNIGHT LLP

Joseph H. Varner, III
Florida Bar No. 394904
joe.varner@hklaw.com
Frederick J. Grady
Florida Bar No. 437980
fred.grady@hklaw.com
Charles Wachter
Florida Bar No. 509418
charles.wachter@hklaw.com
100 N. Tampa Street, Suite 4100
Tampa, FL  33602-3644
Telephone: (813) 227-8500

*Attorneys for Defendant*

BURR & FORMAN LLP

Bryan O. Balogh
(Admitted *Pro Hac Vice*)
420 North 20th Street
Suite 3400
Birmingham, AL  35203
Telephone:  (205) 458-5469

*Attorneys for Defendant*

# TABLE OF CONTENTS

The Class Representative - Michael Feist .................................................................. 1

Mining of the Area .................................................................................................... 6

Reclamation and Residential Development ................................................................ 7

Testing ...................................................................................................................... 9

Radiation Standards ................................................................................................. 10

Drummond's Experts ............................................................................................... 14

Legal Argument ....................................................................................................... 15

   I.     FEIST CANNOT CARRY HIS EVIDENTIARY BURDEN FOR CLASS CERTIFICATION. ...................................................................... 15

   II.    FEIST CANNOT PROVE THE ELEMENTS OF RULE 23 BY A PREPONDERANCE OF THE EVIDENCE. ............................................ 18

       A.     Feist Has Failed to Prove A Clearly Defined Class. ............................... 18

       B.     Feist Has Failed to Prove Commonality. .............................................. 18

       C.     Feist Has Failed to Prove Typicality. .................................................... 19

       D.     Feist Has Failed to Prove Adequacy of Representation. ........................ 19

       E.     Feist Has Failed to Prove the Elements of Rule 23(b)(3) Predominance. ....................................................................................... 20

   III.   FEIST CANNOT PROVE AN INJUNCTIVE CLASS UNDER RULE 23(b)(2). .............................................................................................. 28

       A.     Remediation. ........................................................................................ 29

       B.     Medical Monitoring. ............................................................................ 29

   IV.   FEIST CANNOT PROVE AN "ISSUES CLASS" UNDER RULE 23(b)(4). .............................................................................................. 30

Conclusion .............................................................................................................. 30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Brown v. Electrolux Home Products, Inc.*,
   817 F.3d 1225 (11th Cir. 2016) ...................................................................... *passim*

*Comcast Corp. v. Behrend*,
   569 U.S. 27 ....................................................................................................... 6, 16

*Cotromano v. United Technologies Corp.*,
   2018 WL 2047468 (S.D. Fla. May 2, 2018) ......................................... 20, 21, 22, 26

*Cruz v. Mosaic Global Operations, Inc.*,
   Florida Circuit Court, October 14, 2021 ................................................................ 29

*Jacobs v. Osmose, Inc.*,
   213 F.R.D. 607 (S.D. Fla. 2003) .......................................................................... 28

*Lee-Bolton v. Koppers, Inc.*,
   319 F.R.D. 346 (N.D. Fla. 2017) ................................................................... *passim*

*McMunn v. Babcock & Wilcox Power Gen.*,
   869 F.3d 246 - 273 (3rd Cir. 2017) ...................................................................... 12

*Rink v. Cheminova, Inc.*,
   203 F.R.D. 648 (M.D. Fla. 2001) ...................................................................... 6, 30

*Samples v. Conoco, Inc.*,
   165 F. Supp. 2d 1303 (N.D. Fla. 2001) ................................................................ 25

*U. S. Steel Corp. v. Benefield*,
   352 So. 2d 892 (Fla. 2nd DCA 1977) ................................................................... 25

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ................................................................................... *passim*

**Statutes**

Fla. Stat. §95.11(3) ................................................................................................. 27

Fla. Stat. §376.313 ........................................................................................ 3, 8, 23, 24

**Other Authorities**

Fla. Admin. Code Ann. ch. 64E-5.1001 ...................................................................... 2

Rule 23 ..................................................................................................15, 16, 17, 18

Rule 23(a)..............................................................................................16, 20

Rule 23(b)(2).............................................................................................6, 28

Rule 23(b)(3)........................................................................................6, 16, 20

Rule 23(b)(4)................................................................................................30

Rule 23(c)(4).................................................................................................6

## The Class Representative - Michael Feist

Plaintiff Michael Feist's litigation interests are in direct conflict with the financial and property interests of the putative class. Feist has not lived in Grasslands or Oakbridge ("the Development") since 2013. Ex. 21, p. 52; Ex. 23, No. 3. He has no ownership interest in the proposed class area other than the four walls of his condo, which he rents to a tenant. Ex. 28. Feist has no standing to impose "remediation" on the surrounding land, because he does not own or control the land. Ex. 28. The community, which has enjoyed stable and increasing home values, is opposed to his suit as expressed publicly at two town hall meetings and in 20 affidavits in opposition to class certification. Ex. 1; Ex. 59; Ex. 60. Feist has not attended any of the 22 depositions, except his own, and none of the Court hearings. Ex. 58. He is antagonistic toward homeowners who will be harmed by stigmatizing their communities as a "contaminated" class area. He further intends to wrongly condemn the communities by seeking widespread, economically destructive "remediation." Feist acknowledges that he is in conflict with his neighbors and has "lost friends" in the Development over this litigation. Ex. 21, p. 96;12-20. Current property owners are adamantly opposed to having their valuable homes and neighborhoods attacked as "contaminated," "unlivable," or "unsellable" by Feist and his counsel. Ex. 1; Ex. 59; Ex. 60.

As United States Magistrate Judge Anthony Porcelli aptly pointed out, a question at the heart of this case is "what are the levels and are they harmful?" Ex.

