UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOHN J. JERUE (Dismissed) and
MICHAEL J. FEIST,

       Plaintiffs,

v.                                                    Case No. 8:17-cv-587-TPB-AEP

DRUMMOND COMPANY, INC.,

       Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiffs John J. Jerue ("Jerue") and Michael J. Feist ("Feist") (collectively, "Plaintiffs")[1] initiated this action on behalf of themselves and all other individuals similarly situated against Defendant Drummond Company, Inc. ("Drummond") seeking relief for injuries associated with Drummond's phosphate mining, reclamation, and development activities in Polk County, Florida (Docs. 1; 36, at ¶¶ 1, 2). Feist is the owner of real property located in the Grasslands residential community (Doc. 36, at ¶ 29). Feist alleges that Drummond's mining and reclamation activities caused the land upon which the Oakbridge and Grasslands

---

[1] Initially, the case was brought by Jerue but Feist joined later with the filing of the Amended Complaint (Doc. 12). Eventually, the parties stipulated to the dismissal of Jerue as a named Plaintiff due to personal matters (*see* Docs. 121, 123). Plaintiffs moved to add additional class representatives, but the motion was denied (Docs. 110, 121). Accordingly, Feist is the sole remaining proposed class representative.

developments sit to be contaminated with harmful radiation, that Drummond was aware of the contamination and risks posed to residents but developed the areas regardless, and that Drummond falsely assured the public that the former phosphate mining operations did not present a health risk (Doc. 36, at ¶¶ 2, 4, 15). Currently before the Court are Feist's Motion for Class Certification (Doc. 142), Drummond's response in opposition (Doc. 155), Feist's reply (Doc. 165), and Drummond's notices of supplemental authority (Docs. 221, 228). Feist seeks certification of three classes—the Property Class, the Medical Monitoring Class, and the Fraud Class— which apply individually to his five counts against Drummond (*see* Doc. 36, at 25). Also, before the Court are Drummond's motion to exclude the opinion of Feist's expert, Dr. Jeffery E. Zabel (Doc. 170), and Feist's response in opposition (Doc. 181). The Court conducted a hearing on the motions on October 7, 2022, at which both parties presented oral arguments (Doc. 222). As is more fully set out in the following analysis, after consideration, it is recommended that Feist's Motion for Class Certification (Doc. 142) be denied and Drummond's Motion to Exclude the Opinions of Plaintiff's Expert (Doc. 170) be granted.[2]

## I.      Background and Procedural History

### A. From San Gully Mine to Planned Housing Development

Several decades ago, Drummond purchased real property in Polk County, Florida which previously housed the "San Gully Mine" (Doc. 163-7, at 283, 286).

---

[2] These matters were referred to the undersigned for issuance of a Report and Recommendation. *See* 28 U.S.C. § 636.

Located south of Lakeland in Central Florida, the mine has a long history, including the establishment of a now-nonexistent mining community called San Gully (Doc. 163-7, at 283). Drummond purchased 1400-acres of mining lands in Polk County, Florida, which included the San Gully mine, and engaged in secondary recovery[3] mining from 1978 until the mid-1980's when Drummond ceased mining operations and decided to develop the property (Doc. 156-5, at 5; Doc. 55, at ¶ 1; Doc. 36, at ¶¶ 16, 34). In September of 1985, Drummond, the State of Florida, the Department of Community Affairs, and the Central Florida Regional Planning Council entered into the Drummond Properties Lakeland Development Agreement (*see* Doc. 36, at ¶ 66; Doc. 16-2). Drummond, in advance of its application to local authorities to develop the former mine, conducted testing of the Oakbridge development and the surrounding area (Doc. 156-5, at 6). Drummond thereafter developed the reclaimed land into residential and commercial plots, which it began selling in 1987 (Doc. 36, at ¶¶ 42, 48, 50; Doc. 55, at ¶1; Doc. 156-5, at 6). Reclamation of Grasslands began in 1989 and development began in 1992 (Doc. 156-5, at 7).

## B. Procedural History

Jerue initiated this purported civil class action against Drummond on March 10, 2017 (Doc. 1). In support of his allegations, Jerue cited to both a 2003

---

[3] Drummond engaged in secondary recovery of previously mined phosphate land, meaning Drummond did not originally excavate the phosphate "matrix," but extracted phosphate from portions of the material remaining from previous mining operations before reclaiming the area (*see* Doc. 55, at ¶ 1). Drummond initially engaged in this mining through the Poseidon Mining Company with whom Drummond merged on March 31, 1984 (Doc. 36, at ¶ 35).

Environmental Protection Agency ("EPA") report and a Department of Energy ("DOE") report on Florida's phosphate mining and reclamation activities (Doc. 1, at ¶¶ 58–70). Both the EPA and DOE reports paid particular attention to the Oakbridge development, in addition to other Drummond plots (Doc. 1, at ¶¶ 62, 70). The EPA concluded that individuals residing in those areas may be exposed to unsafe levels of radiation (Doc. 1, at ¶ 61; Doc. 12-4). Meanwhile, the DOE, in conjunction with Argonne National Laboratories, also assessed the radiation risks posed to individuals living in communities built atop reclaimed phosphate lands in central Florida (Doc. 1, at ¶¶ 66–70). According to the DOE report, Oakbridge and other Drummond developments were "highly likely" in need of additional remedial action, as the gamma radiation levels found on the land were anywhere from 2.5 to 8 times greater than baseline background levels (Doc. 1, at ¶ 70). Jerue's original complaint accordingly asserted claims against Drummond for strict liability (Counts I and IV), negligence (Count II), and private nuisance (Count III) (Doc. 1, at ¶¶ 124–70). Jerue also sought to bring the claims in two classes: the Drummond Property Damage Class, which encompassed "[a]ny and all persons that own any real property in the Oakbridge & Grasslands Communities (collectively, the "Class Area) in Polk County, Florida" and the Medical Monitoring Class, which consisted of "[a]ll persons who ever resided on property located within the Class Area for a minimum of four years" (Doc. 1, at ¶ 103).

Drummond moved to dismiss Jerue's claims in their entirety (Doc. 10). But before the Court could issue a ruling on Drummond's motion, Jerue, then joined by

Feist, filed an amended complaint (Doc. 12). Plaintiffs' amended complaint echoed the fundamental allegations levied against Drummond in Jerue's original complaint but also included new references to an October 1978 report by the Florida Radiological and Occupational Health Department and a July 1980 letter written to Drummond by a Florida Public Health Physicist on behalf of the Florida Department of Health, both of which concluded that a significant percentage of homes built in the planned Drummond developments would have indoor gamma radiation levels above federal guidelines (Doc. 12-2, at 3; Doc. 12-3, at 2). Additionally, Plaintiffs' amended complaint reworked the asserted causes of action. The amended complaint asserted claims for strict liability pursuant to chapter 376, Florida Statutes (Count I), negligence and negligence per se (Count II), fraud and fraudulent concealment (Count III), negligent misrepresentation (Count IV), private nuisance (Count V), strict liability for an abnormally dangerous activity (Count VI), and unjust enrichment (Count VII) (Doc. 12, at ¶¶ 131–92). Plaintiffs also maintained their claims that the conditions of contamination caused a diminution in the value of their properties and necessitated medical monitoring to guard against the contraction of dangerous diseases and other health conditions (Doc. 12, at 43). Plaintiffs again sought to bring these claims on behalf of the same two classes as in the original complaint, the Drummond Property Damage Class and the Medical Monitoring Class (Doc. 12, at ¶ 109).

Drummond again moved to dismiss Plaintiffs' claims in their entirety (Doc. 16); upon review, the Court granted in part and denied in part Drummond's motion

(Doc. 34). In accordance with the Court's order, Plaintiffs filed a second amended complaint—the current operative complaint—asserting the following claims: strict liability pursuant to chapter 376, Florida Statutes (Count I); negligence and negligence per se (Count II); fraud and fraudulent concealment (Count III); negligent misrepresentation (Count IV); and medical monitoring (Count V) (Doc. 36). Plaintiffs amended their class definitions and added a third class, the Fraud Class (Doc. 36, at ¶ 111). Drummond filed another motion to dismiss which was denied in total (Doc. 41; Doc. 51).

## II.    *Daubert* Motion

Before considering the motion for class certification, the undersigned must address the also-pending *Daubert* motion. When an expert's report or testimony is "critical" to class certification, the court is bound to make a conclusive ruling on any *Daubert* challenge to that expert's qualifications or submissions before it may rule on a motion for class certification. *Sher v. Raytheon Co.*, 419 F. App'x. 887, 890 (11th Cir. 2011) (citing *American Honda Motor Co. v. Allen*, 600 F.3d 813 (7th Cir. 2010)).[4] This obligation applies whether the Court grants or denies certification, requiring a *Daubert* ruling on any expert opinion which touches upon issues critical to the Court's class certification decision. *Messner v. Northshore University HealthSystem*, 669 F.3d 802, 814 (7th Cir. 2012).

In this case, the focus is on Feist's proffered expert witness on class-wide

---

[4] Unpublished opinions are not considered binding precedent but may be cited as persuasive authority. 11th Cir. R. 36-2.

damages, Dr. Jeffrey E. Zabel. Dr. Zabel, a professor in the economics department at Tufts University and co-director of the Master's Program in Data Analytics, asserts that he is able to calculate damages to property values attributable to Drummond's alleged contamination using a hedonic regression model. Feist uses Dr. Zabel's report to show that "[t]hough not a necessary element of certifying a liability class, damages *can* be determined on a class-wide basis" (Doc. 142, at 26). Thus, prior to making any class determination, the undersigned must examine Dr. Zabel's report to determine whether the underlying methodology shows some hallmarks of reliability for purposes of ruling on the threshold *Daubert* challenge to it.

### A. Dr. Zabel's Report and Rebuttal

Dr. Zabel's report takes the form of a proposal, delineating the steps that he would take were he asked to perform the damage calculations in this case (Doc. 143-7). Dr. Zabel explains that he would use the hedonic regression method, an economic method for estimating value, to measure the impact of environmental contamination on property values (Doc. 143-7, at 4). He explains in his report that there are six standard steps for conducting this hedonic regression analysis and what he would do to build and run the model for this case, if asked (Doc. 143-7, at 6).

First, Dr. Zabel explains, he would "[g]ather information on the nature, source and extent of contamination, and the timing of public knowledge of this information" (Doc. 143-7, at 6). Dr. Zabel explains that he would form a timeline of public knowledge which will "provide information about possible changes in the

impact of the contamination on house prices" (Doc. 143-7, at 6). Here, he explains, "[a]t least since March 2017 information regarding the contamination has appeared in a number of newspaper, television and on-line reports" (Doc. 143-7, at 6). Second, Dr. Zabel would "[i]dentify the areas included in the hedonic analysis" which here, is the class area composed of the Grasslands and Oakbridge communities (Doc. 143-7, at 6). As part of this, he would gather information about the housing market conditions over the duration of the timeline established in step one and identify control areas (Doc. 143-7, at 6). Dr. Zabel explains that during a site visit in February 2020, he identified "several candidate control communities in the area (e.g., other planned developments with similar types of amenities)" (Doc. 143-7, at 6). Third, Dr. Zabel explains, he would "[c]ollect data to be used in the hedonic analysis" including "[d]ata on housing market transactions, their location, and neighborhood characteristics" for both the affected and control areas identified in step two (Doc. 143-7, at 6). Dr. Zabel would source this data from "town assessors, displayed in multiple listing services used by realtors, and compiled and offered for purchase by private vendors" and this data "may be enhanced, as appropriate, through Geographic Information Systems (GIS) analysis to capture other characteristics of the properties' locations" (Doc. 143-7, at 6). This step, Dr. Zabel explains, captures the data "for the period established by the timeline developed in step (1)" (Doc. 143-7, at 6). According to Dr. Zabel, this is important because

> the information about the extent and level of contamination will
> continue to change after the initial discovery and this can affect the

> prices of houses in the affected area. Furthermore, the total impact on house prices may not occur immediately, as the information about the contamination takes time to become fully realized by buyers and sellers and then capitalized into house prices.

(Doc. 143-7, at 6–7). Dr. Zabel explains that this same information can also be collected from before the public knowledge timeline as established in step one "to establish a trend in house prices prior to discovery and awareness of the contamination" and the "trend should be similar for the affected and unaffected areas for the latter to qualify as a 'control' for the affected area" (Doc. 143-7, at 7). Dr. Zabel states that he has access to the necessary sales and characteristic data through CoreLogic, "a property information and analytics company that compiles public records, assessor data, and other sources to create comprehensive databases of housing transactions for the entirety of Polk County going back at least 20 years" (Doc. 143-7, at 7). In step four, Dr. Zabel would check the data for accuracy, formatting, and consider "their temporal aspect" (Doc. 143-7, at 7). In step five, Dr. Zabel explains he would develop the model. In logarithmic form, the formula appears as follows:

$$(1) \quad \log\left(P_{ijat}\right) = \beta_0 + X_{it}\beta_1 + N_{jt}\beta_2 + Z_j\beta_3 + T_a\beta_t^a + C_a\beta_t^{na} + e_{ijat}, \quad i = 1,\dots, n \text{ and } t = 1,\dots,T$$

where $P_{ijat}$ is the price of the property i, in jurisdiction j, in area a (affected or unaffected) at time t, $X_{it}$ is a vector of characteristics for property i at time t, $N_{jt}$ is a vector of neighborhood amenities in jurisdiction j at time t, $T_a$ and $C_a$ are indicators of the house being in the treatment (affected) or control (unaffected) areas, respectively, and $e_{ijat}$ is a standard error term. There are n housing transactions in the sample and T time periods (typically years). Note that it is assumed that the neighborhood variables are measured at the jurisdiction level (i.e., census tract, zip code, or town) which could be different from the affected area defined by the extent of the contamination.

(Doc. 143-7, at 7). Dr. Zabel then explains how each variable works together to

"measure the changes in house prices in the affected and unaffected areas over the time period that the data are observed" while also taking into account neighborhood quality, house characteristics, and neighborhood amenities (Doc. 143-7, at 8). Specifically,

The parameters $\beta_1$ and $\beta_2$ are the values that the market places on the house characteristics $X_{it}$ and neighborhood amenities $N_{jt}$, respectively. The key parameters are $\beta_t^a$ and $\beta_t^{na}$ that measure the changes in house prices in the affected and unaffected areas over the time period that the data are observed. Generally $\beta_1^a$ and $\beta_1^{na}$ (initial time period) are each set to 100 so changes in house prices are measured relative to the base year (the first year of the sample). Then $\beta_t^a$ and $\beta_t^{na}$ constitute price indices that measure changes in house prices in the affected and unaffected areas over the sample period t = 1,..., T. So the difference, $\beta_t^a - \beta_t^{na}$, is a measure of the difference in house prices in the affected and unaffected areas at time t. Suppose that $t^D$ is the period when the contamination is discovered. If the unaffected area is a suitable control for the affected area, $\beta_t^a - \beta_t^{na}$ should be close to zero for $t < t^D$ and $\beta_t^a - \beta_t^{na}$ for $t > t^D$ will measure the impact of contamination on house prices in the affected area.

(Doc. 143-7, at 8). In the sixth step, Dr. Zabel would use the hedonic model built in step five using the sample data, apply an error factor, and evaluate whether the data is "statistically different from zero" (Doc. 143-7, at 9). Finally, Dr. Zabel would use these estimates to calculate the total impact on all property values in the affected area (Doc. 143-7, at 9). According to Dr. Zabel, "[t]he difference in prices attributable to the contamination, typically expressed as a percentage, can then be applied to the properties in the affected area" (Doc. 143-7, at 9). Dr. Zabel explains that a "full list of all the properties in the affected area can be obtained from the local assessor's office or other local agency" (Doc. 143-7, at 9). In summary, Dr. Zabel explains, the model would capture the impact to the class as a whole "that can be applied individually to all properties (for example, as a percentage of

estimated value)" (Doc. 143-7, at 9).