1

57 at 22:6-9.  In order to determine this issue, Drummond engaged a senior certified health physicist, Dr. John Frazier, to test Feist's condo.  Dr. Frazier concluded "radiation measurements I performed inside the residence owned by Michael J. Feist showed only natural background radiation dose rates inside the residence."  Ex. 2 at 2, Opinion 1.  In addition, "radiation exposure rates I measured outside of the residence owned by Mr. Feist do not present a radiation hazard to anyone at the residence owned by Mr. Feist."  *Id.* Opinion 2.  Feist's readings are as follows:

| Feist Indoor ur/hr. (micro Roentgens/hr.) | Feist Outdoor ur/hr. |
|---|---|
| 7.0, 7.2, 7.0, 7.1, 7.0, 6.9, 7.1 | 9.1, 13.9 |

(Ex. 2, App. E).  John Williamson, Environmental Administrator of the Bureau of Radiation Control of the Florida Department of Health ("FDOH") testified that there is no health concern below 22 ur/hr. indoors.  Ex. 19, pp. 49 - 50.  (Higher levels would require case-by-case review.)  *Id.*  Feist's indoor readings are far below the 22 ur/hr. level.  His outdoor readings are not subject to a specific "outdoor" exposure standard, and are likewise not harmful.  Ex. 19, p. 50:10-19, p. 141:18-22; *see also* Fla. Admin. Code Ann. ch. 64E-5.1001 (indoor gamma standard only).  As a result, "there is no scientific basis on which to conclude that Mr. Feist or individual residents of [the Development] have received an unacceptable or harmful dose of radiation."  *Id.* at 5, ¶ 27.  Thus, Feist has failed to and cannot establish a factual basis for his own claim, a prerequisite for class certification.  Ex. 3 at 39:11-15.

Contrary to Feist's repeated and erroneous assertions, Drummond, and the mining company it acquired, Poseidon Mines, did not conduct mining operations on or near Feist's condo.  See Plaintiff's Motion 1-3; Ex. 27.  To the extent it was mined for phosphate, such mining occurred prior to 1950 by owners/operators unrelated to Drummond, like most of the Development.  Ex. 27; Ex. 20, p. 23.  This eliminates Feist's claim under Fla. Stat. §376.313 and common law which requires him to prove a discharge of pollution onto his property.

In addition, Drummond did not sell the condo to Feist and did not make any representations to him or owe a duty of disclosure.  Contrary to Feist's professed ignorance of prior phosphate mining, (which makes him atypical), Drummond fully disclosed this to the public and in the chain of title.  Exs. 24, 25, 34, 35, 36, 37. Thus, Feist's claims for fraud and misrepresentation are unsuitable for class action treatment because they will require individual determinations.  In addition, Feist's claim for emotional distress based on alleged "impact" from radiation is highly speculative, individualized, and inappropriate for class certification.  *See* Dkt. 36, ¶ 30; Dkt. 46, pp. 16 - 17; Ex. 21, p. 91.

Significantly, Feist has failed to document even one adverse health effect to himself or any resident since filing this case four and one-half years ago.  Ex. 21, pp. 58-59.  This is particularly egregious given the fact that there have been residents in the Development for over three decades.  After this suit was filed, the Florida Department of Health ("FDOH") tested miles of streets and common areas of the

Development and approximately 90 residences and lots.  Exs. 38, 39.  Based on this testing, Mr. John Williamson, the FDOH Administrator for Radiation Control, testified there is no evidence of harmful radiation or health risk to any resident.  Ex. 19 at p. 48:18-22; 177:10-21.

The Development contains fifteen separate residential subdivisions comprising single family homes, condominiums, townhomes, a golf course, and other recreational amenities.  Exs. 28, 56.  Feist's counsel hand-picked outdoor areas (yards) of 27 residences out of 1,000 residences for testing, but no indoor locations where people spend 90% of their time.  Ex. 47, pp. 60:28; 61:1-13; 63:4-7 and 102-103; Ex. 52.  This is an absurdly insufficient record (2.7% of 1,000 locations) to condemn the entire Development.  In addition, the outdoor test areas were highly variable from location-to-location and within each location.  Ex. 13, Opinion 1; Ex. 2, Opinion 12.  Feist's expert, Stewart Bland, conceded that any proposed "remediation" would not be uniform, and would require a "property-by-property evaluation."  Ex. 49, p. 253:2-11.

Feist's counsel mentioned "anecdotal" cancers of some residents during the September 16, 2021 status conference, but never produced such evidence.  Anecdotal cancers are consistent with the nationwide lifetime cancer incidence of approximately 40% of the general population.  Ex. 30, p. 43; Ex. 53.  As a result, any claim of possible health effects or medical monitoring will require a case-by-case evaluation of exposure, dose, and causation.  Complex medical issues cannot

be determined on a class-wide basis, and cannot be attributed to a class of individuals based on exceedingly low, variable, or nonexistent doses of radiation.  Ex. 30.

Feist has also failed to show even one dollar in diminished value to his or any property.  Feist actually rents his condo to a tenant, which contradicts any health claim or economic damage.  Feist's economist, Jeffrey Zabel, failed to conduct an "hedonic regression analysis" for home prices in the Development, including Feist's condo.  Zabel admits he has no idea if property values have been affected because he has, inexplicably, not made any calculations.  Ex. 48, pp. 10-11.  Zabel's own academic research (involving property locations in other states) reveals that his model produces impacts from environmental issues that are speculative, nonexistent, positive, negative, or temporary.  Ex. 48, p. 39:12-18; p. 45:2-9; p. 51:15-19; p. 82:16-23.  Drummond intends to challenge Zabel's methodology as unreliable in a *Daubert* motion.  Also, given the highly individual and personal choices of home buyers, any alleged impact on prices will require a property-by-property evaluation and individual appraisal.  Ex. 8, Opinions 1 - 4.

To certify a class, Feist must be able to prove his individual claims, and thereby prove the putative class claims "in one stroke."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Brown v. Electrolux Home Products, Inc.,* 817 F.3d 1225, 1233-1234 (11th Cir. 2016); *Lee-Bolton v. Koppers, Inc.,* 319 F.R.D. 346, 381 (N.D. Fla. 2017).  Feist cannot prove his individual claims and the determination of his individual case will not necessarily prove (or disprove) the

alleged class claims.  Individual questions of liability, causation, and damages "will inevitably overwhelm" questions allegedly common to the proposed class.  *Comcast Corp. v. Behrend,* 569 U.S. 27, 34 (reversing class certification under Rule 23(b)(3) predominance requirements); *Rink v. Cheminova, Inc.,* 203 F.R.D. 648 (M.D. Fla. 2001); *Lee-Bolton,* 319 F.R.D. at 384 - 385 (denied class certification for contamination claims because they "will require distinctly case-by-case inquiries into the facts").  In addition, because of substantial individual variations, there is no basis for an injunctive class or "issues" class under Rule 23(b)(2) or Rule 23(c)(4).