Dr. Zabel also submitted a rebuttal report in response to Drummond's experts, Dr. Henry H. Fishkind and Ms. Jennifer N. Pitts, CRE (Counselor of Real Estate), which directly addresses some of the defense experts' criticisms of his report (*see* Doc. 143-8 (Dr. Zabel's rebuttal report); Doc. 156-2 (Dr. Fishkind's expert report), Doc. 156-5 (Ms. Pitts's expert report)).

Dr. Fishkind and Ms. Pitts argue that properties in the Grasslands and Oakbridge communities are too diverse in nature to be analyzed collectively on a class-wide basis (Doc. 156-2, 13–16; Doc. 156-5, at 9). In response, Dr. Zabel notes first that the hedonic model is designed to incorporate "all manner of observable property attributes" and that, if needed, separate hedonic models can be estimated for different market segments such as single family homes versus condominiums (Doc. 143-8, at 3). Moreover, Dr. Zabel notes that data on neighborhood characteristics can readily be collected from numerous public sources beyond sale price (Doc. 143-8, at 4). For example, Dr. Zabel cites that the model can incorporate demographic data from the U.S. Census Bureau or school district level test scores from the Florida Department of Education (Doc. 143-8, at 4).

Dr. Fishkind also criticizes the report in that "it is not the actual environmental conditions, but instead it is the perception of these conditions, including the 'fear' of potential contamination, that can potently influence home prices as measured by [the hedonic model]" (Doc. 156-2, at 18). Dr. Zabel rebuts that any model of consumer choice will incorporate perception because home

buyers will interpret available information on the contamination in different ways, depending on their risk preferences (Doc. 143-8, at 5). Dr. Zabel responds that the whole point of a hedonic model is to capture the total impact of these perceptions on the overall market through a large number of property transactions (Doc. 143-8, at 5). Dr. Zabel also addresses criticisms of this "average" impact by reiterating that the average would still need to be allocated to each property (Doc. 143-8, at 5).

## B. Legal Standard

The Court must act as a gatekeeper to ensure that the admission of expert testimony is consistent with the requirements of the Federal Rules of Evidence. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 n.7 (1993). The Eleventh Circuit has adopted a three-part framework for determining whether expert testimony is admissible under *Daubert* and Federal Rule of Evidence 702. Under this analysis, expert evidence is admissible if the court finds: (1) the expert is competent and qualified to testify regarding the matters that he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the expert, through scientific, technical or specialized expertise, provides testimony that will assist the trier of fact to understand the evidence or determine a fact in issue. *See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340–41 (11th Cir. 2003) (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998); *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001).

## C. Analysis

### i. Qualification

"Determining whether a witness is qualified to testify as an expert requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony." *Feliciano v. City of Miami Beach*, 844 F. Supp. 2d 1258, 1262 (S.D. Fla. 2012) (internal quotation marks and citation omitted).

As Drummond acknowledges, Dr. Zabel "is a professor in the Department of Economics at Tufts University, and holds a Ph.D. in economics" (Doc. 170, at 13). Dr. Zabel has also published research on the impacts of environmental conditions on property values and real estate markets (Doc. 170, at 3). Drummond instead argues that Dr. Zabel is "not qualified to testify as an expert on the appraised values of properties that may be impacted by environmental contamination" (Doc. 170, at 13). Feist does not dispute that Dr. Zabel is not qualified to act as an expert appraiser of property values (Doc. 181, at 19). Instead, Feist argues, Dr. Zabel's methodology involves the hedonic regression model which does not utilize appraised values[5] to calculate the damages attributable to the alleged environmental contamination (Doc. 181, at 19). As Feist notes, individual appraisals focused on the value of a specific property are incapable of determining a scientifically reliable estimate of the diminution in property value, if any, as a result of Drummond's

---

[5] This fact creates challenges with Dr. Zabel's report which the undersigned addresses in the below analysis. To preview, Dr. Zabel does not include any proposed methodology for applying the result of the hedonic regression model to the proposed class members. However, this issue is apart from that of qualifications as an expert. The fact remains that Dr. Zabel is not presenting evidence on appraisal values.

radioactive pollution, but hedonic regression can (Doc. 181, at 20; *see also* Doc. 156-6, at 147:23–148:11 (explaining that hedonic regression can determine the diminution of property value due to an environmental disamenity across a group of properties on an average basis)). Thus, the undersigned recommends the Court find Dr. Zabel is competent and qualified to testify regarding his hedonic regression model.

### ii.  Reliability

"[W]hen expert 'testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'" *In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1352 (N.D. Ga. 2000) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)). "[T]he Court's inquiry focuses not on whether the expert is correct, but whether the proponent of expert testimony has established by a preponderance of the evidence that the testimony is reliable in the context of the methodologies or techniques applied within the appropriate field." *Id.* at 1352–53 (citations omitted). "The Court's evaluation of the reliability of expert testimony . . . does not depend upon a rigid checklist of factors designed to test the foundation of that testimony. Rather, the gatekeeping inquiry must be tailored to the facts of the case and the type of expert testimony at issue." *Id.* at 1353 (citing *Kumho Tire*, 526 U.S. at 150); *see City of Tuscaloosa*, 158 F.3d at 565–66, 566 n. 25 (discussing reliability of testimony by economic and statistical experts). To assess the reliability of an expert's

testimony, courts consider: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *See United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004) (citation and quotation omitted); *see also Kumho Tire Co.*, 526 U.S. at 150–53 (explaining that reliability requires a case-specific inquiry). Although the decision regarding the reliability of an expert opinion is within the district court's discretion, it may not "make ultimate conclusions as to the persuasiveness of the proffered evidence." *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (quotation omitted).

Here, Dr. Zabel's report is proffered by Feist as support for the motion for class certification. Specifically, Feist uses the report to show damages may be calculated class wide. At this juncture, "[p]laintiffs need only come forward with *plausible* statistical or economic methodologies to demonstrate impact on a class-wide basis." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259 (11th Cir. 2004)*, abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) (emphasis added); *see Coffey v. WCW & Air, Inc.*, No. 3:17CV90-TKW-HTC, 2020 WL 4519023 at *5 (N.D. Fla. Mar. 25, 2020). The Eleventh Circuit has framed the court's inquiry in this context as "limited to whether or not the proposed methods for computing damages are so insubstantial as to amount to no method at all." *Klay*, 382 F.3d at 1259. Indeed, "[a]t the class certification stage, all that the named plaintiffs ha[ve] to prove [is] that a reliable damages methodology exist[s], not the

actual damages plaintiffs sustained*." Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 893 (11th Cir. 2023).

Generally, "[r]egression analyses are admissible even where they omit important variables so long as they account for the 'major variables' affecting a given analysis . . . ." *Reed Constr. Data Inc. v. McGraw-Hill Cos., Inc.*, 49 F. Supp. 3d 385, 403 (S.D.N.Y. 2014) (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)); *see also Freeland v. AT & T Corp.*, 238 F.R.D. 130, 145 (S.D.N.Y. 2006)) *aff'd*, 638 F. App'x 43 (2d Cir. 2016); *In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 385 (M.D. Fla. 2018). However, "it is the 'proponent who must establish that the major factors have been accounted for in a regression analysis.'" *Reed Constr. Data Inc.*, 49 F. Supp. 3d at 403 (quoting *Freeland,* 238 F.R.D. at 145)*.*

Drummond criticizes Dr. Zabel's report as lacking case-specific data collection, data analysis, model design or development, or other testable application of the hedonic method to the facts of the case (Doc. 170, at 8). This, Drummond argues, renders Dr. Zabel's report "unreliable" under *Daubert* (Doc. 170, at 9). In support, Drummond cites a number of cases from other circuits in which courts accepted *Daubert* challenges to expert reports in the class certification context for being, essentially, "so incomplete as to be inadmissible as irrelevant" (Doc. 170, at 10 n.1, 11 (citing *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 552 (D. Cal. 2014)). Drummond criticizes Dr. Zabel's lack of fact-gathering in relation to the case, complaining the report is not "tied to even the bare minimum of case-specific data collection, model development, or real property valuation analysis" (Doc. 170, at

10). As part of this challenge, Drummond also criticizes Dr. Zabel for not actually constructing or running the hedonic model that he asserts will establish class wide damages, arguing this renders his theory untestable (Doc. 170, at 11).

Drummond fails to connect its arguments to the relevant inquiry. Drummond's arguments would certainly be relevant if this motion were filed in relation to trial and Dr. Zabel's report were being offered to prove the class members' actual damages. However, at the certification stage the plaintiff's burden is only to prove "that a reliable damages methodology exist[s], not the actual damages plaintiffs sustained*." Green-Cooper*, 73 F.4th 883 at 893. Indeed, at this stage, Feist need only "come forward with *plausible* statistical or economic methodologies to demonstrate impact on a class-wide basis." *Klay*, 382 F.3d at 1259 (emphasis added). Moreover, a regression model need only consider the major variables to be considered reliable. *Reed Constr. Data Inc.*, 49 F. Supp. 3d at 403. Considering this, Dr. Zabel's report need not be excluded under *Daubert* on reliability grounds. Dr. Zabel's regression model includes variables meant to capture "values that the market places on the house characteristics … and neighborhood amenities" (Doc. 143-7, at 8). Additionally, Dr. Zabel notes that information from the U.S. Census and even test scores from the Department of Education can be incorporated into the model (Doc. 143-8, at 4). The report goes to the plausibility of the method of calculating damages. Dr. Zabel need not have completed his analysis nor included the specific calculations that aim to capture, for example, neighborhood variables. At this point, it is enough to satisfy the *Daubert* requisites

17

that Dr. Zabel has explained how he intends to account for those variables if the class were to be certified and if he were asked to perform the analysis. *See Green-Cooper*, 73 F.4th 883 at 893.

Drummond also challenges Dr. Zabel's report by arguing the Class Area is too heterogenous to be accurately subjected to a hedonic regression. Drummond does not dispute any specific terms or methods in Dr. Zabel's report, only that the hedonic method itself is inappropriate for the facts of this case because "hedonic models are used to give information on averages for general market outcomes, not particularized findings for specific houses" and that this "falls far below the standards required for an expert report submitted in support of class certification" (Doc. 170, at 12). Drummond argues that "[a]verages or community-wide estimations would not be probative of any individual's claim because any one class member['s property] may have an exposure level well above or below the average" and that "[n]ot all claims of property damage based on exposure are alike" (Doc. 170, at 12 (citing[6] *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 266, 271 (3d Cir. 2011)). Thus, Drummond asserts that the proposed model would not be conclusive as to individual cases.

The issues raised by Drummond regarding the heterogeneity of the Class Area bear on the weight of Dr. Zabel's opinion, not its admissibility. Dr. Zabel notes that the hedonic model is designed to incorporate "all manner of observable

---

[6] Drummond inadvertently failed to include a citation to the case (Doc. 170, at 12). Based on context, Drummond appears to be directly quoting from *Gates v. Rohm & Haas Co.*, 655 F.3d 255 (3d. Cir. 2011).

property attributes" and that, if needed, separate hedonic models can be estimated for different market segments such as single-family homes versus condominiums (Doc. 143-8, at 3). As Feist notes, hedonic regression is a "reliable methodology that has been approved by courts in this Circuit, and nation-wide, to show generalized proof of injury across a class of properties and to distribute damages on a formulaic basis at the merits phase" (Doc. 181, at 5). The Eleventh Circuit itself has recognized the usefulness of hedonic regression models. *See City of Miami v. Wells Fargo & Co.*, 923 F.3d 1260, 1284 (11th Cir. 2019), *cert. granted, judgment vacated sub nom, Bank of Am. Corp. v. City of Miami, Fla.*, 206 L. Ed. 2d 251, 140 S. Ct. 1259 (2020), *and cert. granted, judgment vacated sub nom, Wells Fargo & Co. v. City of Miami, Fla.*, 140 S. Ct. 1259, 1284 (2020) ("[H]edonic regression analysis has been favorably referenced and employed elsewhere and over several decades."). Indeed, Drummond's experts concede that hedonic regression can prove class wide money damages in some circumstances (*see* Doc. 156-6, at 147:23–148:11 (Ms. Pitts) (explaining that hedonic regression model can be used to "calculate an average impact . . . across a group of properties"); Doc. 156-3, at 230:23–231:13 (Dr. Fishkind) (noting that some studies "suggest that hedonic modeling can measure . . . environmental disamenities on a class-wide basis" so long as the dataset is sufficiently homogenous)). The Court's role at this stage is not to rule on the expert's persuasiveness. *Rosenfeld*, 654 F.3d at 1193 (quotation omitted). Moreover, the use of averages to prove common impact to a putative class is accepted. *See Tyson Foods Inc. v. Bouaphakeo*, 577 U.S. 442, 459–60 (2016) (holding

that representative proof from a sample, based on an expert witness's estimation of average time that employees spent donning and doffing protective gear, could be used to show predominance of common questions of law or fact in employment class action). The heterogeneity of the class area and the extent to which the formula accounts for it are considerations which go to the persuasiveness of Dr. Zabel's opinion, not its admissibility.

Drummond compares this case to *Cotromano v. United Techs. Corp.* in which the court held that a "mass appraisal" method was unreliable and did not "fit under the facts" of the case in part because "[t]he affected community is not remarkably homogenous…, but rather includes a wide variety and scale of homes . . . of various ages and sizes and conditions—diverse properties which are not logically impacted in the same way by the alleged environmental stigma." 2018 WL 2047468 at *19 (S.D. Fla. May 2, 2018). In *Cotromano*, the court noted that the area specifically included "a wide variety and scale of homes (equestrian farms, up-scale villas, simple ranch houses) of various ages, sizes and conditions." *Id.* Here, as Dr. Zabel noted, not only was the development actually developed purposefully to be homogenous, but the hedonic model itself is designed to incorporate "all manner of observable property attributes" and that, if needed, separate hedonic models can be estimated for different market segments such as single-family homes versus condominiums (Doc. 143-8, at 3). Moreover, Dr. Zabel noted that data on neighborhood characteristics can readily be collected and incorporated into the model (Doc. 143-8, at 4). The undersigned agrees with Dr. Zabel that the class area

in this case is not so heterogenous as that in *Cotromano* such that Dr. Zabel's report is rendered unreliable. Additionally, Drummond's reliance on *Gates* is similarly misplaced as the case stands not for a rejection of the hedonic regression model based on a lack of homogeneity but rather noted that the properties measured were contaminated by multiple disparate sources and times. *Gates*, 655 F.3d at 271 ("Single instances or simple theories of contamination may be more apt for consolidated proceedings than extensive periods of contamination with multiple sources and various pathways."). In contrast, here, Drummond does not allege Dr. Zabel's report contains these flaws but rather that the properties themselves are too disparate to have the effect of the contamination on the price of the property be measured writ large. As already noted, the heterogeneity of the class area and the extent to which the formula accounts for it go to the persuasiveness of Dr. Zabel's opinion, not its admissibility.

### iii.  Assist the Trier of Fact

An expert witnesses may only testify when the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). This prong is geared towards ensuring that the expert testimony is relevant, in addition to being reliable. *See Kumho Tire*, 526 U.S. at 152, 154. To satisfy this *Daubert* requirement, expert testimony must be relevant to an issue in the case and offer insights "beyond the understanding and experience of the average citizen." *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985). "But nothing in either *Daubert* or the Federal Rules

of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Rather, a "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*; *see also McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) ("Under *Daubert*, scientific testimony does not assist the trier of fact unless the testimony has a justified scientific relationship to the pertinent facts."). "[W]hen an expert's data is not directly relevant to the matter at issue in a case, the expert's testimony does not assist the trier of fact and is therefore inadmissible under *Daubert*." *Phillips v. Am. Honda Motor Co.*, 238 F. App'x 537, 540 n.2 (11th Cir. 2007); *Daubert*, 509 U.S. at 591–92 (terming this a problem of "fit," and stating that Rule 702 "requires a valid scientific connection to the pertinent inquiry").