## <u>Mining of the Area</u>

Phosphate mining is a simple process that sifts or separates the phosphate "pebble" from the soil.  Ex. 27.  The remaining soil (minus the phosphate pebble) is returned to the site to fill the relatively shallow mine cuts.  *Id.*  Florida reclamation standards encourage that the excavated soil be returned to the mine cut after removing the phosphate to return the land to beneficial use.  Exs. 31, 32.

Feist misrepresents Drummond's mining activities.  Feist asserts the Development was built on Drummond's "former 1,450-acre phosphate mine," and claims "Drummond's tortious mining activity [is] common towards all plaintiffs." Plaintiff's Motion, 1-2.  These statements are untrue.  Drummond only conducted mining activities for a few months in the late 1970s on approximately 209 acres of the Development.  Ex. 27.  David Muncher, a certified professional engineer, testified that he reviewed the mining history dating back over 100 years.  Ex. 20, pp.

222-223.  Historical aerial photographs show phosphate mining by prior owners and operators prior to Poseidon's involvement.  Photos from 1980 show the limited area of Poseidon's secondary recovery.  Ex. 27.  Mr. Muncher did <u>not</u> testify that 1) Drummond or Poseidon mined the entire 1,400 acre site; or 2) that prior mining by Drummond or Poseidon caused harmful radiation to permeate the site.  *Id.*  In addition, Muncher testified that prior mining activity was "variable" throughout the site, and that portions of the site "remain to be virgin material or virgin non-mined areas," Ex. 20, p. 222, 225, thus requiring individual assessment.

Further, Poseidon's mining activities were limited to secondary recovery of phosphate.  Ex. 27.  Secondary recovery extracts additional phosphate from previously mined soil of which much of the original phosphate has already been extracted by prior operators, thus further reducing the phosphate content of the mined area.  *Id.* Contrary to Feist's assertions, the soil returned to the shallow mine cuts had less phosphate.  Thus, the soil was not "enhanced" with radiation.  *Id.*

## Reclamation and Residential Development

Drummond's reclamation process involved strict state and local supervision, and was in compliance with all regulations.  Ex. 33.  Ironically, much of Feist's case is built on publicly available documents that disclose the Development would be built on formerly mined land.  Exs. 25, 26, 28, 34, 35, 36, 55.  The reclamation process did not produce uniform conditions throughout the Development.  Ex. 20, pp. 23, 39, 49-58, 139-141; Ex. 27.  Reclamation involved grading and contouring

the surface area and infrastructure activity, not a discharge of pollution.  *Id*.  Feist did not test the soil around his condo and the undisputed evidence is neither Drummond nor Poseidon mined that particular area.  As a result, Feist's own case illustrates there was no uniform treatment of the soil by Drummond throughout the Development and there is no evidence to support a discharge of pollution on Feist's property, as required by Fla. Stat. §376.313.  *Id*.  Thus, for each residence, individualized assessments will be required to determine mining impacts, if any.  Ex. 19, pp. 167-168; Ex. 47, pp. 3-12.

Residential development shields the soil with roadways, sidewalks, driveways, drainage, ponds, and house site preparation.  Homes in the Development have a concrete monolithic post tension slab covered with a vapor barrier, which provides further layers of shielding over the soil, thus reducing gamma or radon.  Exs. 25, 29.  In the 1980s there was widespread awareness of radon, a radioactive "gas" that can accumulate in enclosed areas.  Because an undeveloped tract of land does not have enclosed residences for radon testing, Drummond retained consultants to test for the outdoor presence of gamma as an indicator of potential future radon.  Ex. 20, p. 341:1-10; Exs. 25, 26.  The outdoor test results show a wide variation in gamma levels throughout (what was at the time) unremediated and undeveloped areas, of which Poseidon only mined a small portion for secondary recovery.  Ex 54.  Feist relies on this pre-development test data from the 1980s and fails to acknowledge the subsequent site development and shielding.  Ex. 20, pp. 92-94, 159-

162.  As a result, there is no consistent level of gamma on every parcel, and prior test results do not reflect current conditions, which vary from location to location, and within each location.  Ex. 2, Opinion 12; Ex. 13, Opinion 3.1.

### Testing

Dr. John Frazier tested Feist's condo with a highly sophisticated device, known as the HPIC (High Pressure Ionization Chamber).  The HPIC used by Dr. Frazier is more sophisticated than the hand-held RadEye PRD devices used by the FDOH.  Dr. Frazier found that the RadEye is "an appropriate survey instrument that provides accurate measurements of exposure rates from external radiation," assuming an appropriate calibration factor for dose rates.  Ex. 2, Opinion 4.  In addition, the FDOH (using different instruments) tested all the streets in the Development and found consistently safe levels.  Ex. 39.

Feist has avoided indoor testing, and has instead made speculative and erroneous assumptions about the FDOH indoor readings.  For example, Feist's analysis of the RadEye was conducted in California by a consultant (Vetter) who never attempted a side-by-side test under actual conditions in the Development, which Dr. Frazier concluded was "grossly inadequate".  Ex. 2, ¶ X, p. 20.  Vetter's only alleged relationship with the Development was a box of gravel provided by Feist's counsel that has never been identified as coming from any residence in the Development, which is built on soil, not gravel.  Ex. 50, p. 90:11-25; p. 91:1-23.

Vetter's and Bland's adjustments to the RadEye are not scientifically reliable and produce highly inaccurate results.  Ex. 17, p. 7; Ex. 2, p. 26.

Feist failed to submit indoor tests in the Development to avoid the inconvenient truth that homes in the Development are safe from harmful radiation. Any claim to the contrary will require individual testing and dose assessment, not "averages."  Feist has also failed to conduct residential soil testing.  Ex. 47, pp. 21-22.  The only testing actually conducted by Feist in the Development consists of outdoor yards of 27 residences selected by his counsel.  Ex. 47, pp. 102-103.  This slight and non-representative number of locations produced many "readings" because the instrument's head is approximately the size of a golf ball.  Within these 27 locations, readings varied from location to location, and within each location. Exs. 2, 13.  This variability forced Bland to concede that potential "remediation" would require a "property-by-property evaluation."  Ex. 49, pp. 251, 253:2-11. Simply put, Feist's reliance on misleading "averages" does not excuse the need for individual testing and evaluation.