Drummond makes no specific arguments regarding the report's assistance to the trier of fact. The undersigned nonetheless finds Dr. Zabel's report lacking. For one, Dr. Zabel's report does not explain how each class member's damages would be actually calculated following the use of the hedonic model. In Dr. Fishkind's words, "Dr. Zabel's report fails to provide any methodology or guidance concerning how to translate this [percent] average diminution in property value into individual property damages" (Doc. 156-2, at 16). Dr. Zabel defends against this accusation from Dr. Fishkind and Ms. Pitts by pointing to his sixth and seventh steps (Doc. 143-8, at 5). It is true that Dr. Zabel proposes that the model "can be applied individually to all properties (for example, as a percentage of estimated value)"

(Doc. 143-7, at 9). However, Dr. Zabel neither defines the essential term *estimated value* nor does Dr. Zabel propose a method for measuring this estimated value. Like Dr. Fishkind, the undersigned is left asking "What is the [percent average diminution] applied against? The assessed value of the properties? Some metric of market value which has not been specified by Dr. Zabel?" (Doc. 156-2, at 16). Feist touches on this deficiency in his response to Drummond's *Daubert* motion and acknowledges that it must take the step to allocate the regression model's damages to properties within the class (Doc. 181, at 8 n.3). However, Feist stops short of telling the court how he intends to do so. Feist argues that appraisal is not "relevant or necessary to estimating the impact of Drummond's pollution on the diminution, if any, on home values" (Doc. 181, at 19). Yet how does Feist propose to allocate the impact of the pollution which is estimated via the hedonic regression model without some understanding of each class member's property value? The undersigned is thus unable to evaluate the workability of that method in terms of its class certification implications. In other words, the undersigned is left wondering if that method would create individual inquiries which would predominate over class wide inquiries, a gap of essential information in a certification of the type requested by Feist. Feist himself acknowledges that were the court to calculate damages "on an individualized basis … it would inevitably cause undue burden and expense on the litigants by requiring 1,000 separate property evaluations at great time and expense" (Doc. 181, at 20 n.7).

For another, Dr. Zabel's report does not sufficiently explain how he proposes

to frame the temporal window for the operation of his regression model. Dr. Zabel does explain that he would form a timeline of public knowledge which will "provide information about possible changes in the impact of the contamination on house prices" and that "[a]t least since March 2017 information regarding the contamination has appeared in a number of newspaper, television and on-line reports" (Doc. 143-7, at 6). Dr. Zabel explains this timeline is important because "the information about the extent and level of contamination will continue to change after the initial discovery" and "the total impact on house prices may not occur immediately, as the information about the contamination takes time to become fully realized by buyers and sellers and then capitalized into house prices" (Doc. 143-7, at 6–7). Thus, while recognizing its importance, Dr. Zabel fails to explain *how* he would select the timeframe for which he proposes to measure the impact of the perceived contamination. Dr. Fishkind raises this criticism in his report, a criticism to which Dr. Zabel does not specifically respond (Doc. 156-2, at 16, 24; Doc. 143–7). Accordingly, the undersigned is left questioning whether the regression model would capture this nuance or whether the model would measure only from a certain date forward. And if so, from which date would the model measure? The undersigned needs this information to determine, as later described in fuller detail, whether the class contains individuals who have not suffered an injury and thus do not have standing.

The report—while reliable in relation to the hedonic regression model—is unmoored to the court's inquiry. Thus, Dr. Zabel's report "is not directly relevant

to the matter at issue in [the] case, the expert's testimony does not assist the trier of fact[,] and is therefore inadmissible under *Daubert*." *Phillips*, 238 F.App'x at 540 n.2.

## D. Conclusion

The undersigned recommends granting the *Daubert* motion. While the regression model need not be actually carried out at this stage, the model must still be helpful to the trier of fact. The distinctions between aspects of the report which are relevant to the probative value of the report versus its admissibility are narrow but decisive. The question is not whether the court is convinced by the report that Drummond caused any particular amount of damage, rather, the report need only convince the court that the expert has a plausible method for carrying out this calculation across the class if asked to do so. The hedonic regression model proposed by Dr. Zabel may be reliable, however, Dr. Zabel does not provide enough information to connect his proposed model to the court's relevant inquiry. If not provided enough information to make that determination, Feist fails to carry the burden of proof and the *Daubert* motion should be granted. That said, as will be demonstrated in the following, the motion for class certification fails even if Dr. Zabel's report were to be admitted.

Accordingly, the undersigned recommends that the Court grant Drummond's Motion to Exclude the Opinions of Plaintiff's Expert (Doc. 170).

## III.   Motion for Class Certification

In August 2021, Feist moved for class certification, requesting certification of three classes. As it relates to Count I (strict liability pursuant to chapter 376, Florida

Statutes) and Count II (negligence and negligence per se), Feist seeks to certify the following class:

> **Drummond Property Damage Class ("Property Class")**: Any and all persons that own any residential real property in the Oakbridge & Grasslands Communities (collectively, the "Class Area") in Polk County, Florida.

(Doc. 142, at 17; Doc. 36, at ¶¶ 111, 133–51). As it pertains to Count III (fraud and fraudulent concealment) and Count IV (negligent misrepresentation), Feist seeks to certify the following class:

> **Fraud Class**: All persons who purchased property in the Oakbridge or Grasslands Communities within 12-years of March 10, 2017.

(Doc. 142, at 17; Doc. 36, at ¶¶ 111, 152–70). Finally, as it pertains to Count V (medical monitoring),[7] Feist seeks to certify the following class:

> **Medical Monitoring Class**: All persons who have lived in the [Class Area] for more than three cumulative years.[8]

(Doc. 142, at 17; Doc. 36, at ¶¶ 111, 171–80). In support of his motion, Feist argues the classes should be certified pursuant to Fed. R. Civ. P. 23(b)(3) for liability and damages; pursuant to Fed. R. Civ. P. 23(b)(2) for injunctive relief (remediation); pursuant to Fed. R. Civ. P. 23(b)(2) for injunctive relief (medical monitoring); and, in the alternative, pursuant to Fed. R. Civ. P. 23(c)(4) for an issues class (Doc. 142, at 8).

---

[7] Feist asserts the medical monitoring class separately in his operative complaint pursuant to the Court's direction in its order regarding Drummond's second motion to dismiss (Doc. 34, at 33–4).

[8] Feist explains that the Medical Monitoring Class definition has been modified to conform with his experts' opinions that all persons who have lived in the Class Area for more than three, not four, cumulative years require medical monitoring (Doc. 142, at 17 n.10).

As set out in the following, the undersigned recommends denying Feist's motion in its entirety.

## A. Legal Standard

District courts maintain broad discretion in determining whether to certify a class. *Rensel v. Centra Tech, Inc.*, 2 F.4th 1359, 1364 (11th Cir. 2021); *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1569 (11th Cir. 1992) (citation omitted). Since the class action provides an exception to the general rule that litigation be conducted by and on behalf of the individual named parties only, to justify certification of a class, a class representative must be a member of the class and possess the same interest and suffer the same harm as the class members. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348–49 (2011) (citations omitted). The advocate of the class thus carries the burden of proof to establish the propriety of class certification. *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233–34 (11th Cir. 2016). If the court harbors doubt about whether the party seeking class certification carries that burden, the party loses. *Id.*

In determining whether class certification is appropriate, "Rule 23 establishes the legal roadmap courts must follow." *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003). Namely, Rule 23(a) requires the moving party to demonstrate that:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)(1)–(4). "Failure to establish any one of these four factors and at least one of the alternative requirements of Rule 23(b) precludes class certification." *Valley Drug*, 350 F.3d at 1188 (citation omitted); *see Fitzpatrick v. General Mills, Inc.*, 635 F.3d 1279, 1282 (11th Cir. 2011) ("To satisfy Rule 23, the putative class must meet each of the four requirements specified in 23(a), as well as at least one of the three requirements set forth in 23(b).") (citation omitted).

Accordingly, if a district court determines that the moving party established the numerosity, commonality, typicality, and adequacy-of-representation requirements of Rule 23(a), the court then determines whether the moving party established the requirements of one of three possible categories under Rule 23(b). *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613–14 (1997); *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012) (citations omitted). In this instance, Feist seeks certification of the class pursuant to Rule 23(b)(3) and (2).

Under Rule 23(b)(3), a class action may be maintained if Rule 23(a) is satisfied and if:

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)–(D). Under Rule 23(b)(2), a class action may be maintained if, similarly, Rule 23(a) is satisfied and if:

> the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

Fed. R. Civ. P. 23(b)(2).

In determining the propriety of a class action, the question is whether the moving party meets the requirements of Rule 23, not whether the moving party states a cause of action or will prevail on the merits. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) (citation omitted). Though a district court should not reach the merits of a claim when considering the propriety of class certification, "this principle should not be talismanically invoked to artificially limit a trial court's examination of the factors necessary to a reasoned determination of whether a plaintiff has met her burden of establishing each of the Rule 23 class action requirements." *Love v. Turlington*, 733 F.2d 1562, 1564 (11th Cir. 1984). Instead, the district court can consider the merits of the moving party's claim at the class certification stage to the degree necessary to determine whether the moving party satisfied the requirements of Rule 23. *Heffner v. Blue Cross & Blue Shield of Ala., Inc.*, 443 F.3d 1330, 1337 (11th

Cir. 2006) (citations omitted); *see Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. at 350–51 (stating that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question, . . . and that certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied . . . . Frequently that rigorous analysis will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.") (internal citations, internal alterations, internal quotations, omitted). In doing so, the district court does not determine whether the plaintiff will ultimately prevail on the merits; instead, the district court considers the factual record in determining whether the plaintiff satisfied the requirements of Rule 23. *Valley Drug*, 350 F.3d at 1188 n.15. A class certification ruling therefore does not adjudicate the case but rather selects the method best suited to fairly and efficiently adjudicate the controversy. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 460 (2013). The undersigned will now address each proposed class in turn along with the claims raised.

### B. Property Class

As it relates to Count I (strict liability pursuant to chapter 376, Florida Statutes) and Count II (negligence and negligence per se), Feist seeks to certify the following class:

> **Drummond Property Damage Class ("Property Class")**: Any and all persons that own any residential real property in the Oakbridge &

Grasslands Communities (collectively, the "Class Area") in Polk County, Florida.

(Doc. 142, at 17; Doc. 36, at ¶¶ 111, 133–51). Feist alleges that common questions of law and fact among individuals in the Property Class include:

a. Whether Drummond discharged (or caused any other condition of pollution) a hazardous substance into the land or water on or under the respective Class Area;

b. Whether Drummond is strictly liable for discharging (or caused any other condition of pollution) a hazardous substance into the land or water on or under the Class Area.

c. Whether Drummond, through its acts or omissions, is strictly liable for the contamination on, in, and around the Class Area under Fl. [sic] Stat. § 376.313;

d. Whether Drummond was negligent in its polluting, contaminating, restoring and/or reclaiming, handling, storing, remediating, using, and disposing the presence of radioactive materials and related contamination in the Class Area;

e. Whether Drummond, through its acts or omissions, proximately caused property damage, diminution of property values, cleanup costs and health risks due to radioactive materials and related contaminants mined, deposited, released, enhanced, or abandoned in the Class Area;

f. Whether Drummond, through its acts or omissions, deprived Class Members of the free and reasonable use and enjoyment of their properties due to the contamination of neighboring properties in the Class Area;

g. Whether Class Members, through Drummond's acts, omissions and/or discharges (or other condition of pollution), have suffered damages, including but not limited to property and economic damages; and

h. Whether, as a proximate result of Drummond's conduct, Medical Monitoring Class Members are at a significantly increased risk of disease due to exposures to Drummond's radioactive materials, such that they will benefit from ongoing medical monitoring.

(Doc. 36, at ¶ 119).

### i. Claims

#### 1. Count I

In Count I, Feist seeks relief against Drummond on a theory of strict liability pursuant to Fla. Stat. §§ 376.30–376.319, "including but not limited to" §§ 376.302(1)(a) and 376.305(1).

Section 376.313(3), Florida Statutes, creates a private cause of action "for all damages resulting from a discharge[9] or other condition of pollution" covered by §§ 376.30–376.319. Fla. Stat. § 376.313(3); *see also Curd v. Mosaic Fertilizer, LLC*, 39 So. 3d 1216, 1221–22 (Fla. 2010) (noting that in *Aramark Uniform & Career Apparel, Inc. v. Easton*, 894 So. 2d 20 (2004), the Florida Supreme Court recognized that section 376.313(3) creates a private cause of action). Notably, section 376.313(3) provides that "in any such suit, it is not necessary for such person to plead or prove negligence in any form or manner. Such person need only plead and prove the fact of the prohibited discharge or other pollutive condition and that it has occurred." Fla. Stat. § 376.313(3). Interpreting this language, the Florida Supreme Court compared common law causes of action to this statutory cause of action and found that:

---

[9] With respect to "a discharge," section 376.301(13) defines "[d]ischarge" broadly to include "any spilling, leaking, seeping, pouring, misapplying, emitting, emptying, releasing, or dumping of any pollutant or hazardous substance which occurs and which affects lands and the surface and ground waters of the state." Fla. Stat., § 376.301(13). As for the types of discharge of pollution covered by §§ 376.30–376.319, section 376.302(1)(a) provides that "[i]t shall be a violation of this chapter . . . [t]o discharge pollutants or hazardous substances into or upon the surface or ground waters of the state or lands, which discharge violates any departmental 'standard' as defined in [section] 403.803(13)." Fla. Stat. § 376.302(1)(a).

> section 376.313(3) departs from the common law by creating a damages remedy for the non-negligent discharge of pollution without proof that the defendant caused it. The only proof required is the fact of the prohibited discharge or other pollutive condition and that it has occurred. The absence of a causation requirement in the statute cannot be viewed as a legislative oversight. In other statutes within the same scheme (sections 376.30-376.319), where the Legislature wanted to hold a party responsible only if it actually caused the contamination, it so provided. Therefore, we must assume that the omission of a causation requirement in section 376.313(3) was deliberate.

*Aramark*, 894 So. 2d at 24 (internal citations and quotations omitted). Additionally, plaintiffs who bring claims under section 376.313 need not allege any particular standard has been exceeded to state a claim. *See Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1173–75 (11th Cir. 2014) ("[The p]laintiffs here have alleged that [the defendants] contaminated their property, thereby causing their property values to decline. This alleged injury fits within the broad statutory definition of 'loss' or 'destruction,' even if the plaintiffs have not alleged contamination above the regulatory standard.").

Feist's strict liability count was challenged twice in motions to dismiss (Docs. 16, 41). In response to the first, the Court concluded that Feist could proceed with the chapter 376 strict liability claim, as he had sufficiently pled that there had been a "discharge" of "hazardous substances into or upon the surface or ground waters of the state or lands" pursuant to sections 376.313(3) and 376.302(1)(a) (Doc. 34, at 21). The Court also rejected a statute of limitations challenge to the claim, reasoning that section 376.308 does not contain a statute of limitations defense and "it is reasonable to infer that the Florida Legislature 'deliberately omitted' any statute of limitations or statute of repose defense to a claim under Chapter 376 of the Florida

33

Statutes" (Doc. 34, at 13). While Feist's motion for class certification was pending, Drummond filed a notice of supplemental authority citing *Pinares v. Raytheon Techs. Corp.*, No. 10-80883-CIV, 2023 WL 2868098 (S.D. Fla. Apr. 10, 2023), a case in which the Southern District of Florida held that the four-year statute of limitations applies to chapter 376 claims for alleged radiation (*see* Doc. 228). The decision cites to and specifically rejects this Court's order (Doc. 34) on this issue. *Pinares*, 2023 WL 2868098 at *8–9. However, Drummond has filed no motion for reconsideration nor made any argument on the issue beyond a citation to and parenthetical description of the *Pinares* case. Because the prior holding still stands as the law of this case and has not been directly challenged by Drummond, the undersigned recommends taking no action on the statute of limitations issue.