### Radiation Standards

Feist presents a confusing discussion of standards that range from "background" to EPA cleanup standards pertaining to nuclear sites.  However, "background" is not the Florida safety standard. Ex. 2, Opinion 21; Ex. 19, pp. 49-50.  Instead, safe standards in Florida are substantially higher than background. Ex. 2, p. 34; Ex. 43.  As John Williamson of the FDOH testified, gamma radiation is part

of the natural environment.  Ex. 18, pp. 51-52.  Cities such as Denver, Colorado have normal levels of gamma far in excess of Feist's "background" levels, and greater than the levels that Feist claims are unsafe.  *Id.*  Ex. 44.  One of Feist's chief experts, Dr. Robert Ullrich, has a family home in Denver where the radiation levels are higher than what Feist claims in the Development, yet Dr. Ullrich is not concerned about his family's safety from such exposure.  Ex. 51, p. 22:9-12, p. 128:22-25, p. 129:1, p. 129:21-25, p. 130:1-21.  This confirms, as does common sense, that radiation in the Development, even above "background," needs to be evaluated according to the Florida scientific and regulatory standards.

Florida regulatory authorities have formulated such standards that currently apply throughout the State.  Ex. 43.   The Florida standards are as follows:

| 0  -  100  millirem  per  year (above background) | No significant increase in adverse health effects expected - no action required |
|---|---|
| 100 - 500 millirem per year (above background) | Need site - specific information - mitigate risk through education or other actions, where needed to reduce risk based on site - specific conditions |
| Greater than 500 millirem per year (above background) | Need - site specific information - remediation or removal recommended |

Ex. 43, p. 8.  John Williamson confirmed these are the governing standards in Florida.  Ex. 19, p. 38:2-19.  There are several key components to these ranges.  First, a millirem is a measure of dose, not exposure.  It means that an individual needs to be exposed to a radiation dose rate for a sufficient amount of time to absorb a dose measured in millirems.  This avoids the speculative aspect of "exposure" because

exposure can be incidental, continuous, or intermittent.  Exs. 2, 30.  The second aspect of a millirem dose is that it is "per year."  Thus, individual dose assessment for each individual per year will need to be calculated.  *Id.*

Feist's proposed standards are contrary to governing Florida standards.  He proposes the hypothetical concept of "LNT," which assumes that "any amount of ionizing radiation could cause cancer."  *McMunn v. Babcock & Wilcox Power Gen.*, 869 F.3d 246, 272 - 273 (3rd Cir. 2017).  Florida rejects this hypothesis and finds "no significant increase in health effects" up to 100 millirems per year. Ex. 43 at 8. Doses up to 500 millrems per year need site-specific information, and remediation is not recommended unless doses exceed 500 millirems per year.  *Id.*  LNT has also been rejected as "rank speculation" by the Third Circuit in *McMunn* as wholly inadequate to prove dose, causation, and damages.  *Id.*  Dr. Mettler has found no observable cancers from low dose radiation exposures, contrary to the LNT hypothesis.  Ex. 30 at 19 - 22 and 46, Opinions 25 - 27.  Feist has further ignored individual dose assessments by relying on the "RESRAD" computer program, which produces "averages" based on highly variable assumptions inputted into the program.  First, "averages" are meaningless for individual determinations.  Second, the RESRAD program is easy to manipulate, as Feist did by inputting hypothetical conditions that each resident spends six hours every day in his/her yard, grows his/her own vegetables, and ingests radioactive soil.  Ex. 2 at 29 - 32.  These models cannot be applied on a class-wide basis.  Ex. 2.

Dr. John Frazier, Dr. Fred Mettler, and Dr. David Hoel are renowned experts who have studied radiation in populations around the world. They have uniformly concluded that the dose standards applicable in Florida are appropriate and safe. Exs. 2, 3, 11. In fact, doses much greater than the Florida standards cannot be assessed as harmful. *Id.* As a result, any individual who claims a potential health risk must document the dose actually received, measure it against the Florida standards, determine causation, and review individual factors such as baseline cancer risk and other factors. Ex. 2, Opinions 12-15; Ex. 19, pp. 19 - 22. Feist has failed to do this. There is no evidence in the record that establishes any dose Feist received, any dose assessment for the occupants of Feist's condo, or individual dose assessments for any potential class member. Ex. 2, Opinions 12-15. Feist's experts have made unjustified assumptions about residents' "average" exposures based on faulty assumptions, not actual individual doses. Ex. 2, Opinions 12-15. The obvious reason for this flawed approach is to avoid the overwhelming number of individual issues that defeat class certification.

Alleged harmful doses of radiation cannot be proved on a class-wide basis. Ex. 3, pp. 102-108; Ex. 43. Doses vary from resident to resident. The same will be true for whether a property owner has suffered a diminution in property values from fully reclaimed phosphate mining that occurred decades ago. Florida requires site specific information for this determination. Under the Florida standard, remediation is not recommended unless the annual dose exceeds 500 millirems above

13

background per year.  Ex. 3, p. 279:22-25; p. 280:1-3; and Ex. 43.  Feist has failed

to present any evidence of such a dose for himself or others.

### Drummond's Experts

Drummond has consulted a number of experts to evaluate Feist's attempt to

certify a class:

1.   <u>Dr. John Frazier, Ph.D.</u>  – Dr. Frazer is a highly qualified radiation
expert with four decades of experience.  Dr. Frazier tested Feist's condo and
surrounding area and found no unsafe readings that could lead to a harmful dose of
radiation. Dr. Frazier also criticized Feist's experts as using the wrong safety criteria
and making unfounded assumptions and conclusions.  Dr. Frazier found that any
claim of harmful radiation needs to be based on individual dose assessments, not
faulty averages.  Exs. 2, 3.