Drummond again challenged the strict liability count in a motion to dismiss Feist's Second Amended Complaint on different grounds (Doc. 41). Specifically, Drummond argued that Feist's section 376 claim must be dismissed because he "failed to allege specific Florida DEP standards that have been allegedly violated"[10] (Doc. 41, at 13; Doc. 51, at 24 n.11). As Feist's attorney stated at the October 7, 2023 hearing on the motion for class certification, this interpretation of section 376 has been rejected, and plaintiffs who bring claims under section 376 need not allege

---

[10] While ¶ 137 of the Second Amended Complaint alleges Drummond violated "Chapter 62-730, 62-777, 62-780, 62C-16, and/or 64E-5 of the Florida Administrative Code, Part II of Chapter 378, Florida Statutes, 40 C.F.R. § 6262.11, 42 U.S.C. § 6925(a), 40 C.F.R. Part 264, Subparts A-G, K, and CC, and/or 40 C.F.R. Part 268" these authorities are not DEP standards.

any particular standard has been exceeded to state a claim. *See Adinolfe*, 768 F.3d at 1175. The Court rejected the challenge (Doc. 51).

### 2.  Count II

In Count II, on theories of negligence and negligence per se, Feist seeks to recover against Drummond for "property damage, including diminution of property values, the cost of remediation of properties, as well as the cost of periodic medical examinations necessary to detect the onset of physical harm that may be caused by radioactive contaminants" (Doc. 36, ¶ 151). In Florida, negligence requires proof of four elements: (1) duty of care; (2) breach; (3) legal or proximate causation; and (4) actual damages. *Wallace v. Dean*, 3 So. 3d 1035, 1047 (Fla. 2009); *Williams v. Davis*, 974 So. 2d 1052, 1056 (Fla. 2007). To succeed on a negligence claim in this context, plaintiffs need not show a particular level of radiation to demonstrate defendants acted unreasonably; "while the applicable regulatory standard may be instructive for a trier of fact as evidence of what the government deems safe for the public[,] it does not amount to an all-purpose benchmark for determining as a matter of law how much one can reasonably contaminate another's private property…." *Adinolfe*, 768 F.3d at 1174.

The general theory of Feist's negligence and negligence per se claims is that (1) Drummond had a duty to exercise reasonable care in the use of contaminated land for residential and commercial use, (2) Drummond breached that duty by failing to adequately reclaim and restore its mining lands in such a manner, (3) Drummond's breach was foreseeable and, in fact, caused, (4) the potential class

members to suffer damages in the form of diminution in value to their properties, loss of use and enjoyment of their properties, and increased risk of serious latent illness (*see* Doc. 36, at ¶¶ 15, 21, 30, 98–100, 138–39).

In response to Drummond's challenges to Feist's negligence and negligence per se claims, the Court has twice held that Feist stated a claim for negligence and negligence per se (Docs. 34, 51). As part of its order on Drummond's first motion to dismiss, the Court held Drummond owed future landowners a general duty of care and that Plaintiffs could recover under negligence on a purely economic loss (Doc. 34, at 22–26). The Court also held that Florida's general four-year tort statute of limitations, section 95.11(3)(a), Florida Statutes, had not expired because pursuant to section 95.031(1), a cause of action accrues when the last element constituting the cause of action occurs and "any diminution in the value of the Plaintiffs' properties occurred much more recently, when the Plaintiffs filed this action and, in so doing, made public their allegations that the properties are contaminated with elevated levels [of] gamma radiation" (Doc. 34, at 14). Significantly, as will be developed in the following, Feist does not state specifically the date he alleges the diminution of value of the potential class members' properties occurred which renders his class definition problematic.

### 3.  **Forms of Relief Applicable to Property Class**

The property class members seek to recover against Drummond for property damage, diminution of property values, the cost of remediation of properties, and the cost of periodic medical examinations necessary to detect the onset of physical

harm that may be caused by radioactive contaminants on and around their property (Doc. 36, at ¶ 151). In response to the Court's instructions in its order on the motion to dismiss (Doc. 34, at 33–34), the medical monitoring claim was set out as a separate claim and class (Doc. 36, at 41). Thus, certification of the medical monitoring claim will be analyzed separately and not within the analysis of the Property Class. Additionally, at the October 7, 2023 hearing, Feist's attorney withdrew any claim for actual remediation and instead sought relief only for the cost of remediation (*see* Docs. 223–27). Finally, to the extent that Feist sought to recover any damages for emotional distress, Feist's attorney also withdrew those claims (*see* Docs. 223–27). Accordingly, as it relates to the property damage class, the only forms of relief remaining are for the diminution of property values and the cost of remediation.

### ii.  Standing

Prior to the certification of a class, "the district court must determine that at least one named class representative has Article III standing to raise each class subclaim." *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000); *see Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1265 (11th Cir. 2009) (noting that, to certify a class action, the named plaintiffs must have standing, and the putative class must meet all of the requirements of Rule 23(a) in addition to at least one of the requirements in Rule 23(b)). Standing consists of the following three elements: (1) the plaintiff must have suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a

favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citations omitted); *see also TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2203 (2021) ("To answer that question in a way sufficient to establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief.") (citation omitted). More simply, the plaintiff must show that the defendant harmed him, and that a court decision can either eliminate the harm or compensate him for it. *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020). The standard does not change in suits involving class-action allegations because even named plaintiffs who represent a potential class must allege and demonstrate that they personally have suffered injury, not that injury has been suffered by other, unidentified members of the class to which they belong. *Spokeo*, 578 U.S. at 338 n.6. If the named plaintiff does not claim to have suffered an injury caused by the defendant and for which the court can fashion a remedy, no case or controversy exists for a federal court to resolve. *TransUnion*, 141 S.Ct. at 2203.

Drummond raises no challenge to Feist's standing as to property damages. However, Drummond contends that Feist has no standing to impose "remediation" on the surrounding land because he does not own or control the land (Doc. 155, at 22). Feist owns real property located in the Grasslands development and has owned four different properties in the Grasslands development in the last decade (Doc. 36, at ¶ 29). Feist currently rents the property to a tenant and has since 2013 (Doc. 162-

2, at 52:10–15). However, Feist's current ownership interest is in a condominium, which has no acreage other than common areas (Doc. 163-1, at ¶ 9).

The undersigned finds that standing has been established as to Feist. It is unclear from where Drummond draws support for its standing argument given that it has not cited any legal authority, and it appears that the prevailing precedent does not require ownership to determine standing in the environmental context. Notably, the Supreme Court has found standing where litigants have alleged even mere recreational or aesthetic injuries to property not owned by the plaintiff. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) ("The relevant showing for purposes of Article III standing, however, is not injury to the environment but injury to the plaintiff."). In *Parker*, the Eleventh Circuit held the plaintiff had standing to sue the owner of a nearby property despite the plaintiff's failure to allege an aesthetic or recreational injury or riparian ownership of the river which defendant was allegedly contaminating. *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1004 (11th Cir. 2004). It was enough that the plaintiff owned property "near" a facility alleged to have discharged pollutants into navigable waters and the value of their property was diminished, at least in part due to the pollution. *Id.* at 1004 n.11. Moreover, the Eleventh Circuit did not prevent the plaintiff from seeking injunctive relief; in fact, the court reasoned, "an injunction preventing the defendants from allowing such waste to migrate onto the Parker property would redress the injury." *Id.* at 1003. A decade later, the Eleventh Circuit again found a plaintiff had standing where the plaintiff alleged contamination of property it did

not own. *Adinolfe*, 768 F.3d at 1172 ("[W]e summarily reject [defendant's] argument . . . that the plaintiffs lack Article III standing because they have not alleged actual contamination of their properties."). The Eleventh Circuit made this finding where plaintiffs had, among other things, brought Florida common law claims under which "a tort plaintiff seeking to recover for economic harm caused by pollution or contamination need not own property that is itself polluted or contaminated." *Adinolfe*, 768 F.3d at 1178 (citing *Curd*, 39 So. 3d at 1216).

Accordingly, the undersigned recommends finding the named plaintiff, Feist, has standing to pursue both the property damages claim and the remediation claim.

### iii. Certification

#### 1. Adequately Defined and Clearly Ascertainable

Ascertainability serves as an implied prerequisite of Rule 23. *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1302 (11th Cir. 2021). Before a district court can consider whether a potential class satisfies the requisites of Rule 23(a), a class representative must demonstrate that the proposed class is "adequately defined and clearly ascertainable." *Id.* (citation omitted). Class definition and ascertainability typically involve one inquiry because, without an adequate definition for a proposed class, a district court cannot ascertain who belongs in the class. *Id.* For purposes of class certification, "a proposed class is ascertainable if it is adequately defined such that its membership is capable of determination." *Id.* at 1304. Stated differently, a class can be deemed "clearly ascertainable" when a court is certain that its membership is capable of being determined. *Id.* at 1303. Conversely, "[a] class is inadequately

defined if it is defined through vague or subjective criteria." *Id.* at 1302. An adequately defined class thus should be defined by objective criteria with its members identifiable. *Scoma Chiropractic, P.A. v. Dental Equities, LLC*, Case No: 2:16-cv-41-JLB-MRM, 2021 WL 6105590, at *10–11 (M.D. Fla. Dec. 23, 2021).

As to the property class, Drummond contends that the alleged classes are not adequately defined and clearly ascertainable primarily because some residents oppose bringing claims against Drummond (Doc. 155, at 22). It is unclear the relevance this has to the question of whether the class is adequately defined. Moreover, Drummond does not cite any case law to support its position. Given that Drummond raises this argument under the adequacy of representation element of certification, the undersigned will engage in more fulsome analysis there. However, Feist's Property Class definition does suffer from several other more troubling issues.

First, the Class definition is vague in that it does not include temporal restrictions. The Property Class is defined as "[a]ny and all persons that own any residential real property in the Oakbridge & Grasslands Communities (collectively, the 'Class Area') in Polk County, Florida" (Doc. 36, at ¶ 111). It is unclear whether the class, as defined, would include "persons that own[ed]" property as of the filing date of the lawsuit, "persons that own" property currently, or "persons that own[ed]" property as of some other date based on information in the market. Even if the undersigned were to read the definition as those "persons that own" property currently, "current" is another term fraught with difficulty because what is

considered "current" may change throughout the lifetime of the case. Does the class include property owners "current" as of certification of the class, "current" as of a finding of liability, "current" as of whatever date Dr. Zabel's calculation is performed, or "current" as of some other date? Feist's Property Class definition offers no answers to these inquiries and thus it is unclear what property owners would be included in the class.

Additionally, as noted in the *Daubert* analysis, the trigger date has not been defined. Feist's theory of property damage is that Drummond's failed remediation harmed class members when, as a result, publication of the fact of potential or actual contamination was disseminated into the housing market and impacted their property values. As acknowledged by Dr. Zabel, "the information about the extent and level of contamination will continue to change after the initial discovery" and "the total impact on house prices may not occur immediately, as the information about the contamination takes time to become fully realized by buyers and sellers and then capitalized into house prices" (Doc. 143-7, at 6–7). Recognizing this, Dr. Zabel was vague in his report and did not use a specific "trigger" date. Meanwhile, Judge Kovachevich's[11] order on a motion to dismiss, in response to statute of limitations arguments, stated "any diminution in the value of the Plaintiffs' properties occurred much more recently, when the Plaintiffs filed this action and, in so doing, made public their allegations that the properties are contaminated with

---

[11] Judge Kovachevich was originally assigned to the case but the case was reassigned to Judge Barber in 2019 (Doc. 90).

elevated levels gamma radiation" (Doc. 34, at 14). For its part, Drummond argues that information was already in the market "for decades" (Doc. 155, at 31).

But beyond the issue of vagueness lies a more fundamental problem: Regardless of the way in which the Court reads the class definition, it will inevitably include property owners who are *by definition* not injured under one of Feist's requested forms of relief. The Eleventh Circuit addressed a similar issue in *Walewski v. Zenimax Media, Inc.*, 502 F. App'x 857 (11th Cir. 2012). In *Walewski*, the plaintiff filed a class-action lawsuit against the companies that manufactured and marketed a video game asserting various claims based on an animation defect that was contrary to the representations of defendants. *Id.* at 859. The proposed class comprised "[a]ll persons or entities residing in the United States who purchased any version of the *Elder Scrolls IV: Oblivion* video game." *Id.* The district court concluded that the plaintiff had not adequately defined the class and reasoned as follows:

> [T]he proposed class includes all persons or entities nationwide, who purchased any version of the game, presumably from anyone, anywhere, at any time—whether or not they ever were injured by (or experienced) the alleged [a]nimation [d]efect. This overbroad definition is not limited in any way to persons who purchased from Defendants, and therefore presumably includes persons who purchased a copy of the game—new or used—from anyone else.
>
> . . .
>
> Under the definition, for example, a video store which buys the second hand game from a consumer and resells it for more than it paid for it is included in the class, despite the fact that the entity itself never experienced the [a]nimation [d]efect (as it never played the game) and did not suffer any loss.
>
> Even with respect to individuals only, the class definition is wanting. Under that definition, for example, if a teenager purchases a used copy

> from his brother, he is a class member even if he has no complaints about the game, but if his brother gives him the same game as a gift, he is not a class member, even if he experiences the [a]lleged [d]efect. [Walewski] fails to set forth a workable method for identifying which players and owners are correctly included within the class.
>
> . . .
>
> The definition is not only unworkable in terms of identifying class members, it impermissibly includes members who have no cause of action as a matter of law. For example, assuming the [c]ourt were to conclude that Maryland's consumer protection laws were, as pled, applicable to this dispute, . . . [r]etailers and other business who purchased the games for resale purposes [would not have a cause of action under those statutes].