2.   <u>Dr. Fred Mettler, M.D.</u> – Dr. Mettler is a world renowned radiation
expert who was part of the United Nations team studying Chernobyl and Fukushima.
Based on years of research, Dr. Mettler found that doses significantly higher than
Feist alleges are either not harmful, or the potential impact cannot be detected for
any individual.  Dr. Mettler also found that the claims of health effects from low
dose radiation cannot be distinguished from the lifetime cancer rate in the general
population of approximately 40% and other highly individual causes of cancer.  Dr.
Mettler also found that low doses of radiation are not harmful, and that any alleged
impact needs to be determined individually.  Thus, there is no class-wide evidence
to support medical monitoring or a health risk.  Exs. 4, 30.

3.   <u>Dr. David Hoel</u> - Dr. Hoel is a recognized epidemiologist.  He has
reviewed the impact of natural radiation on populations around the world.  Dr. Hoel
has concluded that there is no increase in cancer rates from the radiation levels that
Feist claims in the Development.  Exs. 10, 11, 12.

4.   <u>Dr. Henry Fishkind, Ph.D.</u>  - Dr. Fishkind is a highly respected Florida
economist.  He criticized Zabel's "hedonic" model as speculative and inapplicable
to home prices in the Development.  Contrary to Prof. Zabel, Dr. Fishkind actually
surveyed home values in the Development and found increased property values and
no evidence of diminished values.  Exs. 5, 6, 7.

5.   <u>Jennifer Pitts</u> - Ms. Pitts is a well-respected appraiser who found that
each home will need an individual appraisal to determine the impact, if any, of being

located in the Development.  Ms. Pitts has analyzed attempts by Prof. Zabel and others to calculate "averages," but found that averages do not apply to individual home sales and Feist has not shown diminution in value.  Exs. 8, 9.

6.    <u>Jeffrey Klaiber</u> - Jeff Klaiber is an engineer who found that the soil conditions vary substantially in the Development.  Exs. 13, 14.

7.    <u>Mark Travers</u> - Mark Travers found that reclamation of the Development complied with state and local regulatory requirements in place at the time and that appropriate disclosures were made by Drummond.  Exs. 15, 16.

8.    <u>Randy Whicker</u> - Randy Whicker found that the RadEye is a reliable instrument, but underreports gamma by about 20%.  He disagrees with Feist's speculative adjustments to the RadEye readings.  Exs. 17, 18.

## **Legal Argument**

I.    <u>FEIST CANNOT CARRY HIS EVIDENTIARY BURDEN FOR CLASS CERTIFICATION.</u>

The Supreme Court and Eleventh Circuit require a class action plaintiff to prove the elements of Rule 23 by a preponderance of the evidence.  The overwhelming evidence in this case shows that alleged liability, causation, damages, "remediation," medical monitoring, and other issues are intensely fact specific for each property and each resident.  They cannot be determined on a class-wide basis.

As the Supreme Court explained in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S. Ct. 2541 (2011), class action litigation is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." 564 U.S. at 348.  The only way a court can depart from this bedrock principal is to find - after a rigorous analysis - that the class claims are "fairly encompassed by the named plaintiff's claims;" in this case - Feist's claims.  *Id.*  What this means is that

the determination of Feist's individual claims must "resolve an issue that is <u>central</u> to the validity of each one of the [alleged class] claims <u>in one stroke</u>." *Id.* (emphasis added). Feist fails this test because he has no harmful radiation, no property damage, no medical issues, was not defrauded by Drummond, and neither Drummond nor Poseidon mined the area or discharged pollution on or around his condo. The determination of Feist's claim will not simultaneously determine his claims and all other alleged class claims "in one stroke." *Wal-Mart*, 564 U.S. at 350.

After deciding *Wal-Mart* in 2011, the Court followed up with *Comcast Corp. v. Behrend*, 569 U.S. 27, 133 S. Ct. 1426 (2013). The *Comcast* decision reaffirmed the need for "evidentiary proof" for each element of Rule 23 and focused on Rule 23(b)(3)'s predominance requirement, which "is even more demanding than Rule 23(a)." *Id.* at 34. In *Comcast*, the Court held that an economic regression model (similarly proposed by Prof. Zabel) was inadequate to calculate damages on a class wide basis. Instead, "Questions of individual damage calculations will inevitably overwhelm questions common to the class." *Id.* The same is true in this case. Feist's claims are unique and different from the individual circumstances of other class members. Individual issues of liability, causation, and damages will "inevitably overwhelm" any alleged common questions. *Wal-Mart*, 564 U.S. at 350; *Comcast,* 569 U.S. at 34.

The Eleventh Circuit follows Supreme Court precedent to require proof of each element of Rule 23 <u>by a preponderance of the evidence</u>. *Brown v. Electrolux*

*Home Products, Inc.*, 817 F.3d 1225 (11th Cir. 2016) (plaintiff has a burden of <u>proof</u>, not a burden of pleading).  As the Eleventh Circuit held: "All else being equal, the presumption is <u>against</u> class certification because class actions are an exception to our constitutional tradition of individual litigation." *Id*. at 1233.  As the Eleventh Circuit stated, "the entire point of a burden of proof is that, if doubts remain about whether the standard is satisfied, 'the party with the burden of proof loses.'"  817 F.3d at 1233.  See *Lee-Bolton v. Koppers, Inc.*, 319 F.R.D. 346, 381 (N.D. Fla. 2017) (Plaintiff must establish Rule 23 elements by preponderance of the evidence and all remaining doubts are resolved against class certification).

To determine whether doubts remain about Feist's ability to satisfy this burden, it will be necessary to "probe behind the pleadings." *Wal-Mart*, 564 U.S. at 350.  "Rigorous analysis" will frequently "entail some overlap with the merits of the Plaintiff's underlying claim.  That cannot be helped.  [T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the Plaintiff's cause of action." *Wal-Mart* at 351.  Feist's claims depend on individual circumstances and cannot be proved by generic evidence, generalized surveys, or "Trial by Formula."  564 U.S. at 367.  For example, Feist asserts diminished property value of his condo unit and is concerned about his health "from elevated radiation."  Plaintiff's Motion, 2.  However, Feist's condo does not have harmful radiation, and "elevated radiation" is not a safety standard.  Ex. 2, Opinions 1, 2; § XIV.  Moreover, Feist does not reside in his condo but rents it to a tenant,

contradicting his alleged health concerns.  Exs. 21, 22, 23.  His rental income also shows no economic harm from owning a condo on reclaimed phosphate land.  In addition, Feist does not own or control the land outside his condo unit and has no legal standing to seek widespread soil replacement to a depth of three feet on land he does not own.  Exs. 28, 45, 46.  To the extent that Feist says he is concerned about conditions at three other locations where he resided in the Development, he never had *any* of these locations tested for harmful gamma levels, nor did he consult with a doctor to determine whether he has any potential health issues.  Ex. 21, pp. 74-75.