*Id.* at 861. The Eleventh Circuit held that the district court did not abuse its discretion by concluding that the class was not adequately defined or clearly ascertainable and denying class certification. *Id.* Five years later, the Eleventh Circuit again considered the adequacy of a class definition in *Ward v. EZCorp, Inc.*, 679 F. App'x 987 (11th Cir. 2017). In *Ward*, the plaintiff brought a class action alleging the defendant, a pawnshop, was violating the Florida Pawnbroking Act, which provides that a pawnbroker can assess a $2 fee if a pledgor does not present a pawn ticket when retrieving pledged property. *Id.* Critically, the plaintiff argued the $2 fee could be collected only if the pawnbroker has obtained a written statement of the loss, destruction, or theft of the pledgor's copy of the pawn ticket. *Id.* The Eleventh Circuit agreed with the district court that the plaintiff could not show the class was "clearly ascertainable" where the definition did not distinguish an individual "who was charged the $2 fee in connection with a missing pawn ticket

from those that were charged regardless of presenting a pawn ticket." *Id.*[12]

Here, the Property Class definition suffers from a similar fault. No matter which way the court reads the class definition considering the vagueness discussed above, the class suffers from inclusion of members in substantially different positions. Assume for example that Feist's class consists of "persons that" *currently* "own any residential real property in the Oakbridge & Grasslands Communities" (Doc. 36, at ¶ 111). If Feist is able to prevail on his claim for remediation damages, the class would appropriately capture all current property owners who still control the property and could engage in remediation if desired. However, the class would also contain *new* property owners who obtained their property interests within the class boundaries after the "trigger" date. This is a problem because these individuals would not have suffered any property value harm; these individuals would have already benefited from a decrease in market price of the property when they acquired their property interest. As Drummond's expert Dr. Pitts explains "if there was a discount in sales at any point in time, a current owner as of today may … have discounted the sale already if that market knowledge was available at the time of the sale…." (Doc. 156-6, at 195:5–11). Meanwhile, if the Court reads Feist's class

---

[12] The Eleventh Circuit also considered a similar issue in *Bussey* in the context of administrative feasibility. *See Bussey v. Macon County Greyhound Park, Inc.*, 562 Fed.Appx. 782 (2014). Since *Bussey*, the Eleventh Circuit has held that "[p]roof of administrative feasibility cannot be a precondition for certification" nor is it an inherent aspect of ascertainability. *Cherry*, 986 F.3d at 1302, 1303. Though not a precondition for certification, considerations of administrative feasibility may still be relevant for the Rule 23(b)(3)(D) manageability analysis in the context of a predominance inquiry. *See Rensel*, 2 F.4th at 1361; *Cherry*, 986 F.3d at 1303–04.

as though it were measured as of the time of the filing of the lawsuit, the class would exclude all property owners who purchased land after the filing of the lawsuit, fixing the above-described problem but creating another. Now, the class would be appropriate as to property damages because it would only include those persons who either still own the property or may have suffered damages when they sold their property for a lower amount due to the market's reaction to the news regarding the class wide contamination. However, while the class would properly capture those entitled to compensation for property damage, the class would also include those individuals who sold their property since the filing of the lawsuit and no longer hold property interests within the class area. These class members would not be entitled to remediation damages, and indeed likely have no standing to be entitled to remediation damages, because they no longer have a special interest in the property.[13]

Regardless of any attempts to resolve the vagueness problems of Feist's Property Class definition, the class suffers from inclusion of members in substantially different positions. Under one interpretation, the class includes members who have not suffered an injury that is redressable by an award of property damages because they benefited from the alleged reduced price of the property post-filing of the case. Under the other interpretation, the class includes members who have since sold their property and no longer own property damaged by Drummond

---

[13] This analysis differs from the question of standing for Feist himself because he still has a condominium ownership interest in the property. In this example, the hypothetical plaintiffs would no longer have any ownership interest in the property.

and thus, not redressable by remediation. As this Court recently described, "a class that includes persons who suffered no harm due to the actions of a defendant is not adequate." *See Nguyen v. Raymond James & Assocs., Inc.*, No. 8:20-CV-195-CEH-AAS, 2022 WL 4553068, at *8 (M.D. Fla. Aug. 12, 2022).

For the reasons stated, not only is Feist's Property Class definition vague, but it is inadequate. However, before concluding the motion should be denied for this reason, the court must consider whether to redefine the class on Feist's behalf. "[W]here the named plaintiff has no real opportunity to request certification of subclasses after his proposed class is rejected, an obligation arises for the district court to consider subclassification." *Heaven v. Tr. Co. Bank*, 118 F.3d 735, 738 (11th Cir. 1997). Here, any adjustments that would remedy the Property Class's deficiencies would require significant alterations to Feist's pleadings. The Court would be required to strike a form of damages and impose its own temporal restrictions on the class, excising some potential class members and maintaining others. Critically, the "trigger" date is a contested issue. For the court to *sua sponte* redefine the class by deciding this contested issue would have significant downstream impacts for Feist's case. The undersigned is disinclined to engage in such line-drawing for the sake of saving Feist's motion and recommends that the Court not do so. *See Karhu v. Vital Pharms., Inc.*, No. 13-60768-CIV, 2014 WL 815253, at *11 (S.D. Fla. Mar. 3, 2014), *aff'd*, 621 F. App'x 945 (11th Cir. 2015) ("[T]he Court declines to drastically redefine the action *sua sponte* as one only on behalf of New York consumers."); *Polo v. Goodings Supermarkets, Inc.*, 232 F.R.D.

399, 409 (M.D. Fla. 2004) (refusing to revise an overly broad class definition *sua sponte* and denying leave to amend complaint); *Walewski*, 502 F. App'x at 861 (holding district court did not abuse its discretion for failing to allow the *named plaintiff* to amend his own class definition).

Thus, it is recommended that Feist's Property Class be rejected. Feist's definition is fatally flawed and should prohibit the certification of the Property Class. Further, as will be more fully developed in turn, Feist's unworkable property class definition causes problematic challenges to the predominance and superiority inquiries pursuant to Rule 23(b)(3).

## 2.  **Rule 23(a)**

Though Feist's Property Class should fail before even reaching the Rule 23 inquiry, the undersigned will nonetheless address whether Feist can establish the Rule 23 requirements for class certification.[14] Under Rule 23(a), one or more members of a class may sue as representative parties on behalf of all members only if the movant establishes the numerosity, commonality, typicality, and adequacy-of-representation requirements.  Fed. R. Civ. P. 23(a)(1)–(4).

### a.  **Numerosity**

Initially, Feist must demonstrate that the class is so numerous that joinder of all members would be impracticable. Fed. R. Civ. P. 23(a)(1). To establish

---

[14] Traditionally, the inquiry would end with a finding that a class definition precludes certification. "Without an adequate class definition, a district court would be unable to evaluate whether a proposed class satisfies Rule 23(a)." *Cherry*, 986 F.3d at 1303. However, because this motion comes before the undersigned for a Report and Recommendation, it is necessary to analyze the remaining requisites of Rule 23.

numerosity, the moving party typically must demonstrate either some evidence or a reasonable estimate of the number of purported class members. *Kuehn v. Cadle Co., Inc.*, 245 F.R.D. 545, 548 (M.D. Fla. 2007) (citation omitted); *cf. Vega*, 564 F.3d at 1267 (noting that, while mere allegations of numerosity are insufficient, a plaintiff need not show the precise number of members in the class). Though no fixed numerosity rule exists, courts generally determine less than twenty-one members of a proposed class is inadequate to establish numerosity and more than forty members of a proposed class is adequate to establish numerosity, with numbers between varying based upon other factors. *See Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986); *see Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 878 (11th Cir. 1986) (concluding that a district court did not abuse its discretion in finding that the numerosity requirement had been met where a plaintiff identified at least 31 individual class members). While the moving party bears a minimal burden to make *some* showing of numerosity, the party need not show the precise number of members in the class. *Vega*, 564 F.3d at 1267. Indeed, the numerosity requirement presents a "generally low hurdle." *Id.*

Drummond makes no argument pertaining to numerosity (*see* Doc. 155). The undersigned finds that the numerosity requirement is satisfied to warrant class treatment as the proposed class consists of more than 1,000 properties.

### b.  **Commonality**

Feist must next establish commonality, or that there exists questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). While both the commonality

and typicality requirements focus on whether a sufficient nexus exists between the legal claims of the named class representatives and those of individual class members, commonality pertains to the group characteristics of the class as a whole, whereas typicality pertains to the individual characteristics of the named plaintiff in relation to the class. *Piazza v. Ebsco Indust., Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001) (citations omitted); *Prado*, 221 F.3d at 1278. To meet the commonality requirement, the moving party must demonstrate that the class action involves issues susceptible to class-wide proof. *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1355 (11th Cir. 2009) (citation omitted). The burden of establishing commonality is "relatively light." *Vega*, 564 F.3d at 1268. Essentially, the moving party must show that the determination of the truth or falsity of a common contention will resolve an issue that is central to the validity of each of the claims in one stroke. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. at 350. Commonality therefore requires "at least one issue whose resolution will affect all or a significant number of the putative class members." *Williams*, 568 F.3d at 1355 (citation and internal quotation marks omitted). Notably, "Rule 23 does not require that all the questions of law and fact raised by the dispute be common." *Cox*, 784 F.2d at 1557 (citations omitted).

In this instance, Feist contends that there are several common questions of law and fact because the claims arise out of Drummond's common course of conduct (Doc. 142, at 19). Specifically, Feist argues that Drummond's discharge of pollution in the Class Area through its mining and reclamation activities, construction of residential homes atop the pollutants, failure to disclose the

pollutants to purchasers, and failure to properly remediate the Class Area properties are all common to the class (Doc. 142, at 18–19).

In opposition, Drummond argues there are no "common answers apt to drive the resolution of the litigation." (Doc. 155, at 22 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. at 350)). Drummond points to Feist, who Drummond argues "has safe radiation levels, no dose evaluation, and no control over the outdoor area" (Doc. 155, at 22). Drummond argues it did not mine his neighborhood or discharge pollution onto Feist's condo, did not sell him the condo, and made no false representations of fact to Feist (Doc. 155, at 23). Drummond contends that this means no central common questions will prove Feist's claims as well as other residents' claims (Doc. 155, at 23). Drummond also points to dissimilarities in economic impact because Feist has failed to show even one transaction since the suit was filed has resulted in a diminished value of the property (Doc. 155, at 23).

Notwithstanding Drummond's arguments, for purpose of Rule 23(a)(2), even a single common question will do. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. at 359. This case centers on Drummond's alleged discharge of pollution in the Class Area through its mining and reclamation activities, construction of residential homes atop the pollutants, and failure to properly remediate the Class Area properties. The question of whether Drummond engaged in those activities is a factual question common to all members of the putative class. Moreover, the question of Drummond's liability for those acts is a common question that, in most respects, requires proof of the same material facts. All members of the putative class and

subclass would be affected by the issues surrounding Drummond's discharge, construction, and failure to remediate. Thus, the undersigned finds the commonality requirement is satisfied because one common issue is sufficient to meet the commonality requirement of Rule 23.

### c. Typicality

Class certification also requires that the claims of the class representatives be typical of those of the class. *See* Fed. R. Civ. P. 23(a)(3). To establish typicality, "there must be a nexus between the class representative's claims or defenses and the common questions of fact or law which unite the class." *Kornberg v. Carnival Cruise Lines, Inc.,* 741 F.2d 1332, 1337 (11th Cir. 1984). "A sufficient nexus is established if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *Id.* "A class representative must possess the same interest and suffer the same injury as the class members in order to be typical under Rule 23(a)(3)." *Murray v. Auslander,* 244 F.3d 807, 811 (11th Cir. 2001). Moreover, "if proof of the representatives' claims would not necessarily prove all the proposed class members' claims, the class representatives' claims are not typical of the proposed members' claims." *Brooks v. S. Bell Tel. & Tel. Co.,* 133 F.R.D. 54, 58 (S.D. Fla. 1990) (citation omitted). "Typicality, however, does not require identical claims or defenses." *Kornberg,* 741 F.2d at 1337. "A factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the class." *Id.*

Drummond argues that Feist has failed to prove typicality. Drummond contends "Feist's circumstances are atypical from his inflammatory allegations because he claims not to have known that the Development was built on former phosphate land, did not purchase from Drummond, and has no economic losses or health effects" (Doc. 155, at 23). Drummond does not point to record evidence which would show other class members are different from Feist in these respects. Moreover, "[e]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories." *In re Checking Acct. Overdraft Litig.*, 307 F.R.D. 630, 642 (S.D. Fla. 2015). As already described in the common questions inquiry, there are common legal and factual questions among the class members and those legal theories are shared by Feist. Accordingly, the undersigned finds Feist meets the typicality requirement.

d.   **Adequacy of Representation**

Finally, Feist must satisfy the adequacy-of-representation requirement, which requires the representative party in a class action to fairly and adequately protect the interests of those he purports to represent. Fed. R. Civ. P. 23(a)(4); *Valley Drug*, 350 F.3d at 1189. There are two separate inquiries under Rule 23(a)(4): (1) whether there are any substantial conflicts of interest between the named representatives of the class and the class members; and (2) whether the representatives will adequately prosecute the action. *See Busby v. JRHBW Realty, Inc.,* 513 F.3d 1314, 1323 (11th Cir. 2008) (citing *Valley Drug Co.,* 350 F.3d at 1189). This requirement serves to uncover any conflict of interest that named parties may

have with the class they represent. *See Amchem Prods.,* 521 U.S. at 625. "If substantial conflicts of interest are determined to exist among a class, class certification is inappropriate." *Valley Drug Co.,* 350 F.3d at 1189. Minor conflicts alone will not defeat class certification, the conflict must be "fundamental" to the specific issues in the case. *Id.* A fundamental conflict of interest has been found, for example, "where some [class] members claim to have been harmed by the same conduct that benefitted other members of the class," or where the economic interests and objectives of the named representatives differ significantly from the economic interests and objectives of the unnamed class members. *Valley Drug Co.*, 350 F.3d at 1189–90. Under this section, the Court must also consider the competency and any conflicts that the class counsel may have. *See Amchem,* at 627 n.20.

Drummond argues Feist and his counsel are in conflict with the economic interests of the residents and property owners, stating property owners oppose the class and will be harmed financially by stigmatizing their neighborhood as a "contaminated site." Drummond supports this contention with twenty affidavits of residents stating that they oppose certification (Doc. 155-2, at 2–219). Feist has "lost friendships" in the development over his claims (Doc. 162-2, at 96:20). Elsewhere in Drummond's response, Drummond states that Feist has not attended any of the 22 depositions, except his own, and none of the Court hearings held in relation to this matter (Doc. 164-21, at ¶ 4). Feist states that he has not attempted to speak to, or otherwise communicate with, the residents about the lawsuit or their views of the issues (Doc. 155-2, at 2–219; Doc. 162-2, at 94:4–10).

Contrary to Drummond's contentions, Feist's interests are not fundamentally averse to the opposing residents. A disqualifying conflict would exist where the named representative's and the other class member's motivations and economic interests differ significantly. In *Pickett*, for example, the appellate court reversed the district court decision granting class certification to plaintiffs where the class definition included cattle producers who claimed to have been harmed by contracts and marketing agreements that some of the unnamed members of the class had benefitted from, reasoning that "a class cannot be certified when its members have opposing interests or when it consists of members who benefit from the same acts alleged to be harmful to other members of the class." *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000). Even though the class definition presently may include potential class members who did not suffer harm from Drummond as outlined in the foregoing, Feist does not "claim to have been harmed by the same conduct that *benefitted*" those other members of the class. *See also Valley Drug Co.*, 350 F.3d at 1189–90 (emphasis added).

Disagreement and personal conflict over whether to pursue such claims are similarly unavailing. While Feist may have "lost friends" over the course of this litigation, a "conflict" for these purposes is not simply that the named plaintiffs and class members do not get along or disagree. *See Groover v. Michelin N. Am., Inc.*, 192 F.R.D. 305, 306 (M.D. Ala. 2000) ("The fact that some class members may be satisfied with the welfare benefits they are currently receiving, notwithstanding any alleged contractual violation, and would prefer to maintain the status quo and leave

violations of their rights, if violations exist, unremedied is not dispositive under Rule 23(a).")." To the extent these residents fear that they will be harmed financially by stigmatizing their neighborhood as a "contaminated site" by pursuit of this litigation, this harm has already likely been done to some extent by the initial filing of the case. In essence, the "cat is out of the bag." Moreover, news of the alleged contamination is the damaging factor, not Feist's pursuit of the litigation. And even if the litigation caused the diminution of property values by lending credence to Feist's claims, it cannot be said that his continued pursuit of this litigation is antagonistic or in substantial conflict with the rest of the class.

Finally, Feist and his counsel will adequately prosecute the action. Though Drummond criticizes Feist for not attempting to communicate with other residents about the suit and for not attending any deposition beyond his own, Feist has cooperated in discovery and attended his own deposition where he answered counsel's questions and described the nature of the claims without issue (Doc. 162-2, at 115:3–17). Feist has also retained counsel who are qualified to pursue this class action. Further, Drummond does not challenge the qualifications of Plaintiff's counsel.

Accordingly, the undersigned finds that there are no substantial conflicts of interest between Feist and other potential class members, and that Feist and his counsel will adequately prosecute the action. *Busby,* 513 F.3d at 1323.