II.     FEIST CANNOT PROVE THE ELEMENTS OF RULE 23 BY A PREPONDERANCE OF THE EVIDENCE.

A.     Feist Has Failed to Prove A Clearly Defined Class.  The alleged classes are not "adequately defined and clearly ascertainable."  They are also over inclusive because residents actually oppose claims against Drummond.  Ex. 1; Ex. 28.  As for medical monitoring, it would be virtually impossible to verify individual doses for residents who may have lived in the Development for a period of three years over the past 30 years.  Ex. 28.  For "remediation," such claims can only be determined through a "property-by-property evaluation."  Ex. 49, p. 253.

B.     Feist Has Failed to Prove Commonality.  There are no "common answers apt to drive the resolution of the litigation."  564 U.S. at 350.  Feist, for example, has safe radiation levels, no dose evaluation, and no control over the outdoor area.  Drummond or Poseidon did not mine his neighborhood or discharge

18

pollution onto Feist's condo, did not sell him the condo, and made no false representations of fact to Feist.  Thus, there are no central common questions that will prove Feist's claims, much less other residents' claims.

Dissimilarities are also prevalent for economic impact, if any.  Feist has failed to show even one transaction since the suit was filed 4 ½ years ago that has resulted in a diminished value.  Feist's own expert, Jeffrey Zabel, has failed to conduct an "hedonic" regression analysis on any property or the Development at large, which subjects Zabel's opinions to a separate Daubert motion.  Ex. 48, pp. 10-11.

C.     Feist Has Failed to Prove Typicality.  Feist's circumstances are atypical from his inflammatory allegations because he claims not to have known that the Development was built on former phosphate land, did not purchase from Drummond, and has no economic losses or health effects.  Ex. 21, pp. 22, 27, 52, 58-59.  There is no "typical" dose or health impact, if any, applicable to Feist or other residents.

D.     Feist Has Failed to Prove Adequacy of Representation.  Feist and his counsel are in conflict with the economic interests of the residents and property owners.  Property owners oppose the class and will be harmed financially by stigmatizing their neighborhood as a "contaminated site."  Property owners and residents do not believe the "hype" of Feist and his counsel.  Twenty residents have given affidavits in opposition to certification.  Ex. 1.  Feist has "lost friends" in the Development over his claims.  Ex. 21, p. 96:12-20.  Feist is also seeking remedies

to be applied on other property owners' land without their consent.  In fact, Mr. Feist has never attempted to speak to, or otherwise communicate with, the residents about the lawsuit or their views of the issues.  Ex. 1; Ex. 21, p. 62:17-24.

E.    Feist Has Failed to Prove the Elements of Rule 23(b)(3) Predominance.

As the Supreme Court has stated, predominance under Rule 23(b)(3) is far more demanding than the elements of Rule 23(a).  Class certification is usually denied for environmental or toxic tort claims because of "overwhelming" individual circumstances.  *Cotromano v. United Technologies Corp.*, 2018 WL 2047468 (S.D. Fla. May 2, 2018); *Lee-Bolton v. Koppers, Inc.*, 319 F.R.D. 346 (N.D. Fla. 2017).  To determine whether individual issues predominate, the Court must compare the number and quality of issues that will be "common" versus "individual".

To make this determination, the District Court should classify factual issues as "common" questions or "individual" questions by predicting how the parties will prove them at trial."  *Brown*, 817 F.3d 1225, 1234 (11th Cir. 2016).  As further explained by the Eleventh Circuit, "common questions are ones where 'the same evidence will suffice for each member,' and individual questions are ones where the evidence will 'var[y] from member to member.'"  The Eleventh Circuit has also adopted a rule of thumb:

> If common issues truly predominate over individualized issues in a lawsuit, then the addition or subtraction of any of the Plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered….  If, on the other hand, the addition of more Plaintiffs leaves the quantum of evidence introduced by Plaintiffs

as a whole relatively undisturbed, then common issues are likely to predominate.

*Id*. at 1235.  Feist cites the *Navelksi* case, which involved a single dam failure with demonstrable property damage and is distinguishable.  Moreover, the same court denied class certification in other cases more similar to this case involving alleged environmental contamination.  *Lee-Bolton v. Koppers, Inc.*, 319 F.R.D. 346, 384-385 (N.D. Fla. 2017).  In that case, the court ruled that "even assuming that plaintiffs can prove the common question that negligence occurred…[the claims] 'will require distinctly case-by-case inquiries into the facts.'"  *Id*.; quoting *Jackson v. Motel 6 Multi-Purpose, Inc.*, 130 F.3d 999, 1006 (11th Cir. 1997).  This included "testing each home individually to determine whether each home has contamination levels."  "There is no basis for <u>assuming</u> that each home within the boundary of this proposed class is contaminated."  Thus, a "property-by-property inquiry is inevitable."  *Id*.  As the Court concluded,

> without question; the individual issues in this case will predominate over class issues.  As decided in other contamination cases, 'whether a plaintiff's property is contaminated, the source of such contamination, the extent of such contamination, the cause and timing of harm, and the resulting damage measured in diminution of property value, are all question that will require plaintiff-by-plaintiff scrutiny.'  *Id*., quoting *LaBauve v. Olin Corp.*, 231 F.R.D. 632, 673 (S.D. Ala. 2005).