### 3.  Certification pursuant to Rule 23(b)(3)

As noted above, Feist asserts that the putative class also meets the

requirements under Rule 23(b)(3) for property damages and cost of remediation. Specifically, Feist contends that the putative class satisfies the requirements regarding predominance of common issues and superiority of the class action to other means of litigation. Fed. R. Civ. P. 23(b)(3).

### a. **Predominance**

"[P]redominance … is perhaps the central and overriding prerequisite for a Rule 23(b)(3) class." *Vega*, 564 F.3d at 1278 (citation omitted). To satisfy the predominance requirement, the moving party must demonstrate that the issues in the class action subject to generalized proof, and therefore applicable to the class, predominate over the issues subject only to individualized proof. *Babineau v. Fed. Exp. Corp.*, 576 F.3d 1183, 1191 (11th Cir. 2009); *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir. 1997) (citations omitted). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 623. The predominance inquiry thus focuses upon the legal or factual questions that qualify each class member's case as a genuine controversy and, therefore, is a far more demanding requirement than the commonality requirement under Rule 23(a). *Jackson*, 130 F.3d at 1005; *see Vega*, 564 F.3d at 1270. Predominance requires more than just the presence of common issues. The common issues must outweigh and predominate over any individualized issues involved in the litigation. *Muzuco v. Re$ubmitIt, LLC*, 297 F.R.D. 504, 518 (S.D. Fla. 2013). Common issues of fact and law will predominate where they directly impact every class member's effort to

establish liability and every class member's entitlement to monetary relief. *Babineau*, 576 F.3d at 1191. If, practically speaking, the resolution of an overarching common issue breaks down into an unmanageable variety of individual legal and factual issues, common issues will not predominate. *Id.*

To determine whether a party satisfies the requirement of predominance, a court must first identify the parties' claims and defenses and their elements and then classify the issues as either common questions or individual questions by predicting how the parties will prove them at trial. *Brown*, 817 F.3d at 1234; *see Babineau*, 576 F.3d at 1191 (indicating that courts conducting a predominance inquiry must examine the claims, defenses, relevant facts, and applicable substantive law to determine the degree to which resolution of the class-wide issues will further each individual class member's claim against the defendant). In this context, an individual question asks whether members of the proposed class will need to present evidence that varies from member to member, whereas a common question asks whether the same evidence will suffice for each member to establish a *prima facie* showing or whether the issue is susceptible to generalized, class-wide proof. *Tyson Foods*, 577 U.S. at 453. Importantly, "[w]hen one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.* at 453–54 (citation and internal quotation marks omitted). If, however, plaintiffs must still introduce a great deal of

individualized proof or argue several legal points to establish most or all of the elements of their individualized claims after adjudication of the class-wide issues, such claims do not warrant class certification under Rule 23(b)(3). *Vega*, 564 F.3d at 1270 (quoting *Klay*, 382 F.3d at 1255). Where common issues predominate over individualized issues, the addition or subtraction of any of the plaintiffs to or from the class should not substantially affect the substance or quantity of evidence offered. *Vega*, 564 F.3d at 1260 (quoting *Klay*, 382 F.3d at 1255). Stated differently, individual issues will be deemed important if the addition of more plaintiffs to a class requires the presentation of significant amounts of new evidence, while, on the other hand, common issues will be deemed to predominate if the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs relatively undisturbed. *Vega*, 564 F.3d at 1260 (quoting *Klay*, 382 F.3d at 1255). Simply put, the same evidence will suffice for each member for common questions, but evidence will vary from member to member for individual questions. *Brown*, 817 F.3d at 1234.

As already stated, the predominance determination includes questions relating to damages. *See Tyson Foods*, 577 U.S. at 453–54; *Amgen*, 568 U.S. at 460. However, "the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate." *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003). Instead, individual damages issues predominate "if computing them will be so complex, fact-specific, and difficult that the burden on the court system would be simply intolerable" or if "significant

individualized questions go[ ] to liability." *Brown*, 817 F.3d at 1240 (quotations omitted). "Individualized damages issues are … least likely to defeat predominance where damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods." *Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1179 (11th Cir. 2010) (internal quotation marks and citation omitted). At the class-certification stage, "a model purporting to serve as evidence of damages . . . must measure only those damages attributable to" plaintiffs' theory of liability in the case. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). "And for purposes of Rule 23, courts must conduct a rigorous analysis to determine whether that is so." *Id.* (quotation omitted). As such, a court must not only evaluate whether a damages calculation "provide[s] a method to measure and quantify damages on a class wide basis," but also whether such a methodology constitutes "a just and reasonable inference" or whether it is "speculative." *Id.* Finally, in the analysis of a damages methodology based on averages, the focus is on "whether the sample at issue could have been used to establish liability in an individual action." *Tyson Foods*, 577 U.S. at 458.

Feist attempts to prove his case—and those on whose behalf he brings this action—by showing the Class Area is *entirely* afflicted by radioactive pollution. Feist's core theory of the case is that Drummond mined the land on which the Class Area sits and spread the radioactive wastes back into the stripped mine before developing the property, resulting in a somewhat uniform distribution of radioactive materials across the Class Area. Feist supports the theory that the entire Class Area

is afflicted by radioactive pollution with "hundreds of thousands of actual measurements . . . based on reliable methods, robust scientific and statistical proof" as well as "Drummond's own stated goal … to achieve 'an average or uniform value' of 'radiation materials' 'over the entire site.'" (Doc. 165, at 9 (citing Doc. 147-1, at 20)).[15] Thus, were this case to proceed to a trial, Feist would attempt to prove Drummond's liability on the claims with *class wide* evidence. Said differently, Feist anticipates that he would ask the trier of fact to decide whether the Class Area is *entirely* contaminated beyond a legal threshold, or it is *entirely not* contaminated beyond a legal threshold based on Drummond's conduct toward the entire class. To put it broadly, under Feist's theory, the entire class would rise or fall together.

Drummond, on the other hand, does not view the case so generally. Drummond contends that the case would require individual inquiries into the levels of radiation at each individual's property to determine questions of dose. However, if the class were to be certified and tried as a class, Feist will either succeed by convincing the trier of fact that the whole Class Area is contaminated above a threshold or will fail because he cannot show the entire class is contaminated.

---

[15] Among these sources are Drummond's own surveys of radiation levels across the Class Area, submitted as part of its Application for Development Approval (Doc. 144-1, at 35 (showing no contours below 10 microrem/hr) and data from the Polk County Health Department ((*see* Doc. 146-1, at 3 (finding portions of the area unsuitable for residential development); Doc. 146-2, at 2–3 (finding radiation above background, averaging 18 uR/hr across the Class Area, and "that a significant number of the homes built on this property will probably have indoor radiation levels greater than the recommended Federal guidelines")).

Drummond does not cite any case law indicating Feist, as a matter of law, cannot prove his claim in this manner.

Drummond lists sixteen issues that it contends predominate over the common questions (Doc. 155, at 26–32).[16] Upon review, Drummond's sixteen issues related to predominance are mostly misguided. The following issues are merits questions that go to Feist's measurements of radiation:

> 1. Feist does not have harmful levels of radiation in his condo. Ex. 2, Opinions 1, 2 and § XIV, pp. 35-37. He rents his condo to a tenant. Feist's low levels illustrate the need for individual testing of each residence and negates the value of surveys or "averages."

> 2. Generic evidence or "averages" cannot prove individual radiation levels on any specific property or for any specific individual. Even Feist's alleged "adjusted" RadEye readings vary from 7 ur/hr. to 56 ur/hr. This is a substantial variation that requires individual testing of each location and dose assessment of each resident. Ex. 2. Drummond disputes Feist's "adjustments" and will insist on individual testing as critical to determine dose under the Florida standards.

> . . .

> 4. Plaintiff's radiation surveys only cover outdoor yards from 27 residences, not indoors. Ex. 47, pp. 61-63. Feist effectively acknowledges that indoor areas are shielded – which is critical since residents spend the vast majority of their time indoors. The EPA estimates that "Americans, on average, spend approximately 90 percent of their time indoors." Ex 52. Even outdoor activity in this Development is likely to be on a shielded surface such as an enclosed pool/patio area, garage, driveway, sidewalk, or street. Ex. 28. In addition, residents in this Development do not have vegetable gardens, grow their own food, or ingest soil, as Feist has incorrectly assumed in

---

[16] Some issues raised by Drummond pertain to the fraud class (issue 10), the medical monitoring class (issues 5, 9, and 14), and the remediation request (issues 6, half of issue 7, and 11). Issue 12 concerns emotional distress, which Feist specifically waived at the hearing. Issue 16 does not concern predominance and is a mere summary of Drummond's arguments.

> calculating averages under RESRAD. Id. Away from home, residents spend time at work, shopping, travelling, recreation, socializing, appointments, and other activities, which affect the amount of time spent in the Development and create potential exposure and dose from other sources. Ex. 28. Thus, each resident will have unique and different circumstances.

(Doc. 155, at 26–27). However, these issues raised by Drummond do not directly affect the predominance inquiry as it relates to liability. As discussed extensively at the hearing, Florida law does not require specific measurements to prove liability under chapter 376 or under Feist's negligence claim. *See Adinolfe*, 768 F.3d at 1175 ("[The p]laintiffs here have alleged that [the defendants] contaminated their property, thereby causing their property values to decline. This alleged injury fits within the broad statutory definition of 'loss' or 'destruction,' even if the plaintiffs have not alleged contamination above the regulatory standard."). Accordingly, it is a jury question as to the applicable threshold beyond which liability lies. Drummond has produced no authorities to the effect that as a matter of law Feist is prevented from choosing to pursue his claim on a class wide basis. Moreover, Drummond's statement that "[g]eneric evidence or 'averages' cannot prove individual radiation levels on any specific property or for any specific individual" is incorrect as a matter of law. Indeed, the Supreme Court has permitted the use of averages to measure class wide damages in some circumstances, explaining that "[w]hether a representative sample may be used to establish class wide liability will depend on the purpose for which the sample is being introduced and on the underlying cause of action." *Tyson Foods*, 577 U.S. at 460. Not only does chapter 376 not require contamination beyond a certain threshold, it also does not prescribe

any particular methodology for quantifying contamination. Chapter 376 requires the contamination merely be "in quantities which are or may be potentially harmful or injurious to human health or welfare, animal or plant life, or property or which may unreasonably interfere with the enjoyment of life or property, including outdoor recreation." Fla. Stat. § 376.031(17). Discussion of the propriety of the methods by which radiation levels are measured is superfluous. Drummond's arguments merely cast shade on the persuasiveness of the measurements taken to support Feist's claim.

The following additional issues raised by Drummond are primarily issues which go to the merits of Feist's damages claims as opposed to predominance:

> 7. Feist has not shown any diminished property value attributable to former mining and reclamation. Property values have increased (not decreased) since this case was filed in 2017, and will need to be evaluated by individual appraisals or actual sales transactions, not "Trial by Formula," which has been rejected by the Supreme Court. *Wal-Mart*, 564 U.S. at 368. Ex. 5, Opinions 89-110; pp. 23-29. Home buyers have individual preferences that are unique and variable. Some may prefer location, gated community, access to shopping, recreation facilities, and so forth. Living in a community with fully reclaimed phosphate land may play no role in property values. Exs. 1, 28. Research conducted by Feist's expert (not in this Development) shows that the impact of alleged contamination can be zero, positive, negative, or temporary. Ex. 48, pp. 39, 45, 51,82.

(Doc. 155, at 28–29). Again, these issues raised by Drummond do not go to demonstrating individualized issues predominate but rather the merits of Feist's and the class members' purported damages. Moreover, the variables that may affect property values have been analyzed above in the context of the *Daubert* motion. To

the extent there are individualized issues in the damages context, Feist's challenges

with class wide damages calculation will be analyzed at length below.

Further, these following issues raised by Drummond each pertain to its

affirmative defenses:

> 8. In addition, there have been numerous residential sale transactions after these claims were publicized in March, 2017. Ex. 5, Opinions 89 - 110. These purchasers were on notice of Feist's highly publicized claims and purchased anyway. In addition, purchasers prior to 2017 were on notice of the "well documented "presence and location of naturally occurring radiation ("NORM") in phosphate, including the Development. Ex. 43, p. 2. This knowledge supports Drummond's defenses of assumption of risk, comparative negligence, ratification, and consent that will apply individually to potential class members.

> . . .

> 13. Public record information has been available for decades regarding the Development. Exs. 28, 34, 35, 36, 55. Indeed, much of Feist's case is built on 40-year old public records readily available to individual [sic]. Individual review of limitations issues is required under Florida's four year statute of limitations applicable to the alleged class claims. Fla. Stat. §95.11(3).

> . . .

> 15. Potential class members who purchased from Drummond have enforceable mandatory arbitration provisions and class action waivers, which require individual adjudication. Ex. 28.

(Doc. 155, at 29, 31). These affirmative defenses do not cause individualized

predominance issues that would preclude certification. The general rule is that

"[c]ourts traditionally have been reluctant to deny class action status under Rule

23(b)(3) simply because affirmative defenses may be available against individual

members." *Brown*, 817 F.3d at 1240–41 (quoting Newberg on Class Actions § 4:55)

(quotations omitted). Like damages, affirmative defenses are often easy to resolve and district courts have several tools available to manage them. *See Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 297 (1st Cir. 2000). At this stage, Drummond's argument that the knowledge of each class member would overwhelm the litigation is unpersuasive, at least as to the Property Class. Furthermore, the issue of statute of limitations has already been decided on a motion to dismiss (Doc. 34, at 13–4).

Finally, Drummond argues it did not mine the land where Feist's condo is located:

> 3. Neither Drummond nor Poseidon mined the land where Feist's condo is located or discharged pollution on the site. This defeats Feist's claim for a discharge of pollution under Fla. Stat. §376.313. Poseidon only engaged in secondary recovery, and only on 14.4% of the 1,450 acres of the Development. The location of secondary recovery by Drummond (and any impact, if at all) must be determined on an individual property basis. Ex. 27.

(Doc. 155, at 27). Section 376.313(3) provides that "in any such suit, it is not necessary for such person to plead or prove negligence in any form or manner. Such person need only plead and prove the fact of the prohibited discharge or other pollutive condition and that it has occurred." Fla. Stat. § 376.313(3). Thus, chapter 376 does not require that Drummond have caused the condition of pollution. *Aramark*, 894 So. 2d at 24 ("[S]ection 376.313(3) departs from the common law by creating a damages remedy for the non-negligent discharge of pollution without proof that the defendant caused it."). Accordingly, there would be no individual

issues to consider because Drummond's location of mining is immaterial, at least as to the chapter 376 claim.[17]

On this theory of liability, at first blush, Feist presents a compelling case that no individualized issues predominate to a level that should preclude class certification as to the Property Class.[18] However, as detailed above, Feist's class definition makes Feist's Property Class unworkable. Worse, Feist's overbroad class definition as well as Feist's own experts, Dr. Zabel and Dr. Bland, illuminate the numerous individual inquiries that would be inherent to the Property Class. Fundamentally, the class suffers from inclusion of members in substantially different positions necessitating individualized inquiries to sort out damages and standing. While Feist's general approach as to liability may be sound, the practical application of Feist's pleadings bely certification.

First, the class may be predominated by standing inquiries. While the undersigned has recommended the court find the named plaintiff, Feist, has standing, the question of whether potential class members have standing has not been addressed. The question of individual class members' standing is not one that

---

[17] On the other hand, Feist's common law claim "requires proof that the defendant caused the pollution resulting in the damages." *Aramark*, 894 So. 2d at 23. However, Feist's theory of liability under negligence is instead that Drummond breached its duty by failing to adequately reclaim and restore its mining lands which caused Plaintiffs to suffer damages, not the mining itself, making the location of the mine again immaterial (*see* Doc. 36, at ¶¶ 15, 21, 30, 98–100, 138–39).