Class certification was also denied in a recent Florida federal case involving alleged residential pollution, including alleged radiation "contamination." *Cotromano v. United Technologies Corp.*, 2018 WL 2047468 (S.D. Fla. May 2,

2018).  In that case, residents of a development known as the Acreage sought class certification for widespread pollution allegedly caused by an adjoining industrial site.  The Court reviewed alleged common and individual factors and concluded that there were many individual issues that predominated, including:

> (1) whether the plaintiff's property is actually contaminated…, (2) whether the source of these contaminants is [Defendant]; (3) whether the contamination is sufficiently severe to reduce the property's value, and if so, the extent of that diminution in value; (4) whether the property is contaminated by toxins other than those released by [Defendant], and if so, the extent to which any diminution in property value may be attributed to such other [sources]; (5) whether each plaintiff acquired his or her property before or after the alleged diminution occurred, and (6) whether each plaintiff was first on notice of contamination and whether the timing of that notice renders his or her claims time-barred. *Id*. at *21.

The Court therefore concluded that individual issues predominated and "the existence and degree of liability" will turn on "individual inquiries." *Id*.  The same issues apply with greater force in this case.  There is an overwhelming number of individual issues that predominate:

1.    Feist does not have harmful levels of radiation in his condo.  Ex. 2, Opinions 1, 2 and § XIV, pp. 35-37.  He rents his condo to a tenant.  Feist's low levels illustrate the need for individual testing of each residence and negates the value of surveys or "averages."

2.    Generic evidence or "averages" cannot prove individual radiation levels on any specific property or for any specific individual.  Even Feist's alleged "adjusted" RadEye readings vary from 7 ur/hr.  to 56 ur/hr.  This is a substantial

variation that requires individual testing of each location and dose assessment of each resident.  Ex. 2.  Drummond disputes Feist's "adjustments" and will insist on individual testing as critical to determine dose under the Florida standards.

3.      Neither Drummond nor Poseidon mined the land where Feist's condo is located or discharged pollution on the site.  This defeats Feist's claim for a discharge of pollution under Fla. Stat. §376.313.  Poseidon only engaged in secondary recovery, and only on 14.4% of the 1,450 acres of the Development.  The location of secondary recovery by Drummond (and any impact, if at all) must be determined on an individual property basis.  Ex. 27.

4.      Plaintiff's radiation surveys only cover outdoor yards from 27 residences, not indoors.  Ex. 47, pp. 61-63.  Feist effectively acknowledges that indoor areas are shielded – which is critical since residents spend the vast majority of their time indoors.  The EPA estimates that "Americans, on average, spend approximately 90 percent of their time indoors."  Ex 52.  Even outdoor activity in this Development is likely to be on a shielded surface such as an enclosed pool/patio area, garage, driveway, sidewalk, or street.  Ex. 28.  In addition, residents in this Development do not have vegetable gardens, grow their own food, or ingest soil, as Feist has incorrectly assumed in calculating averages under RESRAD.  *Id*.  Away from home, residents spend time at work, shopping, travelling, recreation, socializing, appointments, and other activities, which affect the amount of time spent

in the Development and create potential exposure and dose from other sources.  Ex. 28.  Thus, each resident will have unique and different circumstances.

5.      Once individual property specific information has been gathered – indoors and out – the occupants will need to be evaluated individually for any potentially harmful <u>dose</u> received from radiation, if any.  Ex. 3, p. 227:14-25; p. 278:6-10.  "Averages" or assumptions cannot satisfy the burden of proof for specific individuals.  As discussed, Feist's condo levels are safe and he has failed to provide evidence of a harmful dose or adverse health effect to himself or others.  Thus, Feist's case will not prove or disprove any other resident's case.

6.      Feist does not control any outdoor real property, and thus has no legal basis to seek Development-wide replacement of soils to a depth of 3 feet, under the guise of "remediation" on other people's land.  Exs. 28, 45, 46.  Residents oppose this radical plan.  Ex. 1.  The claim of remediation requires a "property-by-property evaluation."  Ex. 49, p. 253.  In addition, injunctive relief for remediation is not available under Fla. Stat. §376.313.  Ex. 61.

7.      Feist has not shown any diminished property value attributable to former mining and reclamation.  Property values have increased (not decreased) since this case was filed in 2017, and will need to be evaluated by individual appraisals or actual sales transactions, not "Trial by Formula," which has been rejected by the Supreme Court.  *Wal-Mart*, 564 U.S. at 368.  Ex. 5, Opinions 89-110; pp. 23-29.  Home buyers have individual preferences that are unique and

variable.   Some may prefer location, gated community, access to shopping, recreation facilities, and so forth.   Living in a community with fully reclaimed phosphate land may play no role in property values.  Exs. 1, 28.  Research conducted by Feist's expert (not in this Development) shows that the impact of alleged contamination can be zero, positive, negative, or temporary.  Ex. 48, pp. 39, 45, 51, 82.  In addition, the potential cost of remediation must be evaluated in comparison to the alleged diminished value, for each property.  Florida law prohibits remediation if it exceeds alleged damages for diminished property.  *U. S. Steel Corp. v. Benefield*, 352 So. 2d 892 (Fla. 2nd DCA 1977); see also *Samples v. Conoco*, *Inc.,* 165 F. Supp. 2d 1303 (N.D. Fla. 2001).

8.   In addition, there have been numerous residential sale transactions after these claims were publicized in March, 2017.  Ex. 5, Opinions 89 - 110.  These purchasers were on notice of Feist's highly publicized claims and purchased anyway.  In addition, purchasers prior to 2017 were on notice of the "well documented" presence and location of naturally occurring radiation ("NORM") in phosphate, including the Development.  Ex. 43, p. 2.  This knowledge supports Drummond's defenses of assumption of risk, comparative negligence, ratification, and consent that will apply individually to potential class members.

9.   Feist seeks lifetime medical monitoring and follow up by oncologists, but has not established a harmful dose.  Ex. 21, pp. 58-59.  Indeed, none of the residents have linked any cancer to residential doses over the past three decades.  Ex.

30.  Nonetheless, Feist has proposed a mandatory injunction of lifetime testing and oncological follow-up to be supervised by the Court, despite highly individualized, variable, and disputed dose and causation issues.  Moreover, doses at these levels have not been associated with detectable or provable cancers.  Ex. 30; *Lee-Bolton*, 319 F.R.D. at 385*; Cotromano*, 2018 WL 2047468.