[18] It should be noted that Feist's theory of liability is not without its challenges, as Drummond has asserted numerous defenses to Feist's theory of liability, to include the argument that the Florida Department of Health has disagreed with Feist's allegations of elevated levels of pollution and issued letters to residents to this effect, assuring residents that their particular home's levels were "in the range of normal Florida background" (*see generally* Doc. 164-1).

necessarily must be answered at the certification stage; indeed, the Supreme Court recently declined to answer that question. *TransUnion*, 141 S. Ct. at 2207–08, 2208 n.4 ("We do not here address the distinct question whether every class member must demonstrate standing before a court certifies a class. *See, e.g., Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1277 (CA11 2019)."). While class members may not be required to establish standing at the certification stage, "[e]very class member must have Article III standing in order to recover individual damages." *TransUnion*, 141 S. Ct. at 2207–08. Important to this case, "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *Id.* at 2207 (citations omitted); *see Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008); *Friends of the Earth*, 528 U.S. at 185. Whether absent class members can establish standing instead may be relevant to the class certification analysis required by Rule 23. *See Williams*, 568 F.3d at 1358; *see also* 1 William B. Rubenstein, Newberg on Class Actions § 2:3 (5th ed. 2016) ("Most courts concerned about the standing of absent class members are in fact concerned about whether the class is properly defined . . . . In this sense, the problem of un-injured absent class members is a problem of Rule 23, not of Article III."). The Eleventh Circuit in *Cordoba* held that a "district court must consider under Rule 23(b)(3) before certification whether the individualized issue of standing will predominate over the common issues in the case, when it appears that a large portion of the class does not have standing . . . and making that determination for these members of the class will require

individualized inquiries." *Cordoba v. DIRECTV, LLC,* 942 F.3d 1259, 1277 (11th Cir. 2019).

As discussed in the context of Feist's Property Class definition, regardless of the way in which the court resolves the definition's vagueness issues, it inevitably includes property owners who are *by definition* not injured under one of Feist's requested forms of relief. Under one interpretation, the class includes members who have not suffered an injury that is redressable by an award of property damages because they benefited from the alleged reduced purchase price of the property post-filing of the case. Under the other interpretation, the class includes members who have since sold their property and no longer own property damaged by Drummond and thus, have not suffered an injury redressable by remediation. It is of course true that "the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate." *Allapattah*, 333 F.3d at 1261. However, individualized damages issues will predominate if "significant individualized questions go[ ] to liability." *Brown*, 817 F.3d at 1240 (internal quotation marks omitted) (citing *Klay*, 382 F.3d at 1260). The undersigned does not purport to recommend any definitive holdings regarding these hypothetical persons' standing or ability to prove damages. However, while class members may not be required to establish standing at the certification stage, every class member must eventually have Article III standing in order to recover individual damages, *TransUnion*, 141 S. Ct. at 2207–08, and each class member will have to show standing for each form of relief, property damages and remediation. *TransUnion*,

141 S. Ct. at 2207; *Davis*, 554 U.S., at 734, 128 S.Ct. 2759; *Friends of the Earth*, 528 U.S. at 185. It is apparent that individual inquiries will be required to sort out these matters in relation to Rule 23.[19] Moreover, these inquiries are wrapped up in questions of liability in the sense that standing is a jurisdictional issue that must be established at every stage of litigation. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (stating a plaintiff must demonstrate standing "with the manner and degree of evidence required at the successive stages of the litigation").

Furthermore, Feist's class certification is not saved by his proposed class wide damages methodologies; in fact, the proposed methodologies highlight the individualized inquiries that would be intrinsic to Feist's class. Feist provided the Court with a proposed common methodology for calculating (1) property damages based on Dr. Zabel's hedonic regression model and (2) remediation based on Dr. Bland's report. This, without more, would tend to show that individualized issues are less likely to predominate. *See Sacred Heart Health Sys.,* 601 F.3d at 1179. However, as noted in the *Daubert* analysis, Dr. Zabel's report is unhelpful to the trier of fact because it fails to explain how each class member's damages would be actually calculated and is therefore disconnected to the inquiry before the Court.

---

[19] In *Cordoba*, as here, "[t]he record [did] not reveal much about the makeup of the [] class" and the court had no "indication of how many members of the . . . putative class have standing to sue." *Cordoba*, 942 F.3d at 1277. Worse, the court cannot speculate given that the class definition lacks temporal constraints. In other words, the court would be unable to identify home sales after a certain point in time because that time has not been defined. As discussed already, the undersigned is disinclined to recommend the court engage in a *sua sponte* reworking of Feist's class definitions because this trigger date is a contested factual issue.

Even if the Court were to deny the *Daubert* motion and accept the expert opinion into evidence, the report would not allow Feist to make the proper showing for the same reason it is unhelpful under *Daubert*: the report stops short of showing how damages would actually be allocated class wide. Thus, because Dr. Zabel's opinion is silent as to how the class members' properties would be valued, it seems that an individualized inquiry must be undertaken as to each of the 1000 properties contained in the proposed class. Feist himself acknowledges that were the Court be required to undergo these individualized inquiries "it would inevitably cause undue burden and expense on the litigants by requiring 1,000 separate property evaluations" (Doc. 181, at 20 n.7). The undersigned agrees.

Feist's remediation damages theory is similarly deficient. Feist relies predominantly on Dr. Bland's theory that remediation is required "class wide" based on the as low as reasonably achievable (ALARA) philosophy (Doc. 142, at 14). Dr. Bland states that "[g]iven the current residential use and the potential for any future unrestricted use, remediation of the Class Area is required" (Doc. 142-7, at 7). There is "widespread contamination across the class area" so such remediation, Dr. Bland states, "should be undertaken across the class area" (Doc. 142-7, at 6). Drummond's rebuttal expert, Dr. Mark Travers explained that "the determination of whether a parcel of real estate, in this case a residential lot, needs remediation is based on data collected from each individual parcel" (Doc. 159-2, at 9). Further, Dr. Bland acknowledges in his deposition that remediation may require a "property-by-property evaluation" and, if undertaken, it is very likely some

properties would not require remediation at all (Doc. 164-12, at 253:2–11, 256:12–24).[20]

As concluded above, Feist's property class must fail because it is inadequately defined.[21] The vague definition, in turn, creates uncertainty as to the nature and amount of individualized inquiries that must be addressed, and thus leaves uncertain whether the individualized inquiries predominate. However, the class also suffers from significant predominance challenges.

### b. Superiority

For the final part of the analysis, Feist must establish that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). The superiority analysis focuses upon the relative advantages of proceeding as a class action suit over any other forms of litigation that might be realistically available to a moving party. *Sacred Heart Health Sys.*, 601 F.3d at 1183–84. As noted, in determining the superiority of the class action, the court may consider (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class

---

[20] At the hearing, Feist abandoned his request for actual remediation damages, instead requesting only the cost of remediation. However, the inquiry as to predominance is not materially different. In the same way Feist fails to explain how he proposes to calculate remediation damages class wide, there is no information of record that speaks to Feist's proposed method of calculating the cost of remediation for each separate property.

[21] In his motion, Feist also requests an issues class be certified in the alternative (Doc. 142, at 31–32). Because the property class fails for lack of ascertainability, Feist's alternative request for an issues class should also fail.

members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)–(D).

In this inquiry, the district court should consider its predominance analysis in determining whether a class action provides the superior mechanism for adjudicating the claims, as a finding of predominance of common issues tends to indicate superiority while a lack of predominance effectively ensures a lack of superiority. *Sacred Heart Health Sys.*, 601 F.3d at 1184 ("[T]he predominance analysis has a tremendous impact on the superiority analysis for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims both relative to other forms of litigation such as joinder or consolidation, and in absolute terms of manageability.") (internal quotations, internal citations, and internal alterations omitted); *Vega*, 564 F.3d at 1278 n.18 (noting that a lack of predominance effectively ensures, as a substantive matter, a lack of superiority); *Jackson*, 130 F.3d at 1006 n.12 ("The predominance and efficiency criteria are of course intertwined. When there are predominant issues of law or fact, resolution of those issues in one proceeding efficiently resolves those issues with regard to all claimants in the class.").

Accordingly, in light of the above-described concerns over the potential individualized issues, it is unclear whether the class procedure is superior to other methods of adjudication. *See Clausnitzer v. Fed. Express Corp.*, 248 F.R.D. 647, 662

(S.D. Fla. 2008) ("In light of the determination that individual issues of law and fact predominate over issues common among class members, the class procedure is not superior to other methods of adjudication."). Notably, it is reasonable to anticipate that the problematic individualized inquires could manifest into difficulties in the administrative feasibility of managing a class action here. Administrative feasibility is relevant to Rule 23(b)(3)(D)'s "manageability" factor. *Cherry*, 986 F.3d at 1301–04.[22] If the property class were to be certified, it would be difficult to identify who is even a member of the class given the vagueness of the definition and the lack of a clear trigger date, and it will be cumbersome to complete the final calculation of the property values for each of the alleged 1,000 properties at issue. Such considerations are important in considering administrative feasibility because "[a] difficulty in identifying class members is a difficulty in managing a class action." *Cherry*, 986 F.3d at 1303–04 (citing *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1126 (9th Cir. 2017)).

### 4. Certification pursuant to Rule 23(b)(2)

As to the actual remediation portion of the Property Class and the Medical Monitoring Class, Feist asserts class certification should be granted pursuant to Rule 23(b)(2). Under subsection 23(b)(2), class certification is appropriate where "the party opposing the class has acted or refused to act on grounds generally applicable

---

[22] This inquiry is not a standalone requirement, rather the "court must weigh any manageability concerns against the advantages of proceeding as a class action." *Rensel*, 2 F.4th at 1369. It is unnecessary to weigh these concerns against the advantages of a class action given the undersigned has recommended the class not be certified based upon the class definition which is neither clearly defined or ascertainable.

to the class, thereby making appropriate final injunctive relief . . . with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). As with classes certified under Rule 23(b)(3), a class certified pursuant to Rule 23(b)(2) must be adequately defined and clearly ascertainable as well as meet the requirements of Rule 23(a). Although this rule does not have the same superiority and predominance requirement of Rule 23(b)(3), the class proponent must still demonstrate that the claims are cohesive. *See Barnes v. American Tobacco Co.,* 161 F.3d 127, 143 (3d Cir. 1998).

"Injuries remedied through (b)(2) actions are really group, as opposed to individual injuries. The members of a (b)(2) class are generally bound together through 'preexisting or continuing legal relationships' or by some significant common trait such as race or gender." *Holmes v. Continental Can Company*, 706 F.2d 1144, 1155 (11th Cir. 1983) (quoting Note, Notice in Rule 23(b)(2) Class Actions for Monetary Relief: Johnson v. General Motors Corp., 128 U.Pa.L.Rev. 1236, 1252–53 (1980) (footnotes omitted)). Thus, "[o]pting out of a (b)(2) suit for injunctive relief would have little practical value or effect. Even class members who opted out could not avoid the effects of the judgment. A (b)(2) injunction would enjoin all illegal action, and all class members would necessarily be affected by such broad relief." *Id.* Accordingly, the class claims under this subpart "may require more cohesiveness than a [Rule 23](b)(3) claim . . . because in a Rule 23](b)(2) action, unnamed members are bound by the action without the opportunity to opt out." *Id.* Thus, a court should be hesitant to grant certification on this ground when individual issues and disparate factual circumstances are likely to overwhelm any

common issues. *See Barnes,* 161 F.3d at 143.

Feist alleges that certification of the Property Class as to actual remediation is appropriate pursuant to Rule 23(b)(2) which governs injunctive relief. As already noted, Feist withdrew his claim for actual remediation at the hearing and chooses to pursue the cost of remediation alone. However, even if the claim for actual remediation were not withdrawn, certification of the property class pursuant to Rule 23(b)(2) for property remediation would be inappropriate. As already discussed, Feist's property class definition is inadequate. Further, the property class presents potential individual issues that may be challenging to overcome. Additionally, as Drummond notes, many potential class members oppose remediation of their property and class wide relief would not be possible without infringing on some potential class members' property rights. While Feist may not be inadequate to represent the class in this respect as to the Rule 23(b)(3) portions of the Property Class, this issue is particularly acute given the lack of an opt-out right in Rule 23(b)(2) classes. However, because Feist abandoned this form of relief, the court need not address the merits.

Ultimately, the undersigned finds Feist's Property Class must fail for an inadequate class definition, which also creates uncertainty in clearly determining the predominance and superiority considerations. Thus, it is recommended that the Court not certify the Property Class.

### C. Medical Monitoring Class

As it pertains to Feist's Count V (medical monitoring), Feist seeks to certify the following class:

> **Medical Monitoring Class**: All persons who have lived in the [Class Area] for more than three cumulative years.[23]

(Doc. 142, at 17; Doc. 36, at ¶ 111). In support of his motion, Feist argues the classes should be certified pursuant to Fed. R. Civ. P. 23(b)(3) for injunctive relief in the form of a medical monitoring program (Doc. 142, at 8). Feist requests the Court exercise its "equitable powers to create, supervise, and implement" and for Drummond to fund "an appropriate medical monitoring plan" which would provide "routine medical testing, monitoring and study" of the class members for the remainder of each" class members' life (Doc. 36, at ¶ 175). Feist requests the program include:

> periodic physical examinations, clinical laboratory tests for appropriate biological markers, electrocardiograms, echocardiography, radionuclide cardiac imaging, CT Scans, MRI Scans, vascular ultra sound, lung perfusion scans, and biopsy and such other tests as to maximize the Plaintiffs and the Medical Monitoring Class Members' opportunity for early detection of such latent diseases, including cancer and thyroid disorders.

(Doc. 36, at ¶ 176).

To establish a claim for a medical monitoring fund, the plaintiffs must prove

---

[23] Feist amends the years from four years in the operative complaint to three in his motion for certification (Doc. 142, at 17 n.10). Feist explains that the Medical Monitoring Class definition has been modified to conform with his experts' opinions that all persons who have lived in the Class Area for more than three cumulative years require medical monitoring (Doc. 142, at 17 n.10). Ultimately, it is irrelevant to the conclusions drawn in this report and recommendation.

(1) exposure greater than the normal background levels; (2) to a proven hazardous substance; (3) caused by the defendant's negligence; (4) as a proximate result of the exposure, plaintiff has significantly increased risk of contracting a serious latent disease; (5) a monitoring procedure exists that makes the early detection of the disease possible; (6) the prescribed monitoring regime is different from that normally recommended in the absence of exposure; and (7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles. *See Petito v. A.H. Robins Co.*, 750 So. 2d 103 (Fla. Dist. Ct. App. 1999) (citing *Barnes*, 161 F.3d at 138–39).

Feist's paragraph 125 allegations mirror the elements of a Florida common law claim for medical monitoring:

> a. Plaintiffs and the Medical Monitoring Class Members have each been exposed to toxic and hazardous substances, including radioactive materials, at levels greater than normal background, due to Defendants' negligence in reclaiming the land and in handling, storing, use, disposal and/or failure to properly remediate such toxic and hazardous substances.

> b. The toxic and hazardous substances, including radioactive materials, at issue in this case are proven hazardous substances.

> c. As a proximate result of the exposure to toxic and hazardous substances, including radioactive materials, Plaintiffs and the Medical Monitoring Class Members have a significantly increased risk of contracting serious latent diseases, including, without limitation, cancer.

> d. The significant increased risk of contracting serious latent diseases, including, without limitation, cancer and thyroid diseases, makes periodic diagnostic medical examinations, testing and monitoring reasonable and necessary.

> e. A monitoring procedure exists that makes early detection of

these potential diseases possible.

> f. The prescribed monitoring regiment is different from that normally recommended in the absence of exposure to toxic and hazardous substances.