10.    Feist did not purchase his condo from Drummond and was not misled by any false statement of fact or omission of Drummond.  Ex. 21, p. 145; Ex. 24. Other potential class members will need to establish individually whether they heard or relied on any alleged misrepresentations or omissions, or whether they were on notice of prior phosphate mining and reclamation as Drummond and others fully disclosed to the public and in their chain or title.  Ex. 35; *see also*, Ex. 24, ex. A, no. 6.  Of particular note is the fact that Feist cites to volumes of public record evidence, which was disclosed by Drummond, the State of Florida, and others.  This issue will require individual inquiry into each sales transaction, reliance, and damages, if any.

11.    Feist is in conflict with putative class members.  Feist wants the Development to be declared a "contaminated" site, subject to massive potential reconstruction activity.  Residents are adamantly opposed to seeking such relief and 20 have submitted affidavits.  Ex. 1.  Residents want to preserve their property values.  *Id.*   They do not want their houses to be falsely designated as "contaminated," "unlivable," or "unsellable."  *Id.*  The harm will be done if the Court

certifies a class and allows Feist to seek such drastic and economically harmful relief.  Id.  Opting out of the class cannot undo the stigma of Feist's claims.  Id.

12.    Feist's speculative claim of emotional distress demonstrates highly variable issues for himself and each putative class member.  Feist claims personal injury damages from gamma rays sufficient to cause an "impact," resulting in emotional distress.  Emotional distress damages simply cannot be determined on a class-wide basis.

13.    Public record information has been available for decades regarding the Development.  Exs. 28, 34, 35, 36, 55.  Indeed, much of Feist's case is built on 40-year old public records readily available to individual.   Individual review of limitations issues is required under Florida's four year statute of limitations applicable to the alleged class claims.  Fla. Stat. §95.11(3).

14.    The judgment in this case will be *res judicata* for all claims of all putative class members.  Feist does not propose a "personal injury" class, although he seeks emotional distress, which is a personal injury.  Personal injury claims cannot be pursued on a class-wide basis.

15.    Potential class members who purchased from Drummond have enforceable mandatory arbitration provisions and class action waivers, which require individual adjudication.  Ex. 28.

16.    A proposed class is not superior, appropriate, or manageable.  Feist has alleged diversity jurisdiction with $75,000 in controversy for each claim.  *See* Dkt.

36, ¶ 39.  This is more than a sufficient amount in controversy to allow Feist or any other individuals to pursue separate claims.  Given the overwhelming number of individual issues of dose, causation, property values, and even identifying residents, the proposed class is unmanageable and requires each individual to file suit separately, if at all.  *Jacobs v. Osmose, Inc.*, 213 F.R.D. 607 (S.D. Fla. 2003).

III.   <u>FEIST CANNOT PROVE AN INJUNCTIVE CLASS UNDER RULE 23(b)(2)</u>.

Class actions under Rule 23(b)(2) require a finding that a defendant has engaged in essentially uniform treatment of the class.  There is no opportunity for class members to opt out.  Feist seeks massive and radical mandatory relief with no opportunity for class members to opt out.  Feist seeks to violate basic property owners' rights by forcing massive soil removal and replacement to a depth of 3', along with the destruction of trees, shrubbery, and lawns.  He also seeks lifetime medical testing and oncological follow up for anyone who ever lived in the Development for a period of three years during the past three decades.  Such a class action would go far beyond the scope of Rule 23(b)(2), which requires a finding that Drummond "has acted and refused to act on grounds that apply generally to the class."  *Wal-Mart*, 564 U.S. at 360.  The Supreme Court has held that:

> Claims for <u>individualized</u> relief … do not satisfy the Rule.  The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted - the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." [citation omitted].  Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each

> member of the class.  It does not authorize class certification when each individual class member would be entitled to a <u>different</u> injunction or declaratory judgment against the Defendant.  Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.

*Wal-Mart*, 564 U.S. at 360 - 361.  Based on this criteria and the findings of Defendants' experts, the claims for relief are highly "individualized" and involve individual alleged relief based on each class member's unique circumstances.  *Id.*

   A.   <u>Remediation.</u>

Feist seeks an injunction class of all owners so he can impose mandatory and economically destructive soil excavation and replacement, which will have disastrous consequences for these neighborhoods.  Ex. 1.  However, Chapter 376 does not allow injunctive relief.  *Cruz v. Mosaic Global Operations, Inc.*, Florida Circuit Court, October 14, 2021, ¶ 6.  Composite Ex. 61.  Feist has also sought damages for his property and cannot also seek massive "remediation."  This is far beyond the scope of an injunctive class and will require individualized adjudication of any alleged damages.

   B.   <u>Medical Monitoring.</u>

This class will be virtually impossible to identify since a resident is not the same as an owner, and there are no records of radiation doses for residents who lived in the Development for three years out of the past three decades.  Ex. 28.  Self-identification is subject to abuse.  Individual "health risk assessment must be

undertaken [individually], considering a long list of <u>individual</u> factors." *Lee-Bolton*, 319 F.R.D. at 385.

Feist seeks an injunctive class for lifetime medical monitoring supervised by the Court. Dr. Mettler has detailed complex individual issues that prevent treating this alleged class as "cohesive" for injunctive purposes, including dose, length of residence, pre-existing conditions, numerous baseline risk factors, and lack of scientific causation for any individual. Ex. 30, Opinion 6. Dr. Mettler also found no scientific basis to infer that residence in the Development for three or four years subjected each resident to a harmful dose of radiation. Ex. 30.

## IV. FEIST CANNOT PROVE AN "ISSUES CLASS" UNDER RULE 23(b)(4).

The "issues" identified by Feist primarily involve the existence of alleged pollution in the Development in general. However, resolution of the case requires individual testing and evaluation for any claim of liability, not historical mining and reclamation. *Rink v. ChemiNova, Inc.* 203 F.R.D. 648 (M.D. Fla. 2001). As Judge Porcelli noted, the prior history of the Development will not determine any individual claims. Instead, individual radiation dose levels are relevant, and these are very fact and individual specific.

### **Conclusion**

For the reasons stated, the Plaintiff's Motion should be denied.

*/s/ Joseph H. Varner, III*
Joseph H. Varner, III
Florida Bar No. 394904