> g. The prescribed monitoring regiment is reasonable and appropriate according to contemporary medical and scientific principles.

(Doc. 36, at ¶ 125). Feist argues that the medical monitoring class should be certified primarily on the theory that "[r]adiation exposure is unlike exposure to other pollutants because there is no safe exposure level, making radiation exposure especially dangerous" (Doc. 142, at 30). In other words, individual dosage inquiries would be unnecessary because "it is more likely than not that every individual living in the [Class Area] for more than two cumulative years has sufficiently increased risk necessitating medical monitoring" (Doc. 142, at 30). To support this theory, Feist cites to Mr. Bland who opined that the annual above-background dose to average residents in the Class Area is between 250 to 270 millirem (Doc. 143-2, at 30–31), which is more than six-times EPA limits and exceed Florida's much more lenient limit of 100 mrem per year (Doc. 142-7, at 6–7; Doc. 143-2, at 30–31). Feist also relied on Dr. Dean W. Felsher who opined that "anyone exposed to ionizing radiation above this significant risk level, is at significantly elevated risk for multiple forms of cancer, including leukemia and thyroid cancer" (Doc. 143-5, at 27).

First, some decisions classify medical monitoring costs as an item of damage, the traditional remedy at law, precluding Feist from certification under Rule 23(b)(2). *See Ball v. Joy Technologies, Inc.*, 958 F.2d 36, 39 (4th Cir. 1991), cert.

denied, 502 U.S. 1033(1992); *Hagerty v. L & L Marine Servs., Inc.*, 788 F.2d 315, 319 (5th Cir. 1986). Additionally, the relief that Feist seeks is arguably not a group remedy. The putative class is composed of thousands of individuals with individual medical needs. It is questionable whether a medical monitoring program in this context would serve the purposes of Rule 23(b)(2), a system designed to be applied in situations where, for example, an "injunction would enjoin all illegal action, and all class members would necessarily be affected by such broad relief." *Holmes*, 706 F.2d at 1155.

Setting these issues aside, Feist's medical monitoring class fails for lack of cohesiveness. In contrast to Feist's strict liability or negligence claims, for which Feist seeks property damages, a necessary element of proving liability on Feist's medical monitoring claim is *exposure*, namely, exposure to "greater than the normal background levels" of a "proven hazardous substance." *Petito*, 750 So. 2d at 106. Feist's theory that individual dosage inquiries would be unnecessary does not meet this requirement. While it may well be true that "[r]adiation exposure is unlike exposure to other pollutants because there is no safe exposure level" (Doc. 142, at 30), each class member would still need to sufficiently demonstrate their own exposure to be successful in their claim. Even if a jury were to agree with Feist's theory, this showing would necessarily involve individual inquiry into the class member's presence in the Class Area for the requisite amount of time. Additionally, the remedy itself is not cohesive. Here, as in *Amchem Products, Inc. v. Windsor*, class members will "incur different medical expenses because their monitoring and

treatment will depend on singular circumstances and individual medical histories." 521 U.S. 591, 624 (quotations and citations omitted).[24] Similarly, in *Barnes*, the court noted the many individual issues involved in determining whether a monitoring program is "different from that normally recommended in the absence of exposure" precluded a finding of cohesiveness under Rule 23(b)(2). *Barnes*, 161 F.3d at 146.[25]

Feist cites to two out-of-circuit district court decisions certifying classes under other states' medical monitoring common law claims: *Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378 (D. Colo. 1993), and *Yslava v. Hughes Aircraft Co.*, 845 F. Supp. 705 (D. Ariz. 1993). Not only are these cases not based on Florida claims or binding precedent, but they are also not persuasive. The court in *Cook* provides only 96 words on the issue of the individualized nature of each class member's claim, stating that "common evidence would be required to establish the level and nature of injury or disease . . . and the causal connection, if any, between the release of the substances and any injuries or disease allegedly sustained." *Cook,* 151 F.R.D. at 388. The court concluded that "despite the fact that there would be some issues of individual proof, injunctive relief in the form of medical monitoring would seem appropriate to the class as a whole." *Id.* In *Ysalva*, the issue of cohesiveness is not

---

[24] Though *Amchem* was decided in the context of Rule 23(b)(3), class claims under Rule 23(b)(2) "may require more cohesiveness than a [Rule 23](b)(3) claim . . . because in a Rule 23](b)(2) action, unnamed members are bound by the action without the opportunity to opt out." *Barnes*, 161 F.3d at 142–43.

[25] Notably, the *Barnes* case involved a medical monitoring claim in Pennsylvania that required proof of the same seven elements recognized in Florida.

considered at all. *See Yslava*, 845 F. Supp. at 713.

By contrast, none of the courts which have had occasion to consider such a class under the Florida common law medical monitoring claim have chosen to certify the class. For example, in *Rink v. Cheminova, Inc.,* this Court denied certification of a Florida medical monitoring class, reasoning that "individualized considerations would so permeate the proof and thus work to alter and diminish the common questions that no finding of commonality is warranted." 203 F.R.D. 648, 661 (M.D. Fla. 2001). In particular, the court found the questions of (1) whether class members were exposed to greater than normal background levels and (2) whether a putative class member has a significantly increased risk of contracting a serious latent disease were individual inquiries. *Id.*; s*ee also Zehel-Miller v. Astrazenaca Pharms.*, LP, 223 F.R.D. 659 (M.D. Fla. 2004); *Perez v. Metabolife Int'l, Inc.*, 218 F.R.D. 262 (S.D. Fla. 2003) ("[V]arious individual factors will likely affect the level of medical monitoring, if any, that is appropriate for each specific individual.").

Accordingly, the undersigned finds Feist's Medical Monitoring Class fails for lack of cohesiveness and recommends the Court not certify this class.

## D. Fraud Class

Feist seeks certification pursuant to Fed. R. Civ. P. 23(b)(3) of a Fraud Class consisting of "All persons who purchased property in the Oakbridge or Grasslands Communities within 12-years of March 10, 2017" (Doc. 36, at ¶ 111). Within the Fraud Class, Feist asserts two counts: Count III (Fraud and Fraudulent Concealment) and Count IV (Negligent Misrepresentation) (Doc. 36, at 35, 39).

While each of Feist's counts require proof of slightly different elements, the essential common thread between all three is a requirement that the class members prove that they relied on Drummond's fraudulent statements or omissions.[26]

At the hearing on the motion for class certification, Feist's counsel recognized the difficulty of certifying a class based on allegations of fraud, noting that of the three classes he has put forth, the Fraud Class is the most difficult to certify. Indeed, Feist's motion for class certification gives short shrift to the Fraud Class, particularly as to the predominance inquiry. Feist summarily alleges that "[b]ecause the claim is based on an omission, as opposed to an affirmative misrepresentation, all class members are similarly affected, and class treatment is proper" (Doc. 142, at 25). In support, Feist cites to *Kluge v. Crews Lake Road & Bridge District*, No. 82 –933–CIV–T–15, 1985 U.S. Dist. LEXIS 22530 (M.D. Fla. 1985), a case in which the Middle District certified a class based on this omissions theory. In that case, the court reasoned that because the primary issues "revolve around

---

[26] A claim for common law fraud in Florida requires proof of the following elements: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and, (4) consequent injury by the party acting in reliance on the representation." *Jackson v. Shakespeare Foundation, Inc.*, 108 So. 3d 587, 587 n.2 (Fla. 2013). There are four elements of fraudulent misrepresentation: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010). To state a claim for negligent misrepresentation, the plaintiff must allege: "(1) misrepresentation of a material fact; (2) the representor must either know of the misrepresentation, must make the representation without knowledge as to its truth or falsity, or must make the representation under circumstances in which he ought to have known of its falsity; (3) the representor must intend that the representation induce another to act on it; (4) injury must result to the party acting in justifiable reliance on the misrepresentation." *Atl. Nat. Bank of Fla. v. Vest*, 480 So. 2d 1328, 1331–32 (Fla. Dist. Ct. App. 1985).

alleged omissions in standardized documents covering a bond issue… [t]he potential problem of having to demonstrate individual reliance for all individual class members has therefore been removed." *Id.* at *2. Additionally, the court rejected the argument that individual reliance would need to be proven and therefore would create individualized issues because plaintiffs brought their claims "only upon the alleged omissions in standardized documents" and defendants did not present any evidence that "some of the bond purchasers did not receive the offering documents[.]" *Id.* at *2–3.

*Kluge* seems to be the outlier. A decade later, another opinion in the Middle District of Florida rejected the *Kluge* rationale and refused to certify a class where the claims were based upon fraudulent omissions. *See Butterworth v. Quick & Reilly, Inc.*, 171 F.R.D. 319 (M.D. Fla. 1997). The Second District Court of Appeals later agreed with the *Butterworth* case, holding that "[t]he fact that the instant case involves alleged omissions rather than misrepresentations is irrelevant to the issue of class certification." *Humana, Inc. v. Castillo*, 728 So. 2d 261, 265 (Fla. Dist. Ct. App. 1999). "Florida law imposes a reliance requirement in an omissions case, *which cannot be satisfied by assumptions*." *Id.* (emphasis added). More recently, the Florida Supreme Court explained that in the omission or concealment context, "[r]eliance means that a plaintiff has entered a transaction in whole or in part because of the defendant's fraudulent conduct" and requires the plaintiff to have "received, believed, and acted upon" a misrepresentation made by the defendant. *Prentice v. R.J. Reynolds Tobacco Co.*, 338 So. 3d 831, 838 (Fla. 2022) (citations and

internal quotation marks omitted). Importantly, "there can be no reliance if the plaintiff is unaware of the defendant's misrepresentations until after the transaction is complete, or if the plaintiff would have acted the same way regardless of whether the defendant had made the misrepresentation." *Id.* (citation omitted).

Though Feist is required to prove reliance, that is not the end of the inquiry; in the Eleventh Circuit "the simple fact that reliance is an element in a cause of action is not an absolute bar to class certification." *Klay*, 382 F.3d at 1258. In *Kirkpatrick v. J.C. Bradford & Co.*, the plaintiffs sought class certification of their claim that various brokerage firms "disseminat[ed] materially misleading information" concerning the financial condition of a company in which the plaintiffs had purchased limited partnership interests. 827 F.2d 718, 720 (11th Cir. 1987). The Eleventh Circuit held that "the mere presence of the factual issue of individual reliance could not render the claims unsuitable for class treatment" where "each of the complaints alleges a single conspiracy and fraudulent scheme against a large number of individuals...." *Id.* at 724–25 (quotation marks and citations omitted). In *Klay*, plaintiffs sought certification of a class to pursue federal mail and wire fraud claims where defendants repeatedly claimed they would reimburse the plaintiffs for medically necessary services they provide to the defendants' insureds. *Klay*, 382 F.3d at 1259. The Eleventh Circuit found that common issues predominated, despite the fact that the plaintiffs were required to prove reliance to succeed in their claims. *Id.* The Eleventh Circuit reasoned that the misrepresentations were "simply that the defendants repeatedly claimed they would reimburse the plaintiffs for

medically necessary services . . . and sent the plaintiffs various EOB forms claiming that they had actually paid the plaintiffs the proper amounts." *Id.* The Eleventh Circuit noted, "[i]t does not strain credulity to conclude that each plaintiff, in entering into contracts with the defendants, relied upon the defendants' representations and assumed they would be paid the amounts they were due." *Id.* Because a jury could reasonably draw such an inference from "the nature of the alleged misrepresentations," reliance could be shown through circumstantial evidence common to the entire class. *Id.*; *see also James D. Hinson Elec. Contracting Co. v. BellSouth Telecomms., Inc.*, 275 F.R.D. 638, 646 (M.D. Fla. 2011) (allowing common proof of reliance through circumstantial evidence where the nature of the alleged misrepresentation was defendant's inclusion of amounts on bills which it could not legally recover).

However, where the reliance element is not as susceptible to common proof, courts have been unwilling to find that common questions still predominated. "[A] fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds of degrees of reliance by the persons to whom they were addressed." Fed.R.Civ.P. 23 advisory committee's note to the 1966 Amendment to subdivision (b)(3). When presented with such cases, "the Eleventh Circuit has repeatedly found class certification inappropriate." *In re Atlas Roofing Corp. Chalet Shingle Prod. Liab. Litig.*, No. 1:13-MD-2495-TWT, 2017 WL 2501755, at *10 (N.D. Ga. 2017). Additionally, the Eleventh Circuit recently distinguished *Klay* on the basis that in *Klay* "we stressed that the transactional

exchange between the physicians and the HMO hinged on the latter's payment guarantees, which served as the 'heart of the[ ] agreements' and was the 'very consideration upon which those agreements are based.'" *Tershakovec v. Ford Motor Co., Inc.*, No. 22-10575, 2023 WL 4377585, at *5 n.6 (11th Cir. 2023) (citations omitted). The court then reasoned that "[w]hile one who provides services in exchange for a payment relies only on the payment guarantee, a purchaser of a car may choose to rely on any of a number of marketing and branding representations." *Id.*

So too here. Feist alleges that "Drummond's failure to disclose the elevated levels of radiation blanketing the property forming the Oakbridge, Grasslands, and surrounding areas, despite knowledge of this contamination, constitutes fraud by omission" and without this, "Plaintiff Feist and the Fraud Class Members would not have purchased their property or continued to reside on this property to their detriment" (Doc. 36, at ¶ 155).[27] But "the decision to purchase real estate is a personal matter that may be based on a variety of factors." *Brinker v. Chicago Title Ins. Co.*, No. 8:10-CV-1199-T-27AEP, 2012 WL 1081182, at *6 (M.D. Fla. Mar. 30, 2012) (distinguishing *Klay*, holding that "it cannot be concluded from each class member's decision to close that he or she relied on any omissions or

---

[27] Feist also alleges that Drummond's "affirmative statements of fact contained in its written marketing and promotional materials … in sales conversations and negotiations with Plaintiff Feist and the Fraud Class Members, and the public, and in the March 22, 2017 Letter (attached as Ex. 1) constitute fraudulent misrepresentations" (Doc. 36, at ¶ 160). However, Feist's argument in support of certification is based on Drummond's alleged omission.

misrepresentations of the closing agent"). Here, the class members made their own assessment when deciding to purchase homes in Oakbridge and Grasslands. The class members' knowledge of the alleged contamination may have differed. Moreover, potential purchasers may have weighed the alleged contamination differently. It may have precluded purchase for some; for others, it may not have affected their consideration of the home. At any rate, it cannot be said that this omission went to "the 'heart of the[ ] agreements' and was the 'very consideration upon which those agreements are based.'" *Tershakovec*, 2023 WL 4377585 at *5 n.6. Unlike in *Klay*, the class will need to prove reliance through individual evidence. Thus, the undersigned finds that individualized issues will predominate with regard to the Feist's two fraud counts and recommends that Fraud Class not be certified.

## IV.   Recommendation

For the foregoing reasons, it is hereby

RECOMMENDED:

1.  Feist's Motion to Certify Class (Doc. 142) be DENIED.

2.  Drummond's Motion for Miscellaneous Relief, specifically to Exclude the Opinions of Plaintiff's Expert Dr. Jeffrey E. Zabel (Doc. 170) be GRANTED.

IT IS SO REPORTED in Tampa, Florida, this 25th day of August, 2023.

ANTHONY E. PORCELLI
United States Magistrate Judge

## **NOTICE TO PARTIES**

A party has fourteen days from the date they are served a copy of this report to file written objections to this report's proposed findings and recommendations or to seek an extension of the fourteen-day deadline to file written objections. 28 U.S.C. § 636(b)(1)(C).  A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  See 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).  **Should the parties wish to expedite the resolution of this matter, they may promptly file a joint notice of no objection.**


cc:    Hon. Thomas P. Barber
       Counsel of Record